No. 15-1802

# United States Court of Appeals for the Federal Circuit

RICHARD STORER, GILLES GOSSELIN, JEAN-PIERRE
SOMMADOSSI, AND PAOLA LaCOLLA,
*Appellants*,

*v.*

JEREMY CLARK,
*Appellee*.

**Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. 105,981**

**CORRECTED BRIEF FOR APPELLANTS RICHARD STORER, GILLES
GOSSELIN, JEAN-PIERRE SOMMADOSSI, AND PAOLA LACOLLA**

Calvin P. Griffith
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
cpgriffith@jonesday.com

Gregory A. Castanias
Jennifer L. Swize
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com
jswize@jonesday.com

Anthony M. Insogna
John D. Kinton
JONES DAY
12265 El Camino Real
San Diego, CA 92130
(858) 314-1200
aminsogna@jonesday.com
jkinton@jonesday.com

*Counsel for Appellants Richard Storer, Gilles Gosselin,
Jean-Pierre Sommadossi, and Paola LaColla*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellants Richard Storer, Gilles Gosselin, Jean-Pierre Sommadossi, and Paola LaColla certifies the following:

1.    The full name of every party or amicus represented in this appeal is:

> Richard Storer, Gilles Gosselin, Jean-Pierre Sommadossi, and Paola LaColla

2.    The names of the real parties in interest represented in this appeal are:

> Idenix Pharmaceuticals LLC, Universita Degli Studi di Cagliari, Centre National de la Recherche Scientifique, and Université de Montpellier

3.    The names of all parent corporations and any publicly held companies that own 10 percent of the party represented are:

> Merck & Co., Inc. is the parent company of Idenix Pharmaceuticals LLC

4.    The names of all law firms and the partners or associates that appeared for Appellants Richard Storer, Gilles Gosselin, Jean-Pierre Sommadossi, and Paola LaColla before the Patent Office or are expected to appear in this court are:

> JONES DAY:  Gregory A. Castanias, Thomas E. Friebel, Calvin P. Griffith, Anthony M. Insogna, John D. Kinton, Dale L. Rieger, Philip T. Sheng, Jennifer L. Swize
>
> Ashby & Geddes: Steven J. Balick, John G. Day, Andrew C. Mayo

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ............................................................i

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF RELATED CASES ............................................ viii

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF ISSUES ................................................................2

STATEMENT OF THE CASE............................................................3

    A.    Preliminary Statement ........................................................3

    B.    Idenix's Pioneering Work On HCV Drugs And Treatments ..............5

    C.    Idenix's Disclosures Relating To How To Make The Target Compound ...........................................................................7

    D.    Idenix's Actual Synthesis Of The Target Compound .......................14

    E.    Gilead's '218 Application ..................................................17

    F.    Declaration Of The Interference And The Board's Decision ...........22

    G.    Idenix's First § 146 Action.............................................29

    H.    This Appeal And Idenix's Second § 146 Action ...............................29

SUMMARY OF ARGUMENT ........................................................31

STANDARD OF REVIEW ..............................................................34

ARGUMENT ...................................................................................35

I.    IDENIX SHOULD BE ABLE TO PURSUE ITS § 146 ACTION IN DISTRICT COURT, SUCH THAT THIS COURT LACKS JURISDICTION OVER THIS APPEAL ....................................35

    A.    As Read By *Biogen*, The AIA Silently Eliminated The Longstanding Right To § 146 Review For Only A Subset Of Parties Without Any Rational Basis..................................36

    B.    *Biogen* Misread Two Limited Provisions Of The AIA.....................38

    C.    Disparate Elimination Of § 146 Review Lacks A Rational Basis .....42

II.    THE BOARD LEGALLY ERRED BY PLACING
       DETERMINATIVE WEIGHT ON ONLY A SUBSET OF
       EXPERIMENTAL EVIDENCE WHILE IGNORING OTHER,
       HIGHLY RELEVANT EVIDENCE ........................................................... 45

       A.    Idenix's Disclosures Would Have Enabled A Skilled Artisan To
             Make The Target Compound ............................................................ 46

       B.    The Board Erroneously Elevated Extrinsic, Non-Conclusive
             Evidence Over Conclusive Evidence From The Specification
             Itself ................................................................................................. 51

       C.    The Board Failed To Provide A Reasoned Justification For Its
             Decision ............................................................................................ 54

III.   SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE
       BOARD'S FINDINGS BASED ON GRIFFON'S EFFORTS .................... 58

CONCLUSION ..................................................................................................... 61

# TABLE OF AUTHORITIES

<div align="right">Page</div>

### CASES

*Abbvie Deutschland GmbH & Co. v. Janssen Biotech, Inc.,*
    759 F.3d 1285 (Fed. Cir. 2014) ........................................................36

*Agilent Techs., Inc. v. Affymetrix, Inc.,*
    567 F.3d 1366 (Fed. Cir. 2009) ........................................................36

*Alcon Research Ltd. v. Barr Labs., Inc.,*
    745 F.3d 1180 (Fed. Cir. 2014) .................................................50, 52

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
    239 F.3d 1343 (Fed. Cir. 2001) ........................................................58

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
    314 F.3d 1313 (Fed. Cir. 2003) ........................................................53

*Atlas Powder Co. v. E.I. DuPont de Nemours & Co.,*
    750 F.2d 1569 (Fed. Cir. 1984) ........................................................52

*Atmel Corp. v. Information Storage Devices, Inc.,*
    198 F.3d 1374 (Fed. Cir. 1999) .................................................47, 53

*Bankers Life & Casualty Co. v. Crenshaw,*
    486 U.S. 71 (1988).............................................................................42

*Biogen MA, Inc. v. Japanese Foundation for Cancer Research,*
    785 F.3d 648 (Fed. Cir. 2015) ...................................................passim

*Briggs v. Merit Systems Protection Board,*
    331 F.3d 1307 (Fed. Cir. 2003) ........................................................42

*Bruning v. Hirose,*
    161 F.3d 681 (Fed. Cir. 1988) ..........................................................34

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938)..................................................................61

*Estee Lauder, Inc. v. L'Oreal, S.A.,*
    129 F.3d 588 (Fed. Cir. 1997) ................................................37

*Fiers v. Revel,*
    984 F.2d 1164 (Fed. Cir. 1993) ..............................................52

*Galveston, Harrisburg & San Antonio Railway Co. v. Wallace,*
    223 U.S. 481 (1912)..................................................................39

*Gechter v. Davidson,*
    116 F.3d 1454 (Fed. Cir. 1997) ..............................................55

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.,*
    802 F.2d 1367 (Fed. Cir. 1986) ........................................46, 53

*Idenix Pharmaceuticals LLC. v. Gilead Pharmasset LLC,*
    No. 1:14-cv-00109-LPS (D. Del filed. Jan. 29, 2014) ...........29

*Idenix Pharmaceuticals LLC v. Gilead Pharmasset LLC,*
    No. 1:15-cv-00416-LPS-CJB (D. Del. filed May 21, 2015) .......30, 43

*In re Gartside,*
    203 F.3d 1305 (Fed. Cir. 2000) ........................................35, 57

*In re Lee,*
    277 F.3d 1338 (Fed. Cir. 2002) ..............................................55

*In re Reuning,*
    276 F. App'x 983 (Fed. Cir. 2008) ..........................................55

*In re Rouffet,*
    149 F.3d 1350 (Fed. Cir. 1998) ..............................................58

*In re Thrift,*
    298 F.3d 1357 (Fed. Cir. 2002) ..............................................55

*In re Wands,*
   858 F.2d 731 (Fed. Cir. 1988) ..................................................passim

*Johns Hopkins University v. Cellpro, Inc.,*
   152 F.3d 1342 (Fed. Cir. 1998) ..........................................58, 59, 60

*Martin v. Johnson,*
   454 F.2d 746 (C.C.P.A. 1972) ......................................46, 47, 53, 54

*Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.,*
   555 F. App'x 961 (Fed. Cir. 2014) ...................................................54

*Power Integrations, Inc. v. Lee,*
   797 F.3d 1318 (Fed. Cir. 2015) ..........................................54, 55, 57

*Randall Manufacturing v. Rea,*
   733 F.3d 1355 (Fed. Cir. 2013) ..................................................34, 51

*Romer v. Evans,*
   517 U.S. 620 (1996).......................................................................42

*Rosencrans v. United States,*
   165 U.S. 257 (1897).......................................................................39

*Streck, Inc. v. Research & Diagnostic Systems, Inc.,*
   659 F.3d 1186 (Fed. Cir. 2011) ......................................................36

*Troy v. Samson Manufacturing Corp.,*
   758 F.3d 1322 (Fed. Cir. 2014) ................................................30, 36

*United States v. Telectronics, Inc.,*
   857 F.2d 778 (Fed. Cir. 1988) ........................................................46

*University of Rochester v. G.D. Searle & Co., Inc.,*
   358 F.3d 916 (Fed. Cir. 2004) ........................................................47

## STATUTES

28 U.S.C. § 2106...............................................................................45

35 U.S.C. § 112 ................................................................24, 34, 46, 52

35 U.S.C. § 141 .........................................................................passim

35 U.S.C. § 142 ..................................................................................1

35 U.S.C. § 146 .........................................................................passim

America Invents Act of 2011 .....................................................passim

Administrative Procedure Act..................................................37, 54

## OTHER AUTHORITIES

37 C.F.R. §§ 1.302, 1.304 ...............................................................1

158 Cong. Rec. E2016 (daily ed. December 31, 2012) .........................40

## STATEMENT OF RELATED CASES

This appeal arises out of a patent interference, and is related to three other matters, all of which are pending in the U.S. District Court for the District of Delaware.  Those matters and this appeal involve the same real parties in interest: (i) Idenix Pharmaceuticals LLC, Universita Degli Studi Di Cagliari, Centre National de la Recherche Scientifique, and Université de Montpellier (for simplicity, "Idenix"), who are the assignees of the Storer *et al.* patent at issue (U.S. Patent No. 7,608,600), and (ii) Gilead Pharmasset LLC ("Gilead"), who is the assignee of Clark's application at issue (U.S. Patent Application No. 11/854,218). A1305 (Clark Notice of Real Party in Interest); A1329 (Storer Notice of Real Parties in Interest).  The three related cases are as follows:

(1)  This appeal concerns the same interference that is the subject of a district-court action seeking review under 35 U.S.C. § 146.  *See Idenix Pharmaceuticals LLC et al. v. Gilead Pharmasset LLC*, No. 1:15-cv-00416-LPS-CJB (D. Del. filed May 21, 2015).  On June 6, 2015, Gilead moved to dismiss that § 146 action for lack of subject-matter jurisdiction and in favor of the present appeal.  As of the date of this filing, the district court has not ruled on Gilead's motion.

(2)  This appeal is also related to another § 146 action arising out of an earlier interference.  *See Idenix Pharmaceuticals LLC et al. v. Gilead Pharmasset*

*LLC*, No. 1:14-cv-00109-LPS (D. Del. filed Jan. 29, 2014). That interference (*Sommadossi et al. v. Clark*, Interference No. 105,871—"the '871 interference") involves the same parties, same patent application families, and similar and overlapping issues as the interference underlying the present appeal. That interference involves compounds whereas the interference underlying the present appeal involves methods of treatment using those compounds. The district-court action for this earlier interference is scheduled for trial in October or December 2016.

(3) This appeal is related to a patent-infringement action and § 291 claim that Idenix filed against Gilead and Gilead Sciences, Inc. that involves the same Idenix patent at issue in this appeal and a Gilead patent related to the family at issue here. *See Idenix Pharmaceuticals LLC et al. v. Gilead Sciences, Inc. et al.*, No. 1:13-cv-01987-LPS (D. Del. filed Dec. 1, 2013). That action, which has been consolidated for pretrial purposes with No. 1:14-cv-00109, is also scheduled for trial in October or December 2016.

# <u>JURISDICTIONAL STATEMENT</u>

Appellants (collectively, "Idenix") appeal from the final judgment of the Patent Trial and Appeal Board, entered March 23, 2015, in favor of Clark (hereinafter, "Gilead") in Interference No. 105,981.  Idenix timely noticed its appeal under 35 U.S.C. § 141 on May 22, 2015.  35 U.S.C. § 142; 37 C.F.R. §§ 1.302, 1.304; *Biogen MA, Inc. v. Japanese Foundation for Cancer Research*, 785 F.3d 648 (Fed. Cir. 2015).  However, Idenix previously sought district-court review under 35 U.S.C. § 146, and believes that, by statute, the district court under § 146, rather than this Court under § 141, has jurisdiction to review the Board's judgment.  *See* Argument Part I, *infra*.  If § 146 district-court review is available to Idenix, this Court is without jurisdiction.

## STATEMENT OF ISSUES

1.    Does this Court, rather than the district court, have jurisdiction to decide Idenix's challenge to the Board's interference decision, where no act of Congress expressly eliminates the 200-year-old right to jurisdiction in district court, and the purported elimination of that right in the America Invents Act of 2011 ("AIA") depends on negative implication and irrationally applies to only a subset of patent applicants and holders based solely on the date an interference is declared, rendering that interpretation of the AIA unconstitutional?

2.    Where Idenix presented evidence showing that its specification, coupled with the knowledge of the hypothetical person of ordinary skill in the art, enabled synthesis of the target compound, did the Board commit legal error by (i) relying extensively on one set of allegedly failed experiments notwithstanding the specification's disclosures and evidence showing that others made the compound without difficulty, using substantially the same route taught by the specification, and (ii) failing to explain its extensive reliance on the one set of experiments?

3.    Do the allegedly failed experiments relied upon by the Board constitute substantial evidence of undue experimentation, where those experiments used a method that undisputedly would have obtained the target compound if used and analyzed by the hypothetical person of ordinary skill in the art?

## STATEMENT OF THE CASE

### A.    Preliminary Statement

Idenix's U.S. Provisional Patent Application No. 60/392,350 ("the '350 application") is enabling, and thus entitles Idenix to the benefit of that application's filing date for its U.S. Patent No. 7,608,600 ("the '600 patent"), which is the Idenix patent at issue in the underlying interference.  The '350 application discloses how to make the compound at issue—a compound that builds on Idenix's prior, pioneering research to develop modified nucleosides for the treatment of the hepatitis C virus ("HCV").  The '350 application discloses two bookends for making the target compound:  the chemical structure of the target compound itself, and a precursor compound only one step away from the target compound.  With these disclosures in hand, the hypothetical person of ordinary skill seeking to make the target compound would know to start with the precursor compound and apply a well-known chemical reagent to obtain the target compound in a single step.

The Board's decision is largely devoid of its view of this powerful, relevant evidence of enablement.  Instead, the Board primarily addressed, and relied on, experiments by an Idenix individual who allegedly failed to make the target compound, without weighing that evidence against the direction provided by the specification itself, or even against experiments of others who easily succeeded in making the target compound.  The Board's elevation of the subset of experimental

- 3 -

evidence over the specification constitutes legal error. The Board's failure to explain its near-complete reliance on that experimental evidence constitutes further legal error.

Idenix has requested de novo, district-court review of the Board's decision under 35 U.S.C. § 146. The recent panel decision in *Biogen*, however, held that interferences declared after September 2012 are limited to administrative-based review in this Court under 35 U.S.C. § 141, even though it is undisputed that interferences declared before then, as well as all derivation proceedings (the proceedings that replace interferences under the AIA), have the right to § 146 review. Idenix respectfully submits that the *Biogen* decision misapprehended the AIA. Indeed, if *Biogen*'s interpretation were upheld, the AIA would irrationally and arbitrarily distinguish between litigants, rendering the statute unconstitutional.

The need for proper review of the evidence of enablement is important not only for this case, but because there are earlier-filed proceedings between the parties on related issues that remain pending. Idenix requests that this Court reconsider its *Biogen* decision and hold that Idenix may pursue district-court review under § 146. If this Court nonetheless holds that it, rather than the district court, has jurisdiction, it should remand for the Board to correct its errors.

### B.    Idenix's Pioneering Work On HCV Drugs And Treatments

Idenix was founded by Dr. Jean-Pierre Sommadossi in May 1998.  Since its

inception, its primary focus has been on the discovery and development of antiviral

drugs to treat human viral diseases.  Diseases that have been at the center of

Idenix's research are those caused by HCV.  HCV is the leading cause of chronic

liver disease worldwide.  A101:59-60 (Idenix's '600 patent).  HCV causes a viral

infection that, over time, leads to cirrhosis and liver cancer.  A101:61-62.  An

estimated 170 million people are infected with HCV worldwide.  A101:65-66.

Cirrhosis caused by chronic HCV infection accounts for thousands of deaths per

year in the United States, and HCV infection is the leading indication for liver

transplants.  A101:67-A102:3.

In response to the significant global need for an effective way to treat HCV,

a team of researchers led by Dr. Sommadossi studied how structural modification

to natural nucleosides enables them to inhibit viral replication.  A152:41-153:12;

A56010-12 (Storer Decl. ¶¶ 6-8); A13863-65 (De Francesco Decl. ¶¶ 36-38).

Nucleosides are the building blocks of DNA and RNA.  A20262 (Dahma Decl.

¶ 33).  The following "Haworth projection" depicts the structure of an RNA

nucleoside[1]:

---

[1] A Haworth projection is a common way of representing the three-dimensional
perspectives of nucleosides.  A57705.  The depiction shows whether atoms are
attached above or below the plane of the pentagonal sugar ring.  Groups above the



A57704-05 (Dahma Decl. ¶¶ 16-17).

One way to stop the replication process is by using nucleoside analogs that mimic natural nucleosides in that they are incorporated into viral RNA, yet they block further extension of that RNA. A13862 (De Francesco Decl. ¶ 33). Synthetically modified nucleosides (also called "nucleoside analogs") have been known since the 1960s. A57706 (Dahma Decl. ¶¶ 20-23); A14906-07; A20574.

In 2000, Dr. Sommadossi and several collaborators discovered that nucleoside analogs with a methyl "up" at the 2′ position have potent anti-viral activity, and they filed pioneering patent applications on such analogs and their synthesis and utility. A13863-65; A14576-877. With the benefit of Idenix's groundbreaking research, numerous companies including Pharmasset, Inc.

---

plane (*e.g.*, the Base at the 1′ position in the depiction above) are in the "up" position, while groups below the plane (*e.g.*, the OH at the 2′ position) are in the "down" position. Hydrogen atoms are not depicted, and carbon atoms are represented by a vertex (a point where two or more straight lines meet). As the depiction above shows, the positions of the carbon atoms on the sugar ring are referenced as 1′ through 5′. Naturally occurring nucleosides used in the formation of RNA have hydroxyl (OH) groups at the 2′-carbon and 3′-carbon positions, as shown.

(Gilead's predecessor) and others have since focused on developing 2′-methyl "up" nucleosides for HCV treatment.[2]  A40593-94, A41080-82 (¶¶ 40-52, 62); A13871-72 (De Francesco Decl. ¶ 52).

In December 2001, Idenix scientists built on their foundational research and identified nucleosides with a methyl "up" and a fluoro "down" at the 2′ position as compounds of interest.  A56010-12 (Storer Decl. ¶¶ 6-8).  In 2002, the Idenix scientists and their collaborators submitted a series of patent applications regarding this research.  Filed on June 28, 2002, their '350 application was the first U.S. patent application specifically directed to treating HCV infections by administering an effective amount of a 2′-methyl "up", 2′-fluoro "down" nucleoside.  A8067. Approximately a year later, on June 27, 2003, Idenix filed the application that issued as the '600 patent—the Idenix patent involved in this interference.  A87-1212.  The '600 patent claims priority to the '350 application.  A87.

## C.   Idenix's Disclosures Relating To How To Make The Target Compound

The specification at issue—common to Idenix's '350 application and '600 patent—is detailed and specific.  It enables a person of ordinary skill to make the target compound by disclosing the chemical structure of the compound and a

---

[2] After it was acquired by Gilead, Pharmasset was renamed Gilead Pharmasset LLC.  This brief refers to both Pharmasset entities collectively as "Pharmasset."

precursor compound close to it, which one of ordinary skill would know how to modify with a single, well-known step to synthesize the target compound.

***The '350 application discloses the structure of the target compound.*** Both the '350 application and the '600 patent disclose the chemical structure of the target compound Idenix identified as useful for treating HCV (disclosing the formula of the compound of Count 1). A130; A148; A152-53; A1211-12; A8123-24; A8157-58; A20257-69 (Damha Decl. ¶¶ 15-60).[3] Consistent with those disclosures, an embodiment of that compound can be visually depicted as follows:



The methyl group, *i.e.*, one carbon atom bonded to three hydrogen atoms, is represented as "$CH_3$" (or in some cases as "Me"); the fluorine or fluoro group is represented as "F."

***The '350 application discloses a well-known precursor compound that is only one step away from the target compound.*** First, each synthetic scheme in the specification that describes synthesizing nucleosides with 2′ branched

---

[3] The disclosures of the '350 application and the '600 patent are virtually identical for purposes of the enablement issue on appeal, and the Board equated the two in its decision. Thus, hereinafter Idenix generally treats the two together.

modifications (such as the compound of Count 1), discloses a 2′-keto precursor, *i.e.*, a compound with "=O" at the 2′ position.[4]  A8185-86; A10017.  This compound is only two steps away from the desired 2′-methyl "up", 2′-fluoro "down" configuration.  A8185-86; A10017; A20271 (Dahma Decl. ¶¶ 67-68).

Then, each scheme discloses how to modify the 2′-keto precursor to obtain a well-known compound referred to by the parties as "Matsuda Compound 17." A20514; *see generally* A20510-18.  This compound was known since at least 1988.  A20501; A20514; A39486 (Marquez explaining that the Matsuda reference was publicly available since 1988).  It is undisputed that a person of ordinary skill in the art would have known that Matsuda Compound 17 is a viable precursor to the target compound.  A39537:20-A39538:7 (Marquez); A57455:25-A57456:21 (Wnuk).

As schemes 3, 4, and 8 each show, alkylation at the 2′ position of the 2′-keto precursor results in an alkyl group (such as a methyl group) opposite an OH group, as in the Matsuda compound.[5]  To elaborate:  The specification states that the

---

[4] The '600 patent discloses the same schemes as the '350 application, although scheme 8 in the '350 application is identified as scheme 9 in the '600 patent. *Compare* A10017 *with* A167; *see also* A161-62.

[5] The graphical depictions in these schemes, showing that the alkylation step results in the alkyl group ("$R^6$" in schemes 3 and 4 and "R" in scheme 8) in the "up" position and OH in the "down" position at the 2′ position, cover various reagents and reactions.  A8185-86; A10017.  But as discussed above, and as relevant here, if the alkylation reagent is methyl lithium (MeLi) or methyl Grignard

alkylation reagents include organolithium and Grignard reagents.  A8184:7-9;

A10017 (scheme 8 (showing that R is methyl and that b includes MeMgBr, also

known as methyl Grignard)).  As one in the art would know, when the desired

alkyl group is a methyl group, the alkylation step involves methylation and the

only possible organolithium reagent is methyl lithium.  A39910:17-23 (Wnuk).

Thus, when the 2′-keto precursors are methylated with methyl lithium or the

methyl Grignard reagent in this single step, the products include compounds

having a 2′-OH "up", 2′-methyl "down" configuration, e.g., Matsuda Compound

17.  A20271-72, A20275-26 (Dahma Decl. ¶¶ 64-69, 77-79); A18 (stating that the

product of methylating the 2′-keto precursor disclosed in the '350 application, i.e.,

"[t]he intermediate form 2 in Scheme A" in Damha's declaration, "corresponds to

Matsuda compound 17").  The following graphic shows the syntheses that the '350

application teaches for modifying a 2′-keto precursor to obtain the 2′-OH "up", 2′-

methyl "down" configuration of Matsuda Compound 17:

---

(MeMgBr) for methylation as taught by the specification, one of ordinary skill in
the art will obtain products with the orientation (i.e., "stereochemistry") of the OH
and methyl groups needed to synthesize the target compound using DAST or
Deoxo-Fluor.  Furthermore, the prior art teaches how to control the
stereochemistry of these groups. See, e.g., A20493-A20500 (Harry-O'kuru
referenced in scheme 8 at A10017); A20501-18 (Matsuda).  This is undisputed.
And as Gilead's expert testified, if DAST is run on the product of methylation with
methyl lithium, the graphical depiction of the stereochemistry of the precursor is
"irrelevant" to what the ordinary artisan would actually produce.  A39468:12-
A39471:11 (Marquez discussing the depiction of the reaction steps shown on
A37610, which he also testified was enabling at A39460:4-A39464:4).



A20271-72, A20275-26 (Dahma Decl. ¶¶ 64-69, 77-79); *see also* A40222-23,

A40251 (Wnuk Decl. ¶¶ 147-148, 230).

*The synthetic transformation reaction for modifying the Matsuda*

*compound to obtain the target compound was well-known.* The synthetic

transformation from Matsuda Compound 17 to the target compound involves only

a single-step reaction using a well-known reagent. A20271-72, A20275-26

(Dahma Decl. ¶¶ 64-69, 77-79); A57471:17-A57472:7; A57484:5-21. The target

compound differs from Matsuda Compound 17 at the 2′ position in only two ways.

In the target compound, (i) there is a fluorine rather than a hydroxyl (OH) group,

and (ii) the methyl group is "up" rather than "down." A57445:22-A57446:15;

A57449:5-14; A58867:10-21. The following comparison shows the differences:

Matsuda Compound 17          Claimed 2'-methyl "up", 2'-fluoro
                             "down" compound

Addressing those two differences required only a single step that was well

within the skill of the ordinary artisan.  At the time, the field of art was familiar

with techniques for modifying naturally occurring and synthetic nucleosides.  It

was well-known in the art that one could use a deoxyfluorination reagent, such as

"DAST" (N,N-Diethylaminosulfur Trifluoride) or its improved, second-generation

version known as "Deoxo-Fluor" (Bis(2-methoxyethyl)aminosulfur Trifluoride),

for such a one-step, OH-to-fluoro conversion.[6]  A12 n.24 (citing A41150-54); A16

n.34; A20620; A20630; A20726; A37024:11-14; A37617; A38925-27; A39026-

---

[6] Although not legally required, the '350 application and the '600 patent cite prior-
art references that disclose using DAST for deoxyfluorination of nucleosides,
including at the 2′ position.  A104; A158; A8072; A8166-67; A14958:7-11
("Fluorine is usually introduced into [nucleosides] . . . through replacement and
inversion of a stereochemically fixed hydroxyl group with [] (DAST) . . . .");
A16026:18-20 ("Direct introduction of a fluorine substituent can be accomplished
with fluorinating agents such as diethylaminosulphur trifluoride [(DAST)] . . . .").

29; A39532:20-A39533:2; A41159; A57465:12-16; A57471:17-A57472:7;

A57484:5-21; A57738 n.5; A57771; A57775-76; A57779; A57781.

DAST and Deoxo-Fluor were well-known by 2002 to (i) displace a hydroxyl

(OH) group with a fluorine atom and (ii) simultaneously invert the stereochemistry

so that the fluorine is in the opposite orientation of the hydroxyl group that it has

replaced.  For example, a hydroxyl group in the 2′ "up" position would be replaced

by a fluorine in the 2′ "down" position.  A12 n.24 ("DAST is a nucleophilic

fluorinating agent and acts by displacing the hydroxyl group and inverting the

position of the methyl group."); A37405:19-A37406:10.  In fact, DAST and

Deoxo-Fluor were the most common fluorination reagents used at the time for

chemical reactions where fluorine was sought in place of a hydroxyl group (hence

the name "deoxyfluorination" reagent).  A20273-75 (Dahma Decl. ¶¶ 70-76);

A37642-44 (2nd Dahma Decl. ¶¶ 78-88); A57471:17-A57472:7 (Wnuk confirming

that "(DAST) appears to be the most convenient and powerful reagent for

deoxyfluroination"); A37024:11-14 ("[I]t [is] true DAST was extensively used and

studied prior to June 28, 2002"); A39532:20-A39533:2; A57484:5-21.

It is undisputed, and a matter of scientific fact, that reacting Matsuda

Compound 17 with DAST or Deoxo-Fluor using standard techniques in the art

produces the target 2′-methyl "up", 2′-fluoro "down" nucleoside.  A39508:22-

A39510:5, A39523:8-A39524:24 (Marquez); A40285 (Wnuk Decl. ¶ 311);

A13642-3 ('218 application disclosing use of "a commercially available fluorinating reagent such as (diethylamino) sulfur trifluoride (DAST) or Deoxofluor"). The Board recognized this. It found that DAST and Deoxo-Fluor displace the hydroxyl group with a fluorine atom, and also cause the methyl to simultaneously invert. A12 n.24. This is exactly the same transformation that occurs when the Matsuda compound is reacted with DAST or Deoxo-Fluor. A20271-72, A20275-26 (Dahma Decl. ¶¶ 64-69, 77-79); A57484:5-21; A57471:17-A57472:7; A39533:3-13.

### D. Idenix's Actual Synthesis Of The Target Compound

After the Idenix scientists and their collaborators conceived that a 2′-methyl "up", 2′-fluoro "down" nucleoside would exhibit anti-HCV effect, but before they prepared the specification for their '350 application, they desired to make the compound. They gave Dr. Jean-Francois Griffon, a chemist at Idenix's Montpellier, France facility, the chemical structure of the desired compound, and asked him to synthesize it. A56267:12-A56270:4 (Dr. Storer explaining the assignment). No one expected this would be difficult. A56280:11-A56281:2. Indeed, in February 2003, Griffon tried a route later shown to work by Clark.[7]

---

[7] As addressed throughout this brief, Griffon's efforts, like those of other Idenix scientists tangential to the key deoxyfluorination method suggested by Idenix's specification, do not address whether the specification is enabling. In fact, Idenix presented that evidence in the earlier '871 interference, not in this interference, to show diligence in reducing its invention to practice for its priority case, not for

A41291 (Griffon February 2003 progress report—from structure 3 to structure 6a in the bottom scheme); *see* Statement of the Case Part E, *infra*.

Like Clark, Griffon started this route with a protected version of the well-known precursor, Matsuda Compound 17.  A41291 (structure 5); A39926:9-12; A39928:2-9 (Matsuda Compound 17).  Then, he reacted the protected Matsuda Compound 17 with Deoxo-Fluor.  A41291 (step c is identified as "Deoxo-Fluor").  As noted, it is undisputed that reacting Matsuda Compound 17 with Deoxo-Fluor would produce the target nucleoside.  *See* p. 13, *supra*.

In February 2003, however, Griffon reported to his supervisors that his attempt had failed.  As he stated, producing the target nucleoside from the Deoxo-Fluor reaction was "(very!) expected," but "unfortunately" the one new compound from the reaction that he analyzed was not the target compound.  A41289.

Griffon's results show that his reaction actually produced at least three other compounds that he did not analyze.  A56441:23-A56444:12.  And as Griffon admitted in his deposition, it was not possible to know whether he had in fact made the compound, because he did not analyze all of his reaction products.  A56443:20-A56444:9.

---

purposes of enablement.  Gilead, however, submitted that evidence in this interference to argue undue experimentation, and the Board relied on it.  *See* Statement of the Case Part F, *infra*.  Accordingly, Idenix summarizes the evidence here.

At the time, however, with the misunderstanding that Griffon's Deoxo-Fluor reaction failed, Idenix consulted with experts in the field.  A56280:24-A56281:15 (deposition of Dr. Storer).  Dr. Paul Coe, one of the scientists they consulted, independently identified the same deoxyfluorination transformation reaction that Idenix's '350 application suggested and that Griffon tried.[8]  A41387 (suggesting DAST for the sugar route to avoid "pyrimidine ring" (*i.e.*, base) participation in the nucleoside route).[9]  Griffon ultimately tried several other schemes that did not use the 2′-keto compound or the 2′-OH "up", 2′-methyl "down" compound, *e.g.*, Matsuda Compound 17, and thus have nothing to do with the path one of ordinary skill would take with the specification in hand.  A56044-67 (Griffon Decl. ¶¶ 10, 37, 42, 44, 53, 94).

After becoming frustrated with Griffon's efforts, Storer transferred the project to another scientist, Dr. Alistair Stewart, at a different Idenix facility.  A48111:20-24.  Between December 2004 and January 2005, Dr. Stewart worked to synthesize the compound; like Clark, he used DAST as the deoxyfluorination reagent.  A55734-35; A55760-61.  Then, in January 2005, Jingyang Wang, another

---

[8] Each of the '350 application, '600 patent, and Clark's '218 application discloses the use of a "sugar" or carbohydrate route and a pre-formed nucleoside route. A8183-86 (*e.g.*, schemes 3 and 4 of the '350 application); A161-62 (*e.g.*, schemes 3 and 4 of the '600 patent); A13638-44 ('218 application).  For purposes of the issues on appeal, the deoxyfluorination transformation is the same for both routes.

[9] Significantly, this was the very reaction Clark first used.  A37610 (compounds 43, 46, and 47); A40270-73 (Wnuk Decl. ¶¶ 294-96).

Idenix researcher, also used DAST, and she successfully synthesized the desired

compound on her initial attempt.  A17; A38765-68; A38891:15-19; A38774

(Scheme B).  Ms. Wang did not have a Ph.D., and the successful DAST reaction

was her first-ever attempt to fluorinate a nucleoside.  A38770; A38901:17-19.

### E.    Gilead's '218 Application

Pharmasset has long monitored Idenix's research.  A40593-94; A41082.  In

2002-2003, after Idenix filed its '350 application, Jeremy Clark was working at

Pharmasset as a junior chemist.  A39826 ¶¶ 29-30.  Clark has a master's degree

rather than a Ph.D.  A39633:2-5.

According to Gilead, around November 2002, Clark "had an idea" that a 2′-

methyl "up", 2′-fluoro "down" nucleoside might be effective in treating HCV, and

he later submitted a series of patent applications on the compound he claimed to

have invented.  A39827 ¶ 31.  First, Clark wrote down the structure of the

compound around December 6, 2002.  A39827 ¶¶ 31-34.  Then, by January 31,

2003, Clark had arrived at what Gilead describes as an enabling method of

synthesis.  A39828-30 ¶¶ 38-43.  This method is described in Gilead's U.S. Patent

Application No. 11/854,218 (the "'218 application"), which claims priority to May

2003.  A13571-A13783.  Like Idenix's '600 patent, the '218 application claims

methods for treating HCV by administering an effective amount of a 2′-methyl

"up", 2′-fluoro "down" nucleoside.  A13692-707.  Clark is the sole named inventor

on the '218 application.  A41072.

Clark's method relies on the same deoxyfluorination transformation as

Griffon tried.  That transformation is summarized and depicted in a section entitled

"Modification of a pre-formed nucleoside," as the following reproduction shows:



A13641-42.  The '218 specification teaches that "[t]he starting material for this

process . . . can be purchased or can be prepared by any known means [and] can be

optionally protected with suitable protecting groups . . . by methods well known to

those skilled in the art, as taught by [the literature]."  A13642.  This process is also

shown in scheme 4 of the '218 application, where compound 4-2 (the 2′-keto precursor) is methylated in Step 3 to form the Matsuda compound.  A13648-50.

As such, the '218 application teaches that a 2′-keto precursor can be methylated using methyllithium or methylmagnesium bromide (*i.e.*, MeMgBr, a.k.a. the methyl Grignard reagent) to form Matsuda Compound 17.  A13642-43. This is identical to the step described in the '350 application, as the following comparison shows:



A8184-86; A10017; A13641-43; A13648-50.

The '218 specification further teaches:  "Step 5 introduces the fluorine atom at the 2′ position of the pre-formed nucleoside.  This can be achieved by treatment of the tertiary alcohol ("2-4") with a commercially available fluorinating reagent such as (diethylamino )sulfur trifluoride (DAST) or Deoxofluor . . . ."  A13643. Clark's nucleoside labeled 2-4, p. 18 *supra*, is the same as the known Matsuda Compound 17, with the only difference being Clark's addition of protecting groups

(Pg). A13643 (lines 12-18). Protecting groups stop atoms from being reactive, and it was well-known in the art how to add and remove protecting groups. *Id.*; *see also* A57456:25-A57457:7 (Wnuk). Schemes 3, 4, and 8 of the '350 application also depict adding and removing protecting groups. A8184-86; A10017. As Step 5 shows, Clark then introduced a fluorine atom at the 2′ "down" position by reacting his protected Matsuda Compound 17-equivalent with either "DAST" or "Deoxofluor." A13643. Following Step 5, "the [target 2′-methyl "up", 2′-fluoro "down" nucleoside] can be deprotected by methods well known to those skilled in the art, as taught by [the literature]." A13644.

Importantly, Gilead concedes—indeed, asserts—that this method of synthesis described in the '218 application is enabling. A39460:4-A39462:16 *see also* A37610 at 4 (Compound 43 to 46 to 47). Gilead concedes that this method is enabling even without disclosures of such details as temperature, protecting groups, methods of deprotecting, or solvents for the DAST reaction. In presenting its priority case in the related '871 interference, Gilead relied on a Pharmasset report dated January 31, 2003, to show an enabling conception by Clark. A37607-16; A39460:4-A39464:4. As Gilead's expert testified, the scheme shown in the report enabled one of ordinary skill in the art to synthesize a 2′-methyl "up", 2′-fluoro "down" nucleoside without undue experimentation. A39459:24-A39465:2 (Marquez discussing the report, marked as "Exhibit 2108" in the '871

interference).  This scheme does not recite temperature or solvents or other details for the DAST reaction.

The deoxyfluorination transformation that Clark identified and described in his '218 application (and is shown in the Pharmasset report) is substantively identical to the deoxyfluorination transformation attempted by Griffon.  That is, with knowledge of the chemical structure of the target compound as disclosed in the '350 application, both Clark and Griffon understood to make a 2′-OH "up", 2′-methyl "down" precursor, which Clark reacted with DAST and Griffon reacted with Deoxo-Fluor.  A13642 (Scheme 2); A13643:19-27.  As noted, it is undisputed that reacting the 2′-OH "up", 2′-methyl "down" precursor with either one of these deoxyfluorination reagents produces the target 2′-methyl "up", 2′-fluoro "down" configuration.  *See* p. 13, *supra*.

The similarities between Clark's enabling method of synthesis and the deoxyfluorination synthesis attempted by Griffon are not coincidental.  When presented with the chemical structure of a target compound and tasked with finding a method of synthesizing that compound, the hypothetical person of ordinary skill, especially when armed with the '350 or '600 specification, would know to start with compounds closest in structure to the target compound and apply known chemical reagents with known properties.  That person would have known to react a 2′-OH "up", 2′-methyl "down" precursor such as the Matsuda compound, which

was disclosed in the specification, with either DAST or Deoxo-Fluor, which were the most common deoxyfluroination reagents at the time. A37024:11-14; A39532:20-A39533:2; A57471:17-A57472:7; A57484:5-21.

### F.    Declaration Of The Interference And The Board's Decision

In August  2013, Gilead requested an interference between its '218 application and Idenix's '600 patent. On December 3, 2013, the Board declared the interference, designating Idenix as the senior party and Clark as the junior party. A2. Count 1, the only count, recites claim 1 of Idenix's '600 patent and in the alternative claim 164 of Gilead's '218 application. A2-4; A1211; A41068-70. As defined in Count 1, the compounds at issue are nucleosides having two substitutions at the 2′ position of the sugar ring, specifically, a 2′-methyl "up" and a 2′-fluoro "down."

Gilead moved to deny Idenix the benefit of the filing date of its '350 application on the ground that the disclosures were not enabling. A3054. Addressing the adequacy of the '350 application, the parties submitted dozens of exhibits, including numerous prior-art references and testimony from experts addressing the disclosures of the application and the knowledge of a hypothetical person of ordinary skill in the art. A3065-72 (Gilead's motion); A3535-46 (Idenix's response); *see also* A3903-08 (Gilead's reply). Gilead also pointed to evidence of Griffon's efforts that Idenix had submitted in the earlier interference

with respect to diligence, not enablement; according to Gilead, because Griffon was allegedly unable to make the compound for several years, Idenix's application was not enabling because one skilled in the art required undue experimentation to make a target compound. A3065-72. But as Idenix explained in response, regardless what any specific scientist did, "[t]he issue here is whether undue experimentation is required as to the skilled artisan," and "[a]pplying the well known DAST deoxyfluorination method to known Matsuda Compound 17 as directed by the structure itself is simply not undue." A3543. As one example, Idenix pointed to Wang's easy success in making the target compound by that route on her first attempt. A3538 (citing A38775-77 ¶¶ 17-20; A38863:5-11). Idenix also pointed out that "Clark, a chemist without a Ph.D., was allegedly able to make [the target] nucleoside in just a few months and with very little effort using DAST." A3538 (citing A39633:2-3; A39837-39 ¶¶ 32, 39, 41).

The Board declined the parties' joint request for an oral hearing. A3997-98. On January 16, 2015, the Board issued its decision. A1-66. Consistent with both parties' proposals, the Board defined the hypothetical person of ordinary skill in the art as "highly sophisticated" and having a level of skill that is "very high": the ordinary artisan "hold[s] a doctoral degree in the field of organic, synthetic, or medicinal chemistry with at least a year's experience in the field of nucleoside synthesis or relevant drug discovery [or] . . . a master's degree in one of those same

- 23 -

fields with at least three years of practical experience in the field of nucleoside synthesis or relevant drug discovery."  A29-30; A34.

Turning to enablement, the Board determined that a person of ordinary skill in the art would not have been able to make any nucleoside of Count 1 without undue experimentation as of the June 28, 2002 filing date of the '350 application, and on this sole basis granted Gilead's motion to deny Idenix the benefit of that filing date.  A35-36.

In reaching its conclusion, the Board largely sidestepped the primary evidence of the '350 application that is critical, under 35 U.S.C. § 112, to evaluating whether the specification is enabling to a hypothetical person of ordinary skill in the art.  After pointing out the parties' unremarkable agreement that the '350 application "provides no explicit disclosure or example" of how to synthesize a compound of Count 1 (A8), the Board examined the prior art and a handful of experiments for actual synthesis of the target compound.  According to the Board, "[f]ailure to synthesize a single embodiment of the compounds recited in Count 1" would answer whether the '350 application was enabling.  A8.  From that premise, the Board evaluated enablement based on actual attempts to synthesize the target compound, largely irrespective of the specification's disclosures.

In particular, in finding undue experimentation under the factors set forth in *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988), the Board repeatedly relied on Griffon's allegedly failed efforts, even though Griffon arrived at the route enabled by the '350 specification without having the specification in hand.  A35 (relying on Griffon for three of the five factors the Board considered).  The Board relied on Griffon's efforts almost to the exclusion of any of the other evidence submitted by either side, including the primary, intrinsic evidence of the specification itself.

- With respect to the first *Wands* factor—the quantity of experimentation necessary for a skilled artisan to arrive at the invention[10]—the Board recited the parties' arguments (A9-14) and concluded, based almost exclusively on Griffon's allegedly failed reactions of "[Matsuda] compound 17 with DAST," that "a high amount of experimentation is necessary to synthesize" the claimed compound.[11]  A18-19; A34 (determining that "at least two years" of experimentation was required).

---

[10] Gilead and the Board numbered the *Wands* factors differently.  This brief follows the Board's numbering.

[11] Adopting Gilead's misleading terminology used in its papers, the Board characterized Griffon's efforts as those of an "Idenix team" or "group" working to synthesize the compound.  A19; A23.  As the record reflects, only Griffon was running the experiments to synthesize the target compound.  A56265:5-10.  His "team" was comprised of lower-skilled technicians making precursor compounds or handling other tasks.  A56268:21-A56269:3; A56348:24-A56349:4; A56083-84.

To the extent the Board included Wang in the "team," she was successful.  To the extent the Board included Dr. Coe, he explicitly suggested the use of DAST, which

- With respect to the second *Wands* factor—the amount of direction or guidance presented—the Board again recited the parties' arguments, which largely concerned the '350 disclosures, other published art, and expert testimony regarding the specification itself. A19-23. But in concluding that the application does not guide one of skill in the art how to synthesize the target compound, the Board diverged from the parties' arguments and, in a one-paragraph analysis, again relied on Griffon's "fail[ure] to synthesize such a compound for approximately two years subsequent to the submission of the ['350] application." A23. The Board emphasized that Griffon was not successful at reacting Matsuda Compound 17 with Deoxo-Fluor: Griffon "attempted the very syntheses that Idenix's expert Dr. Damha states would be suggested by the disclosures of the ['350 application], but w[as] unable to successfully synthesize the target molecule." A23-24.

- With respect to the seventh *Wands* factor—the predictability or unpredictability of the art—the Board once again restated the parties' arguments (A30-33), but then, in a single sentence, ruled against Idenix on the same grounds as above. The Board found that "Idenix's

---

Clark used and which works. As shown *infra*, this positive evidence seems to have been misunderstood.

repeatedly unsuccessful attempts to synthesize" the target compound showed that the art was unpredictable, and it added that "the statements of Dr. Coe and Dr. Storer" further showed this.  A33-34; *see also* A41386-41402; A41451-57.

Throughout its analysis, the Board wholly failed to take into account Clark's ability to make a nucleoside of Count 1 using a synthesis that is enabled by Idenix's disclosures, despite the fact that Clark's success directly contradicted the evidence of Griffon's alleged failures.  In summarizing the parties' arguments with respect to the first *Wands* factor, the Board noted that Idenix had raised Clark's success using a method consistent with the '350 application's disclosures as evidence of enablement.  A13 (citing A39633:2-3; A39827-29 ¶¶ 32, 39, 41).  Yet, in its analysis, the Board did not address Clark's success, nor explain why Clark's success should be ignored and why it gave determinative weight to Griffon's experiments over Clark's success.

The Board's reliance on Griffon is deficient in additional ways.  The Board did not contend with the facts that, although Griffon reported that he did not obtain the target compound, he testified that he actually did not know if the reaction failed as he simply did not analyze all of his reaction products (A56441:23-A56444:12), and he did precisely what an ordinary artisan would do—he reacted Matsuda Compound 17 with Deoxo-Fluor—which would produce the target nucleoside.

- 27 -

A39524:10-24 (Marquez).  Nor did the Board adequately contend with Wang's

success; on her first attempt, she identified and used DAST even after knowing

about perceived Griffon's failures, and successfully synthesized the target

compound with that reagent.  A38768; A38891:15-19; A38774.  The Board

dismissed Wang's success because she followed Griffon (A17), but the fact that

she did, still chose the DAST route, and succeeded undermines reliance on

Griffon's efforts.  The Board also failed to explain why Idenix's primary evidence

showing that the '350 application disclosures, including the chemical structure of

the target 2′-methyl "up", 2′-fluoro "down" nucleoside and how to make the crucial

precursor Matsuda Compound 17, themselves were not enabling, irrespective of

any of the experimental evidence submitted by either party.

       After ruling that the '350 application was non-enabling, the Board ruled that

all of Idenix's involved '600 patent claims were not enabled for the same reasons,

and thus not patentable.[12]  A38-40.

---

[12] Although the Board's "Conclusion" states that it found the '600 patent both non-enabled and lacking written description (A64), the Board in fact addressed only non-enablement.  A35-36.  Thus, only non-enablement is at issue on appeal.

The Board's non-enablement determination affected other motions, so a remand would necessarily require remand on those motions as well.  *See* A49-50 (Storer's motion to substitute count B); A50-51 (Storer's motion that the '600 patent anticipates the claims of Clark's '218 application); A51-53 (Storer's motions to add claim 14 and an application); A63-65.

In February 2015, Idenix informed the Board that it would not pursue a priority case before the Board.  A4268.  Instead, Idenix intended to preserve its resources and seek district-court review under 35 U.S.C. § 146, which is what Idenix elected to pursue for the earlier '871 interference after the Board similarly reached an erroneous determination on enablement.  On March 23, 2015, the Board entered judgment in favor of Gilead.  A76-80.

### G.     Idenix's First § 146 Action

Meanwhile, Idenix's first § 146 action is well under way.  That action arises out of the '871 interference involving nucleosides used in the methods at issue here.  The Board declared that interference in February 2012 and entered judgment against Idenix in January 2014.  That same month, Idenix filed its § 146 complaint.  Over the past two years, the parties have been steadily engaged in discovery and other pre-trial matters.  Fact discovery is set to close in December 2015; case-dispositive motions will be argued in July 2016; and trial is scheduled for October or December 2016.  *See Idenix Pharms. LLC et al. v. Gilead Pharmasset LLC*, No. 1:14-cv-00109-LPS, Dkt. No. 39 at 9-12 (D. Del. Oct. 1, 2014).

### H.     This Appeal And Idenix's Second § 146 Action

After the Board entered judgment in the interference underlying this appeal, Idenix intended to (and ultimately did) seek § 146 review.  In this second § 146 action, Idenix could have sought consolidation with the already pending § 146

action.  Also, even though not needed to demonstrate error in the Board's decision, Idenix could have submitted new evidence to prove that Griffon in fact made the target compound.  *See Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1325, 1327-28 (Fed. Cir. 2014).

Before Idenix's time for appeal had run, however, a panel of this Court decided *Biogen MA, Inc. v. Japanese Foundation for Cancer Research*, 785 F.3d 648 (Fed. Cir. 2015), holding that the AIA eliminated district-court subject-matter jurisdiction over actions filed pursuant to § 146 for interferences declared, like here, after September 15, 2012.[13]  In order to protect its rights including its preference for § 146 review, Idenix filed both a § 146 complaint in district court on May 21, 2015, and the next day filed a protective § 141 notice of appeal to this Court.  As Idenix noted in both its § 146 complaint and its § 141 notice of appeal, it would prefer to proceed in district court under § 146 if § 146 review is available to it.  No. 15-1802, Doc. No. 1-2 at 1 n.1; *Idenix Pharmaceuticals LLC et al. v. Gilead Pharmasset LLC*, No. 1:15-cv-00416-LPS-CJB, D.I. 1 at 3 n.1 (D. Del. May 21, 2015).

---

[13] The appellant in the *Biogen* case subsequently sought en banc review, which was denied.  On November 9, 2015, the appellant filed a petition for a writ of certiorari. *See Biogen MA, Inc. v. Japanese Foundation for Cancer Research*, No. 15-607 (U.S.).

## SUMMARY OF ARGUMENT

I.      This Court has jurisdiction over this appeal only if the district court does not have jurisdiction under § 146.  Although *Biogen* held that § 146 review is not available to interferences declared after September 15, 2012, that decision misapprehended the AIA.  Under the clear statutory language, including the two specific provisions on which *Biogen* relied that address other matters, the AIA did not eliminate § 146 review for any interferences.  If it did eliminate § 146 review for parties like Idenix here, there would be no rational basis for that arbitrary distinction based simply on the date the Board declared the interference, and the statute should be held unconstitutional.  The *Biogen* appeal did not present, and the *Biogen* panel did not reach, this constitutional issue.

The substantive issues on appeal do not turn on the availability of § 146 review—the Board's errors warrant remand under the standards governing this Court's review under § 141.  Idenix raises this jurisdictional issue because it is nonetheless entitled to § 146 review.  In the event the Supreme Court alters *Biogen* or this Court reverses its holding from that case, Idenix requests that the Court transfer this case to the District of Delaware for review under § 146.

II.     If the *Biogen* decision is not altered and the Court has jurisdiction over this appeal, it should vacate the Board's judgment, which was premised on non-enablement, and remand.  Idenix was the first to conceive of and the first to

constructively reduce to practice by filing an application on 2′-methyl "up", 2′-fluoro "down" nucleoside compounds and their use for treating HCV.  In its '350 application and its '600 patent, Idenix disclosed the chemical structure of the compound at issue, as well as other information sufficient to enable a hypothetical person of ordinary skill to make the compound without undue experimentation. Indeed, the specification disclosed how to make a well-known precursor compound that is *only one synthetic step away* from the target compound, and it is undisputed that two reagents that, when applied to the precursor, produce the target compound were also well-known.  In short, with the information from Idenix's disclosures, an ordinary artisan, who the Board found is highly skilled, would have known how to make and could have made the compound at issue.

The Board did not grapple with the '350 application's disclosures and the understanding of a hypothetical person of ordinary skill in the art.  Instead, it appeared to believe that a subset of extrinsic, non-hypothetical experiments was more important, or even dispositive:  The Board repeatedly relied on the alleged failures by Griffon to make the target compound, regardless of the disclosures in the '350 application.  But the critical inquiry for enablement is whether the *specification*, coupled with the knowledge in the art, enables a person of ordinary skill to make the target compound.  The Board failed to explain whether and how it weighed Griffon's efforts against that more relevant dispute about the sufficiency

of Idenix's disclosures.  To the extent the Board believed that the target compound had to already be in the prior art for the specification to be enabling, this misapplied the governing legal standard.

To make matters worse, the Board failed to explain its almost-singular reliance on Griffon's efforts over those of any others, particularly where Griffon's own testimony undermines his initial report that his deoxyfluorination reaction failed to produce the target compound.  Compare that to the other experimental evidence:  In addition to Wang, Clark succeeded using a method virtually identical to the route that Idenix's expert said one of ordinary skill would have identified in view of Idenix's disclosures and the prior art, and to a route that Griffon identified.  In focusing so narrowly on one set of experiments, the Board failed to confront, much less explain any dismissal of, Clark's and Wang's countervailing successes.  And because the parties are engaged in a series of disputes related to this matter, the Board's legal error in failing to explain its view of Idenix's primary argument, and its near-exclusive reliance on its erroneous interpretation of Griffon's attempts, is highly prejudicial.

III.    An additional error warrants vacatur and a remand:  Griffon's alleged failures do not constitute substantial evidence to support the Board's findings.  Griffon followed a method that was successful for Clark and that, as Gilead's expert agrees, works if performed by one of ordinary skill in the art.  Thus, the

only conclusion to draw is either that Griffon was successful and did not know it, or that he was not acting as a person of ordinary skill in the art. In either case, the answer does not change the dispositive question: Is the '350 application, coupled with the ordinary skill and knowledge in the art, enabling to make the compound in question? The answer is "yes."

## STANDARD OF REVIEW

The Court reviews "the Board's compliance with governing legal standards de novo." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).

Under 35 U.S.C. § 112 (now § 112(a)), "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . ." Enablement is a question of law involving underlying factual findings. *Bruning v. Hirose*, 161 F.3d 681, 686 (Fed. Cir. 1988). Factual considerations for determining whether experimentation is undue include:

(1) the quantity of experimentation necessary,

(2) the amount of direction or guidance presented,

(3) the presence or absence of working examples,

(4) the nature of the invention,

(5) the state of the prior art,

(6) the relative skill of those in the art,

(7) the predictability or unpredictability of the art, and

(8) the breadth of the claims.

*In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1998).

The Court reviews the Board's legal conclusion of enablement de novo and its underlying factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1313, 1315 (Fed. Cir. 2000). "'[S]ubstantial evidence' review involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Id.* at 1312. In addition, the Board "must explicate its factual conclusions, enabling [this Court] to verify readily whether those conclusions are indeed supported by 'substantial evidence.'" *Id.* at 1314.

## ARGUMENT

## I.    IDENIX SHOULD BE ABLE TO PURSUE ITS § 146 ACTION IN DISTRICT COURT, SUCH THAT THIS COURT LACKS JURISDICTION OVER THIS APPEAL

*Biogen MA, Inc. v. Japanese Foundation*, 785 F.3d 648 (Fed. Cir. 2015), held that the AIA eliminated district-court jurisdiction under § 146 to review interferences declared, as here, after September 15, 2012. Idenix respectfully submits that this panel decision is wrong. Nothing in the statute or its legislative history indicates any intent, express or implied, to eliminate the 200-year-old right

to § 146 district-court review.  If the Court believes that *sua sponte* en banc review would be appropriate, it should hold that the AIA did not eliminate § 146 review for any interferences.  In the alternative, if *Biogen*'s interpretation is applied, its arbitrary elimination of § 146 review for one subclass of patent holders and applicants lacks a rational basis, and the Court should hold that the statute is unconstitutional.

### A.    As Read By *Biogen*, The AIA Silently Eliminated The Longstanding Right To § 146 Review For Only A Subset Of Parties Without Any Rational Basis

For almost two centuries, applicants and patentees have had the right to choose between two alternate forms of review if their applications or patents are subject to an interference:  review in district court (under § 146) or a direct appeal (under § 141).  *See Abbvie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1296 (Fed. Cir. 2014); *Troy*, 758 F.3d at 1325, 1327, 1337-38.  The AIA retained these two options for the new "derivation" proceedings under its "first inventor to file" system.  AIA § 3(j)(4) & § 7(c), 125 Stat. at 290-91, 314.

In a § 146 action, parties may present new issues and evidence and "shore up evidentiary gaps in the agency record," *Abbvie*, 759 F.3d at 1296, and all of "the procedures and rules of federal litigation" apply, *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 659 F.3d 1186, 1196 (Fed. Cir. 2011).  In addition, the district court "must make de novo factual findings" for the new evidence.  *Agilent*

*Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1379 (Fed. Cir. 2009).  By contrast, a direct appeal to this Court under § 141 is "based solely on the agency record" and is reviewed under the standards of the Administrative Procedure Act ("APA").  *Abbvie*, 759 F.3d at 1296.  Thus, although § 141 and § 146 review are often both referred to as "appeals," *Estee Lauder, Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 592 (Fed. Cir. 1997), § 146 actions are in fact much broader.

Yet, *Biogen* held that Congress—*by negative implication*—eliminated § 146 review for interferences declared after September 15, 2012, which is when the AIA went into effect.[14]  785 F.3d at 654.  Under this reading, the AIA treats interferences declared after September 15, 2012, on the one hand, differently from interferences declared on or before that date, on the other.  *Biogen*'s reading also treats prospective proceedings differently:  Post-September 2012 interferences are not entitled to § 146 review, whereas derivation proceedings (the AIA's interference-like proceedings) are.  The arbitrary distinctions are stark:



_____
[14] The AIA has several other effective dates.  Unless noted, they are not relevant here.

And the distinctions lead to an irrational result that is particularly relevant here. Interferences involving related pre-AIA patents and applications cannot all be reviewed in district court unless they were all declared before September 15, 2012. Idenix respectfully submits that this is not what Congress intended, and that *Biogen* was wrongly decided.

## B.    *Biogen* Misread Two Limited Provisions Of The AIA

*Biogen* reached its conclusion based on a negative implication it found arising from two limited provisions when read "together." *Biogen*, 785 F.3d at 656. Neither of those provisions is in Section 3, the section that amended § 146 to account for derivation proceedings. As *Biogen* acknowledged, Section 3 did not alter § 146 review for interferences. *Id.* Section 3 is thus "silent as to whether interference proceedings and judicial review of these proceedings continues with respect to" pre-AIA applications. *Id.* at 655. Rather, according to *Biogen*, the elimination is "ma[d]e clear" by § 6(f)(3)(C) and a "technical corrections" act. *Id.* at 656. *Biogen* held that § 6(f)(3)(C) withdrew both § 141 and § 146 review for interferences declared after September 15, 2012, and the technical correction restored § 141 review but not § 146. *Id.* at 656-57.

Neither of these provisions explicitly eliminates § 146 review. Where a statute, such as pre-AIA § 146, "clearly defin[es] the jurisdiction of the courts," the force of its provisions "should not be disturbed by a mere implication flowing from

subsequent legislation." *Rosencrans v. United States*, 165 U.S. 257, 262 (1897); *Galveston, Harrisburg & San Antonio Ry. Co. v. Wallace*, 223 U.S. 481, 490 (1912) ("jurisdiction is not defeated by implication"). In fact, when properly understood, these provisions are, on their face, off point.

**Section 6(f)(3)(C)** concerns only "Pending Interferences," *i.e.*, interferences that had already been declared by September 15, 2012. *See* AIA § 6(f)(3), 125 Stat. at 311. It is contained deep within Section 6, which generally sets forth procedures and provisions for the new "Post-Grant Review Proceedings." Section 6(f)(3) allowed the PTO to continue then-pending interferences "as if this Act had not been enacted" (unless the PTO dismissed the interference without prejudice to filing for post-grant review). AIA § 6(f)(3)(A)(ii), 135 Stat. at 311. But to continue those interferences as if the AIA "had not been enacted," one would have to ignore broad changes made by the AIA, such as its replacement of the BPAI with the PTAB and its new venue option for § 146 review. *See* AIA § 7(a), 125 Stat. at 313 (PTAB); AIA § 9(a), 125 Stat. at 316 (replacing D.D.C. with E.D. Va.). In subparts (B) and (C), respectively, § 6(f)(3) fixed these issues, allowing the PTAB to be "deem[ed]" the BPAI for any further proceedings in then-pending interferences, and authorizing their review under §§ 141 and 146 as amended by the AIA, thus capturing the new venue option. AIA § 6(f)(3)(B), (C), 125 Stat. at 311.

Contrary to *Biogen*'s reading, § 6(f)(3)(C) did not address interferences not yet pending on the AIA's effective date, because there was no need to. The AIA, *as enacted*, covered them. Post-September 2012 interferences did not need the "PTAB" to be "deemed" the "BPAI" for there was only one such entity for proceedings initiated after September 2012—the PTAB. *See* AIA § 7(e), 125 Stat. at 315 (effective date). Likewise, the AIA's new venue option captured civil actions reviewing post-September 2012 interferences. *See* AIA § 9(b), 125 Stat. at 316.

**The technical correction** is likewise off point. It corrected an error with respect to § 141, not § 146. When AIA Section 7 amended § 141 to provide for appeals to this Court of derivation and other new proceedings, it inadvertently failed to list interferences. *See* AIA § 7(c), 125 Stat. at 314. Thus, Section 7 deprived interferences declared after September 15, 2012, of § 141 review. Congress corrected its oversight in the technical correction, providing that pre-AIA § 141 would be available for interferences declared after September 15, 2012 (but with BPAI references "deemed" to refer to the PTAB).[15] *See* Technical

---

[15] *Biogen* viewed the legislative history as "silent" on the availability of § 146 review (785 F.3d at 657), which counsels *against* an interpretation that Congress eliminated § 146 review. Moreover, the legislative history is *not* silent. A purpose of the technical correction was to authorize "the PTAB to conduct, and *the courts* to hear appeals of, interferences commenced after the effective date of the AIA's amendments to § 135(a)." 158 Cong. Rec. E2016 (daily ed. December 31, 2012) (speech of Rep. Lamar Smith) (emphasis added). "Courts" (plural) presumes the

Corrections Act § 1(k)(3), Public Law 112-274, 126 Stat. 2456, 2458 (Jan. 14, 2013). Because nothing in Section 7 had deprived interferences of § 146 review in the first place, there was no need for Congress to later "authorize pre-AIA § 146 review," contrary to what *Biogen* held. *Biogen*, 785 F.3d at 656.

Moreover, when read as eliminating § 146 review, the technical correction renders pre-AIA § 141 nonsensical. Pre-AIA § 141 specifically refers to § 146:

> A party to an interference dissatisfied with the decision of the [BPAI] on the interference may appeal the decision to the [Federal Circuit], but such appeal shall be dismissed if any adverse party to such interference, within twenty days [of a § 141 notice of appeal], files notice with the Director that the party elects to have all further proceedings conducted as provided in section 146 of this title. If the appellant does not, within thirty days after filing of such notice by the adverse party, file a civil action under section 146, the decision appealed from shall govern the further proceedings in the case.

35 U.S.C. § 141. To square this provision with *Biogen*, one must presume one of two things: either (i) § 146 review is available only to the adverse party, and only if the dissatisfied party has pursued § 141 review, or (ii) even as it was correcting one error (the AIA's inadvertent elimination of § 141), Congress introduced another (pre-AIA § 141's express references to § 146). The choice between these two illogical interpretations underscores the erroneous interpretation of the AIA under *Biogen*.

---

availability of § 146 review; if only § 141 review were contemplated, only a single court (this Court) would be involved.

## C.    Disparate Elimination Of § 146 Review Lacks A Rational Basis

If the Court nonetheless concludes that the AIA deprives parties to post-September 2012 interferences of § 146 review, it should hold that the provision is unconstitutional.  The equal protection component of the Fifth Amendment requires that any classification in a statute bear "a rational relationship to a legitimate government interest."  *See Romer v. Evans*, 517 U.S. 620, 635 (1996); *Briggs v. Merit Sys. Prot. Bd.*, 331 F.3d 1307, 1318 (Fed. Cir. 2003) (noting that equal protection analysis under the Fifth and Fourteenth Amendments is the same). In assessing a legislative choice under rational-basis review, a court must determine whether there is any "reasonably conceivable state of facts" that could provide a justification for the classification at issue.  *Briggs*, 331 F.3d at 1318.  If the challenger shows the absence of any rational basis, the statute cannot be upheld.  *See id.*  "[A]rbitary and irrational discrimination violates the Equal Protection Clause under even [the] most deferential standard of review."  *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988).

There is no conceivable state of facts that could justify the AIA silently taking away a right for certain parties based solely on the AIA's effective date, particularly for a right available for nearly two centuries.  The decision cannot rationally be attributed to "administrative convenience."  The AIA grants § 146 review for all of the AIA's new derivation proceedings.  It also maintains § 146 for

interferences that were declared on or before September 15, 2012, many of which are still ongoing.  But as read by *Biogen*, the AIA deprives parties to later interferences, including those contemporaneous with derivation proceedings, from § 146 review.  785 F.3d at 656-57.  That is the epitome of irrational distinctions.

The arbitrary dividing line is acutely present here.  In a § 146 action, Idenix would show that the Board misapprehended the evidence before it.  In addition, relying on this Court's precedent, Idenix would submit additional evidence since developed showing that Griffon did in fact synthesize the target nucleoside, but that—unlike a hypothetical person of ordinary skill—he made a crucial misstep in not analyzing all of his reaction products, which misled his supervisors into believing that the method taught by the '350 application did not work.  That is what Idenix intends to show in its § 146 action arising from the related '871 interference.  *See Idenix Pharms. LLC et al. v. Gilead Pharmasset LLC*, No. 1:15-cv-00416-LPS-CJB, D.I. 21 & attachments (D. Del. Oct. 22, 2015) (proffering evidence showing, *e.g.*, that Griffon had a route to make the compound but "he did not confirm that because he failed to characterize and isolate the reaction products" and that Griffon's failure to identify his results "was inconsistent with how a person of ordinary skill in the art would have attempted to make a compound for treating a virus").

But if *Biogen*'s interpretation is upheld, the AIA will deprive Idenix of the choice to elect § 146 review here, simply because the Board declared the interference after a certain date. Idenix will thus not have an opportunity to fully present evidence proving its entitlement to the invention at issue here, including the newly developed evidence regarding Griffon's efforts. Also, the arbitrary divide could permit significant havoc. There is no dispute that Idenix has the right to pursue its first § 146 action; the '871 interference was declared in January 2012, before the determinative date established in *Biogen*. Any interpretation of the AIA that could allow Gilead to argue that a decision in this appeal renders moot any of the other related matters would be irrational.

In short, if Congress silently eliminated § 146 review for parties to post-September 2012 interferences but for no one else, that action would be arbitrary and irrational.

\*    \*    \*    \*

As noted in Parts II and III below, the Board's errors on the record before it alone require a remand. Lest there be any doubt, however, Idenix should be entitled to present its additional evidence. Under a proper reading of the AIA, the Court should recognize that the District of Delaware has jurisdiction under § 146 and transfer this case to that court. If the Court disagrees and adheres to *Biogen*'s interpretation of the AIA, it should hold that Congress's action is unconstitutional,

and likewise transfer this case.  If the Court nonetheless exercises jurisdiction, it should, at minimum, refrain from affirming the Board's judgment without allowing Idenix to present its additional evidence to the Board.  *See* 28 U.S.C. § 2106 (a "court of appellate jurisdiction may . . . require such further proceedings to be had as may be just under the circumstances").

## II.    THE BOARD LEGALLY ERRED BY PLACING DETERMINATIVE WEIGHT ON ONLY A SUBSET OF EXPERIMENTAL EVIDENCE WHILE IGNORING OTHER, HIGHLY RELEVANT EVIDENCE

If the Court exercises jurisdiction over this appeal, it should remand due to the Board's legal errors.  The Board placed determinative weight on Griffon's allegedly failed experiments while ignoring (1) countervailing evidence that Clark (like others) was able to make the target compound using a similar method, and (2) Idenix's primary argument that the '350 application itself enables one to make the target compound because it discloses the structure of the compound and a well-known precursor that is only one step away.  By statute, if the specification itself, coupled with the knowledge of a hypothetical person of skill in the art, discloses how to make the invention, the specification is enabling; there is no need to resort to the results of any actual experiments.  The Board also legally erred in failing to provide any explanation showing whether, or how, it balanced Griffon's attempts with the specification's disclosures and other, experimental evidence.

### A.    Idenix's Disclosures Would Have Enabled A Skilled Artisan To Make The Target Compound

The record facts put forth by Idenix, including the Board's own findings about the well-known use of DAST, should have directed the Board to hold that the '350 application and the '600 patent are enabling.  Idenix's disclosures, coupled with the knowledge of a person of ordinary skill in the art, teach how to make the target compound.

If the specification sufficiently discloses "the manner and process of making and using" the invention "as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same," the enablement requirement is met.  *See* 35 U.S.C. § 112, ¶ 1.  The specification is not required to disclose every detail.  "The test of enablement is whether one reasonably skilled in the art could make or use the invention from the disclosures in the patent coupled with information known in the art without undue experimentation."  *United States v. Telectronics, Inc.*, 857 F.2d 778, 785 (Fed. Cir. 1988).  "[E]very detail need not be set forth in the written specification if the skill in the art is such that the disclosure enables one to make the invention."  *Martin v. Johnson*, 454 F.2d 746, 751 (C.C.P.A. 1972); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) ("[A] patent need not teach, and preferably omits, what is well known in the art.").

Where, as here, the invention concerns a chemical compound, "[a] description of a chemical compound without a description of how to make" it can be enabling if making the compound is "within the skill of one of ordinary skill in the art." *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 921 (Fed. Cir. 2004). "The specification would be of enormous and unnecessary length if one had to literally reinvent and describe" what "[o]ne skilled in the art knows how to make," such as "a known chemical starting material." *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999). Similarly, "the recognition of the structure of a chemical compound ordinarily provides those skilled in the art with some information as to its synthesis." *Martin*, 454 F.2d 746 at 752. Applying these rules in *Martin*, the Court held that, even assuming that the specifications there had "absolutely no how-to-make disclosure," the specifications were enabling. *Id.*

Here, Idenix submitted evidence from the '350 application itself and from prior art showing what was known in the field at the time, demonstrating that the application's disclosures would have enabled a person of ordinary skill to make the target compound of Count 1. In its '350 application and its '600 patent, as in *Martin*, Idenix performed the substantial step of disclosing the precise chemical structure of the target compound. Idenix also disclosed a well-known precursor

close to it, Matsuda Compound 17.[16]  With knowledge of those structures, the

hypothetical person would have known to use a common, one-step synthesis to

modify the well-known precursor to obtain the target compound.

To be specific:  No one disputes that, simply by knowing the chemical

structure of the target compound as disclosed in the '350 application (and the '600

patent), a skilled artisan would have recognized that Matsuda Compound 17 was a

viable precursor.  As Gilead's expert Marquez testified:

> Q.  Well, let's look at [the target compound] itself. . . .  Looking at the
> structure, can you tell what a precursor is to [the compound]?
> . . .
> A.  One of the possibilities, among other precursors, when you work
> retrosynthetically, is the one that you mention, Matsuda, which we
> discussed before.

A39537:20-A39538:7; *see also* A57455:25-A57456:21 (Wnuk testifying that

Matsuda Compound 17 "might be considered as one of possible starting material,

precursor substrate").

It is also undisputed that, simply by looking at the chemical structure of the

target compound disclosed by Idenix, a person of ordinary skill would know to use

a fluorination reagent.  As Gilead's expert Wnuk testified:

---

[16] To the extent Gilead quibbles that Matsuda Compound 17 is not explicitly in the
'350 application, its 2′-keto precursor is, as is that precursor's conversion to the
Matsuda compound.  *See* pp. 8-11, *supra*.

Q.  A person of ordinary skill in the art looking at that structure in 2002 would recognize the need for a fluorination reagent to fluorinate the 2′ position; right?

A.  Yes.

Q.  Just looking at the structure, seeing the fluorine in the 2′ position at least provides one of ordinary skill in the art with the information to know that they will need a fluorination reagent; correct?

A.  A fluorinating reagent are [sic] used to introduce fluorine into the compound, yes.  That's the definition.

A57445:22-A57446:15; *see also* A58867:10-21.

It is further not disputed that DAST and Deoxo-Fluor were the most well-known fluorinating reagents at the time for one-step fluorination reactions.  As Wnuk testified:

Q.  [The literature] says Deoxo-Fluor and DAST are widely used in one-step reactions for the introduction of fluorine into organic compounds.  Do you see that?

A.  Yes.

Q.  And as of September 2002 that was the state of the art; correct?

A.  Yes, we consider nucleophilic fluorination, yes.

A57484:5-21; *see also* A57471:17-A57472:7 (Wnuk confirming that "(DAST) appears to be the most convenient and powerful reagent for deoxyfluroination."); A37024:11-14 (Marquez confirming that "it [is] true DAST was extensively used and studied prior to June 28, 2002"); A39532:20-A39533:2 (Marquez confirming that "DAST reaction conditions were known conditions for nucleosides . . . by

1988"). As the Board properly found, "it was well-known in the prior art that DAST could be employed in the 2′ fluoridation of nucleosides and nucleoside analogs." A28; *see also* A16 n.34 ("Deoxo-Fluor® is, like DAST, a nucleophilic organic fluorinating agent.").

Finally, it is undisputed, and indeed the basis of Gilead's assertion that its '218 application is enabling, that reacting a 2′-OH "up", 2′-methyl "down" precursor, such as Matsuda Compound 17, with DAST or Deoxo-Fluor using standard techniques in the art would produce the target nucleoside compound of Count 1. As Marquez testified:

> Q. [I]f a skilled artisan applied the DAST reaction to compound 12(a) [*i.e.*, protected Matsuda Compound 17], what product would they get?
>
> A. Knowing what I know now because Clark succeeded in making it by that route, [the skilled artisan] will get the right compound. But that's in hindsight. We now know it works.

A39523:24-A39524:24; A2160.[17]

---

[17] As to whether one could predict that the reaction would work, the law does not require prediction, only lack of undue experimentation. *See Alcon Research Ltd. v. Barr Labs.*, 745 F.3d 1180, 1189 (Fed. Cir. 2014) ("[A] patent does not need to guarantee that the invention works for a claim to be enabled"; the Court has "rejected enablement challenges based on the theory that there can be no guarantee that prophetic examples actually work."). Nevertheless, Marquez said it best: "one with skill in the art would just do the reaction and see what happens, determining later if it had worked." A28812. If one did the reaction and analyzed the products made, they would see that it worked.

In short, Idenix's disclosures of (i) the chemical structure of the target 2′-methyl "up", 2′-fluoro "down" nucleoside and (ii) Matsuda Compound 17—which is *only one step* away from the target compound—would have enabled a skilled artisan to make the target nucleoside compound as of June 2002 using a common, well-known reagent. A skilled artisan would have known from viewing the structure of the target compound to react Matsuda Compound 17 with either DAST or Deoxo-Fluor. Even in the framework of the *Wands* factors, this evidence was directly relevant to the first, second, and seventh factors.[18] *See* 858 F.2d at 737.

## B. The Board Erroneously Elevated Extrinsic, Non-Conclusive Evidence Over Conclusive Evidence From The Specification Itself

In finding no enablement, the Board did not conduct the proper legal inquiry. *See Randall*, 733 F.3d at 1362 (conducting de novo review of "the Board's compliance with governing legal standards"). Although the Board noted the statutory standard for enablement (A7-9), and recited arguments from each side regarding the '350 disclosures and what was known in the art, the Board focused

---

[18] Idenix also addressed the other *Wands* factors. As Idenix explained, although there are no working examples in the specification as addressed by the third *Wands* factor, none is needed in light of the disclosures and the knowledge of one of ordinary skill in the art, and the other factors are either neutral or favor Idenix. The nature of the invention of modified nucleosides was well-known (the fourth factor), the art was familiar with the steps needed to obtain the target compound (the fifth factor), the skill level was high (the sixth factor), and the claims are narrow (the eighth factor). A3535-46.

almost exclusively on a sampling of experiments that were not prior art or part of the knowledge of the ordinarily skilled artisan. That was legal error.

The specification, as interpreted by the hypothetical person of ordinary skill in the art, is the most critical evidence regarding enablement. If the specification is enabling, there is no need for further inquiry into extrinsic evidence. "[A] specification disclosure which contains a teaching of the manner and process of making and using the invention in terms which correspond in scope to those used in describing and defining the subject matter sought to be patented *must* be taken as in compliance with the enabling requirement of the first paragraph of § 112 *unless* there is reason to doubt the objective truth of the statements contained therein which must be relied on for enabling support." *Fiers v. Revel*, 984 F.2d 1164, 1171-72 (Fed. Cir. 1993) (emphasis in original). Where the specification is dispositive, the extent of "experimentation" as analyzed under the *Wands* factors may not even be relevant. *See Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1189 (Fed. Cir. 2014) (legal error to evaluate the *Wands* factors without a "threshold showing that any experimentation is necessary to practice the claimed methods"). At minimum, "failed" experiments cannot undo the enabling specification. *See Atlas Powder Co. v. E.I. DuPont de Nemours & Co.*, 750 F.2d 1569, 1577 (Fed. Cir. 1984) (the patentee's experiments that "failed" 40% of the time did not undermine the specification's enablement; for instance, "one skilled in

the art would know how to modify slightly many of those 'failures' to" obtain the claimed invention).

Here, the Board barely engaged with the specification. Its token analysis failed to adhere to the statutory standard examining whether Idenix "set forth in *the patent specification* how to make and use" its invention. *Atmel*, 198 F.3d at 1381 (emphasis in original).

Even where the Board appeared to consider the specification, it often misunderstood the inquiry, again committing legal error. For instance, in addressing the second *Wands* factor on the amount of direction or guidance provided, the Board stated that the '350 application does not provide "an explicit explanation or guidance as to how to synthesize" the target molecule. A23; *see also* A34 (stating that there was no "explicit example" in the specification). As a matter of law, explicit disclosures are not required. *See Hybritech*, 802 F.2d at 1384; *Martin*, 454 F.2d at 751-52; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003) ("The specification need not explicitly teach those in the art to make and use the invention."). And in addressing the third, fourth, and fifth *Wands* factors on working examples, the nature of the invention, and the state of the prior art, the Board faulted Idenix because the target compound "had not yet been synthesized" and there was no "example" of the target nucleoside in the prior art. A25; *accord* A26-27 (finding that "synthesis of a 2′-

fluoro-2′-methyl nucleoside had not yet been reported in the prior art"); A34
(finding that "fluoridation of tertiary alcohols to produce a 2′ "down" tertiary
fluorine was not taught or suggested in the prior art").  But prior existence or
synthesis of the claimed invention is not legally required.  *See, e.g., Pfizer Inc. v.
Teva Pharms. USA, Inc.*, 555 F. App'x 961, 967 (Fed. Cir. 2014) (for a claim to a
chemical compound, the application's "disclosure, coupled with the methods for
synthesis and resolution that were found to be well-known and routine in the art, is
sufficiently enabling"); *Martin*, 454 F.2d at 752 (simply disclosing "the structure
of a chemical compound," without a particular synthesis, is informative).  If it
were, the enablement inquiry would wholly eviscerate the novelty requirement.

On remand, the Board should be directed to apply the proper standard and
evaluate the specification's disclosures in light of the knowledge of a person of
ordinary skill in the art.

## C.    The Board Failed To Provide A Reasoned Justification For Its Decision

Even the Board's analysis of the experimental evidence was incomplete.
The Board selectively looked at one set of experiments where there was evidence
of enablement from at least two others, without any explanation for that approach.

As the Court has recently reiterated, under the APA, the Board "is obligated
not only to come to a sound decision but to fully and particularly set out the bases
upon which it reached that decision." *Power Integrations, Inc. v. Lee*, 797 F.3d

1318, 1323 (Fed. Cir. 2015); *In re Thrift*, 298 F.3d 1357, 1364 (Fed. Cir. 2002)

(The Board must "document its reasoning on the record to allow accountability"

and to facilitate "effective judicial review."); *In re Lee*, 277 F.3d 1338, 1342 (Fed.

Cir. 2002) ("For judicial review to be meaningfully achieved within these strictures

[of the APA], the agency tribunal must present a full and reasoned explanation of

its decision.").  The Board fails to fulfill its obligations when it requires this Court

to "resort to speculation" as to the Board's analysis, *Gechter v. Davidson*, 116 F.3d

1454, 1457 (Fed. Cir. 1997), as this Court is not permitted "to supply a reasoned

justification for an agency decision that the agency itself has not given." *Power

Integrations*, 797 F.3d at 1326.  When a Board decision is "insufficiently or

inappropriately explained," remand is required. *Lee*, 277 F.3d at 1346; *In re

Reuning*, 276 F. App'x 983, 987 (Fed. Cir. 2008) ("When an agency (such as the

Board) fails to explain its findings of fact and conclusions of law or fails to

consider all relevant factors, the proper course, except in rare circumstances, is to

remand to the agency for additional investigation or explanation.").

Clark's experiments directly contradict the Board's reliance on the allegedly

failed attempts of Griffon.  Clark was able to synthesize a nucleoside of Count 1

using a route taught by Idenix's disclosures plus a well-known reagent. *See* pp.

17-21, *supra*.  Griffon used essentially the same route as Clark, but without

analyzing all of his products.  Wang also succeeded; in fact, after reviewing

perceived Griffon's failures, she readily identified DAST as the route to use and

she succeeded on her first attempt, providing powerful evidence of minimal

experimentation. *See* p. 16-17, *supra*. Yet the Board set Wang's experiments

aside, and failed to analyze Clark's experiments or provide a reasoned decision as

to why that evidence, as well as Idenix's primary evidence based on the

specification itself, should be given less or no weight in the face of Griffon's

experiments, even if the Board properly interpreted Griffon's experiments (which

it did not).[19]  Instead, for three *Wands* factors—quantity of experimentation,

amount of direction or guidance, and predictability in the art—the Board found in

favor of Gilead due substantially or *entirely* to Griffon's experiments.[20]

---

[19] In relying on Griffon's experiments, the Board discussed Griffon's educational background and ruled that he met the requirements for a person of ordinary skill in the art (without considering whether in fact he acted as one of ordinary skill). A15 n.33. Tellingly, for Clark, the Board undertook *no* analysis as to whether his experiments were representative of one of ordinary skill in the art. It appears that the Board assumed that Clark's efforts were inventive because he is a named inventor. But that reasoning is circular. Clark's experiments (such as his decision to use DAST) should have been given weight in deciding whether Idenix's disclosures were enabling, just as any other skilled artisan's experiments and results would be considered. Indeed, the fact that Clark and Griffon identified and used the same or similar methods as that disclosed in Idenix's application does not show that Clark's use of the method was inventive, but rather that it was known to those of ordinary skill in the art.

[20] The Board stated that it was also relying on views expressed by Dr. Coe and Dr. Storer. A33-34. The Board misunderstood their recommendations. Nothing indicates that Coe had the '350 application in hand, and each proceeded from the assumption that Griffon was operating as a person of ordinary skill in the art. Moreover, while the Board attributed to Coe a belief that fluorination is

- 56 -

Idenix submits that on remand, upon properly balancing Clark's (and Wang's) successful experiments with a proper interpretation of Griffon's alleged failures and—more importantly—placing that limited set of experiments in context of Idenix's disclosures and the knowledge of one of ordinary skill in the art to react the Matsuda compound with the well-known DAST or Deoxo-Fluor reagents to make the target compound, the Board should find in favor of Idenix.  Given the other, relevant evidence, Griffon's efforts do not provide "substantial evidence" to support the Board's findings.  *Gartside*, 203 F.3d at 1313.

But at minimum, to enable this Court's review and supply a reasoned basis for its decision, the Board was obligated to explain why Griffon's experiments were determinative rather than leave it to the Court to speculate.  *See Power Integrations*, 797 F.3d at 1327 ("the board had an obligation" to evaluate the patent holder's primary argument).  The Board's minimal analysis is all the more problematic in light of the other litigation matters between the parties on similar issues; Gilead should not be allowed to use the Board's decision in this later-filed case, with a narrow record, to cause collateral havoc in those earlier-filed proceedings in which discovery continues.

---

unpredictable (A33-34), his letter (the only evidence from Coe) contains no such statement.  A41386.

### III.    SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE BOARD'S FINDINGS BASED ON GRIFFON'S EFFORTS

Idenix raises a final point:  The Board overlooked an inherent flaw in its reliance on Griffon's allegedly failed Deoxo-Fluor experiments to find undue experimentation.  The Board assumed that Griffon's efforts were representative of those of a person of ordinary skill in the art.  Substantial evidence does not support that view.

The person of ordinary skill in the art is a "legal construct." *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).  As this Court has consistently recognized in the context of obviousness, an actual artisan's personal knowledge "is irrelevant. The relevant inquiry is what a hypothetical ordinarily skilled artisan would have gleaned from the cited references at the time." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1364 (Fed. Cir. 2001); *In re Rouffet*, 149 F.3d at 1357 (The "legal construct" of a POSITA "presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan.").  "A party who wishes to prove that the claims of a patent are not enabled by means of a failed attempt to make the disclosed invention must show that the patent's disclosure was followed." *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1360 (Fed. Cir. 1998).

Idenix does not dispute that Griffon met the definition of a hypothetical person of ordinary skill in terms of his education and years of experience, as the

Board found.  A15 n.33.  But as Idenix explained to the Board, this does not ensure that he was following the '350 patent specification and performing his experiments as the hypothetical artisan would.  A3538.  Gilead never even argued those facts.  A3071-72.  For several reasons, the Board's findings are not supported by substantial evidence.

*First*, there is no evidence that Griffon had the specification in hand, or was using it to guide his efforts.  There is likewise no evidence that, aside from Griffon's Deoxo-Fluor scheme, any of the other six other schemes he tried were suggested by the '350 application.  *See* A56043-67 (Griffon Decl. ¶¶ 10, 37, 42, 44, 53, 94).  Experiments that do not follow the specification are not relevant to the enablement inquiry.  *See Johns Hopkins*, 152 F.3d at 1360.

*Second*, Griffon testified that he did not analyze all of his reaction products when he performed his Deoxo-Fluor route.  Griffon's failure to analyze his reaction products or modify the reaction conditions or protecting groups, as Wnuk testified was normal practice for one of ordinary skill, is clear evidence that Griffon's efforts were not those of the hypothetical person of ordinary skill.  A57490:5-13.  Where the persons conducting the experiments were not shown to be of ordinary skill in the art, their work was "insufficient as a matter of law" to show non-enablement, "[b]ecause it is imperative when attempting to prove lack of enablement to show that *one of ordinary skill in the art* would be unable to make

the claimed invention without undue experimentation." *Johns Hopkins*, 152 F.3d at 1360 (emphasis in original).

*Third*, Griffon's efforts must be viewed in light of Clark's efforts, which Gilead concedes were enabling. Griffon arrived at the same route as Clark. The success of that route is a matter of scientific fact that Gilead does not—and cannot—dispute, or else its own '218 application would not be enabling. A39523:24-A39524:24 (Marquez confirming: "Knowing what I know now because Clark succeeded in making it by that route, he will get the right compound. . . . We now know it works."). Whether or not Griffon ultimately failed, his identification of the same route is clear evidence of enablement. Like Clark's use of DAST, Griffon reacted Matsuda Compound 17 with Deoxo-Fluor.

Griffon's report to his supervisors must be considered in this light. Given Clark's success using the same route, which concededly works, either Griffon did not perform the experiments at a level commensurate the hypothetical person of ordinary skill, or he did in fact synthesize the target compound regardless of what he reported. Either way, his experiments do not support the Board's finding that Griffon's efforts demonstrate undue experimentation. If Griffon did *not* perform the experiments at a level commensurate of a person of ordinary skill, his allegedly failed experiments cannot be used as evidence of non-enablement, as a matter of law. *See Johns Hopkins*, 152 F.3d at 1360. Likewise, if Griffon did synthesize the

target compound even though he did not know it, his  allegedly "failed" experiments were actually successful, and the Board's reliance on those experiments as evidence of non-enablement would be unsupported.[21]

The Court need not decide whether Griffon's experiments were in fact successful to conclude that a remand is warranted.  The Board erroneously relied on Griffon's efforts and little else.  Whether Griffon's experiments were successful or not, they do not permit "a reasonable mind" to accept those experiments "as adequate to support" the Board's finding that a person of ordinary skill would not be able to make the compound without undue experimentation.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence does not support the Board's decision, and a remand is warranted.

## CONCLUSION

The Court should hold that it lacks jurisdiction over this appeal and transfer the matter to the District of Delaware.  If the Court disagrees, it should vacate the judgment and remand to the Board for further proceedings.

---

[21] As noted in Part I, *supra*, if Idenix is permitted to present additional evidence on remand, that evidence would show that Griffon did in fact synthesize the target nucleoside, but he failed to properly analyze the results of his experiments.

Respectfully submitted,

Calvin P. Griffith

/s/ *Anthony M. Insogna*

JONES DAY

Anthony M. Insogna

901 Lakeside Avenue

John D. Kinton

Cleveland, OH 44114

JONES DAY

(216) 586-3939

12265 El Camino Real

cpgriffith@jonesday.com

San Diego, CA 92130

(858) 314-1200

aminsogna@jonesday.com

Gregory A. Castanias

jkinton@jonesday.com

Jennifer L. Swize

JONES DAY

51 Louisiana Avenue N.W.

Washington, DC 20001

(202) 879-3939

*Counsel for Appellants Richard*

gcastanias@jonesday.com

*Storer, Gilles Gosselin, Jean-Pierre*

jswize@jonesday.com

*Sommadossi, and Paola LaColla*

November 16, 2015

# ADDENDUM

Boxinterferences@uspto.gov
571-272-4683                                          Filed: January 16, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

JEREMY CLARK
Junior Party
(Application No. 11/854,218)

v.

RICHARD STORER, GILLES GOSSELIN, JEAN-PIERRE SOMMADOSSI,
and PAOLA LACOLLA
Senior Party
(US 7,608,600 B2)

_____

Interference No. 105,981 (JGN)
Technology Center 1600

_____

**Decision on Motions - Bd.R. 125**
_____

*Before* RICHARD E. SCHAFER, DEBORAH KATZ, and JOHN G. NEW,
*Administrative Patent Judges.*

NEW, *Administrative Patent Judge.*

A1

Interference 105,981
Clark v. Storer

1                                    I. INTRODUCTION

2          This interference is before a merits panel for a decision on non-priority

3    motions.  The interference involves Junior Party Jeremy Clark's ("Clark") US

4    Appl. No. 11/854,218 (the "'218 application")  and Senior Party Richard Storer,

5    Gilles Gosselin, Jean-Pierre Sommadossi, and Paola LaColla's ("Storer") US

6    Patent  7,608,600 B2 (the "'600 patent").  Declaration at 1.[1]  The subject matter of

7    the interference is generally related to a method of using a class of 2´-fluoro, 2´-

8    methyl (or halomethyl) nucleosides with a uracil or cytosine base for the treatment

9    of a host infected with the hepatitis C virus ("HCV").  An important aspect of the

10   nucleosides is the position of the fluorine moiety (F) in the "down" position as

11   shown in the image below.  Count 1 of the interference is Storer claim 1 or Clark

12   claim 164 and recites:

13          1.      A method for the treatment of a host infected with a hepatitis C
14          virus, comprising administering to the host infected with a hepatitis C
15          virus an effective amount of a compound having the formula:



16
17          or a pharmaceutically acceptable salt thereof, wherein:
18

---

[1] Paper No. 1

2

Interference 105,981
Clark v. Storer

1  $R^1$ is H; mono-, di- or triphosphate; acyl; an amino acid ester; a
2  carbohydrate; a peptide;
3
4  or a pharmaceutically acceptable leaving group which when
5  administered *in vivo* provides a compound wherein $R^1$ is H or
6  phosphate;
7
8  $R^2$ is H; acyl; an amino acid ester; a carbohydrate; a peptide; or a
9  pharmaceutically acceptable leaving group which when administered
10 *in vivo* provides a compound wherein $R^2$ is H;
11
12 Base* is selected from the group consisting of adenine, $N^6$-
13 alkylpurine, $N^6$-acylpurine, $N^6$-benzylpurine, $N^6$-halopurine, $N^6$-
14 vinylpurine, $N^6$-acetylenic purine, $N^6$-acyl purine, $N^6$-hydroxyalkyl
15 purine, $N^6$-alkylaminopurine, $N^6$-thioalkyl purine, $N^2$-alkylpurine, $N^2$-
16 alkyl-6-thiopurine, thymine, cytosine, 5-fluorocytosine, 5-
17 methylcytosine, 6-azapyrimidine, 6-azacytosine, 2- and/or 4-
18 mercaptopyrimidine, uracil, 5-halouracil, 5-fluorouracil, $C^5$-
19 alkylpyrimidine, $C^5$-benzylpyrimidine, $C^5$-halopyrimidine, $C^5$-
20 vinylpyrimidine, $C^5$-acetylenic pyrimidine, $C^5$-acyl pyrimidine, $C^5$-
21 hydroxyalkyl purine, $C^5$-amidopyrimidine, $C^5$-cyanopyrimidine, $C^5$-
22 iodopyrimidine, $C^6$-iodo-pyrimidine, $C^5$-Br-vinyl pyrimidine, $C^6$-Br-
23 vinyl pyrimidine, $C^5$-nitropyrimidine, $C^6$-amino-pyrimidine, $N^2$-
24 alkylpurine, $N^2$-alkyl-6-thiopurine, 5-azacytidinyl, 5-azauracilyl,
25 triazolopyridinyl, imidazolopyridinyl, pyrrolopyrimidinyl,
26 pyrazolopyrimidinyl, guanine, hypoxanthine, 2,6-diaminopurine, and
27 6-choropurine;
28
29 $R^{12}$ is $C(Y^3)_3$; and
30
31 $Y^3$ is independently H or F.
32
33 or
34

3

Interference 105,981
Clark v. Storer

1    164.  A method for the treatment of hepatitis C infection, which
2    comprises:
3
4           administering to a mammal in need thereof an antivirally
5    effective amount of a (2′R)-2′-deoxy-2′-fluoro-2′-C-methyl
6    nucleoside (β-D or β-L) or its pharmaceutically acceptable salt of the
7    structure:
8



9
10
11          wherein $R^1$ and $R^7$ are independently H, a monophosphate, a
12   diphosphate, a triphosphate, a H-phosphonate, an alkyl, an alkyl
13   sulfonyl, or an arylalkyl sulfonyl; and
14
15          $R^4$ is $NH_2$ or OH.
16
17   Declaration at 3.

18          Before us are the following motions:

19   1. Clark Substantive Motion 1[2] to deprive Storer of the benefit of its US
20      Appl. No. 60/392,350.
21
22   2. Clark Substantive Motion 2[3] to deprive Storer of the benefit accorded
23      with respect to Count 1 of its U.S. Appl. No. 60/466,194.

_____

[2] Paper No. 389
[3] Paper No. 390

4

Interference 105,981
Clark v. Storer

3. Clark Substantive Motion 3[4] to deprive Storer of the benefit accorded with respect to Count 1 of its U.S. Appl. No. 60/470,949.

4. Clark Substantive Motion 10[5] to deprive Storer of the benefit accorded with respect to Count 1 of US Appl. No. 10/6018,907.

5. Clark Substantive Motion 7[6] for judgment against Storer's US Patent No. 7,608,600 B2 on the grounds of unpatentability under 35 U.S.C. § 112, 1st paragraph, for lack of enablement and written description.

6. Clark Substantive Motion 5[7] to substitute Clark's proposed count 2 or, alternatively, Clark's proposed count 3, for Count 1.

7. Clark Substantive Motion 8[8] for judgment against Storer's US Patent No. 7,608,600 B2 on the ground of unpatentability under 35 U.S.C. § 101, for lack of utility and, accordingly, under 35 U.S.C. § 112, 1st paragraph, for lack of enablement.

8. Clark Substantive Motion 9[9] for judgment against Storer's US Patent No. 7,608,600 B2 on the ground of unpatentability under 35 U.S.C. §§ 102(e) or 103 as being either anticipated by, or obvious over, Clark's US Appl. No. 10/828,753.

9. Clark Miscellaneous Motion 18[10] to exclude evidence.

_____

[4] Paper No. 391
[5] Paper No. 392
[6] Paper No. 154
[7] Paper No. 162
[8] Paper No. 155
[9] Paper No. 156
[10] Paper No. 427

5

Interference 105,981
Clark v. Storer

10. Storer Substantive Motion 5[11] to substitute proposed count B for Count 1.

11. Storer Substantive Motion 11[12] for judgment against Clark on the grounds of unpatentability of all of Clark's involved claims as anticipated under 35 U.S.C. § 102(e) and/or 103.

12. Storer Contingent Motion 14[13] to add a new claim to the interference.

13. Storer Contingent Motion 15[14] to add an application to the interference.

14. Storer Miscellaneous Motion 16[15] to exclude evidence.

We address these motions in the order presented above.

_____

[11] Paper No. 157
[12] Paper No. 158
[13] Paper No. 327
[14] Paper No. 328
[15] Paper No. 425

6

A6

Interference 105,981
Clark v. Storer

1                         II. CLARK MOTIONS

2  **A. Clark Substantive Motion 1[16]**

3        Clark Substantive Motion 1 seeks to deny Storer benefit for Count 1 of its

4  US Appl. No. 60/392,350, filed June 28, 2002 (the "S1" application) pursuant to

5  37 C.F.R. § 41.208(3).  Clark Subs. Motion 1, Paper 389 at 1.  As challenger of

6  Storer's accorded benefit, Clark must demonstrate that the S1 application does not

7  constitute a constructive reduction to practice of Count 1.  Bd.R. 42.201; SO ¶

8  208.4.2.  Clark argues that the S1 application does not describe, enable or provide

9  a credible utility of any of the 2′-fluoro-2′-methyl nucleosides that constitute the

10  subject matter of Count 1.

11

12  1. Enablement of the compounds of Count 1

13        The first paragraph of 35 U.S.C. § 112 requires that the specification of a

14  patent must enable a person skilled in the art to make and use the claimed

15  invention.  *In re Wands*, 858 F.2d 731, 735 (Fed. Cir. 1988).  However, a patent

--------------------

[16] In addition to Clark's arguments set forth in the main body of this decision, Clark continues to argue that, despite the panel's prior decision (*see* Paper No. 350), interference estoppel should apply in this interference and that the Board should therefore reject Storer's attempts to argue issues that Storer raised, or could have raised, in the '871 interference.  Motion at 8-9.  Clark's attention is directed to the Federal Circuit's recent decision in *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1296-97 (Fed. Cir. 2014), holding that, because an interference action under 35 U.S.C. § 146 was pending in the district court, the Board's decision lacked requisite finality for purposes of estoppel.  We therefore decline to address this argument further.

7

Interference 105,981
Clark v. Storer

1   need not disclose what is already well known in the art at the time of invention.

2   *See Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730

3   F.2d 1452, 1463 (Fed. Cir. 1984).

4        Clark seeks relief on the basis that Storer's S1 application does not

5   constitute a constructive reduction to practice of the subject matter of Count 1, i.e.,

6   it does not include a described and enabled anticipatory embodiment that falls

7   within Count 1.  Count 1 is recited *supra*, and relates to methods of treating HCV

8   infections with members of a genus of nucleosides, all of which possess a fluorine

9   atom at the "down" position of the 2′ carbon atom on the ribose ring.  Both parties

10  agree that the S1 application provides no explicit disclosure or example of how

11  such an embodiment of Count 1 can be synthesized.  *See* Clark Subs. Motion 1,

12  Paper 389 at 12; Storer Opp. 1, Paper 402 at 12; *see also* Ex. 1194, pp. 97-99, 101,

13  110, 121-122, 130.  Failure to synthesize a single embodiment of the compounds

14  recited in Count 1 would effectively prevent practice of the methods recited in the

15  S1 application.

16       The question therefore devolves onto whether Clark, as challenger, can

17  show, by a preponderance of the evidence, that a person skilled in the art, upon

18  reading the Specification of the S1 application, and being knowledgeable

19  concerning the prior art in the field of nucleoside synthesis, would not have been

20  able to synthesize the 2′-fluoro ("down") nucleosides of Count 1 without undue

21  experimentation.  *See Wands*, 858 F.2d at 736-37; *see also Alcon Research Ltd. v.*

22  *Barr Laboratories, Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014).

8

Interference 105,981
Clark v. Storer

1    Whether synthesis would require undue experimentation is a "conclusion

2  reached by weighing many factual considerations.... includ[ing] (1) the quantity of

3  experimentation necessary, (2) the amount of direction or guidance presented, (3)

4  the presence or absence of working examples, (4) the nature of the invention, (5)

5  the state of the prior art, (6) the relative skill of those in the art, (7) the

6  predictability or unpredictability of the art, and (8) the breadth of the claims"). *In*

7  *re Wands*, 858 F.2d 731, 737 (Fed.Cir.1988).

8    With respect to the first *Wands* factor, the quantity of experimentation

9  necessary for a skilled artisan to arrive at the invention, Clark argues that an artisan

10  attempting to synthesize a compound recited in Count 1 would have been required

11  to engage in an extensive and undue amount of experimentation.  Clark Subs.

12  Motion 1, Paper 389 at 15 (citing Ex. 2001, ¶¶ 167-176, 186, 202, 214, 229-231,

13  235, 248-250; Ex. 2044, p. 1; Ex. 2145, ¶¶ 85-101).

14    Clark points to the findings of the panel in the related 105,871 interference,

15  which found that the Idenix team members had diligently attempted to make a 2´-

16  fluoro-2´-methyl nucleoside as a high priority target for several years.  Clark Subs.

17  Motion 1, Paper 389 at 11.  Clark observes that, during this interval, the Idenix

18  team members were employed as chemists, several of whom hold doctoral degrees,

19  but were nevertheless uniformly unsuccessful in synthesizing the target nucleoside.

20  *Id.*  Furthermore, argues Clark, Idenix also consulted outside experts, including

21  individuals to whom Dr. Richard Storer, one of the Senior Party, referred to as an

22  "expert in organofluorine chemistry" and a "world expert in carbohydrate

23  chemistry" for advice on how to make a 2´-fluoro-2´-methyl nucleoside.  However,

9

Interference 105,981
Clark v. Storer

1  argues Clark, Storer alleged it was successful only after Clark's C2 application was

2  published and Idenix scientists followed a procedure described therein.  Clark

3  Subs. Motion 1, Paper 389 at 15-16.  Furthermore, argues Clark, documents

4  produced by Storer show that Idenix chemists and/or consultants tried or

5  considered trying numerous different fluorinating reagents when unsuccessfully

6  attempting to synthesize a 2′-fluoro-2′-methyl nucleoside during the interval 2002-

7  2005.  Clark Subs. Motion 1, Paper 389 at 11.

8       Clark rejects the argument of Storer, and its technical expert Dr. Masad J.

9  Damha,[17] that one skilled in the art as of June 28, 2002 would "immediately see,"

10  based on the prior art, that the fluorinating reagent N, N-Diethylaminosulfur

11  trifluoride ($Et_2NSF_3$ or "DAST") could be readily used to make a 2′-fluoro-2′-

12  methyl nucleoside from a nucleoside substituted at the 2′ position with a tertiary

13  alcohol (OH) because DAST was a well-known and predictable reagent for

14  fluorinating nucleosides, including those with tertiary alcohols at the 2′ position.

15  Clark Subs. Motion 1, Paper 389 at 10 (citing Storer Substantive Motion 5, pp. 18-

---

[17] Storer's expert witness is Dr. Masad J. Damha.  Dr. Damha is currently James McGill Professor of Chemistry at McGill University, Montreal, Canada, where he has been a faculty member since 1992. Ex. 1132, ¶ 2.  He has also received a number of distinguished awards and is the author of approximately 150 papers and book chapters in peer-reviewed journals, many of which address the synthesis of nucleoside analogs. *Id.*, ¶ 7.  Dr. Damha has also consulted for pharmaceutical companies in the United States and Canada and has presented lectures and conference presentations at academia and industry on synthesis and applications of nucleosides, oligonucleotides and their analogs. *Id.*, ¶ 9.  Upon review of his curriculum vitae, we find that Dr. Damha is therefore qualified to opine as an expert on the subject matter of this interference.

10

Interference 105,981
Clark v. Storer

1  20, ll. 11-3; Storer Contingent Responsive Motion 14, p. 18-19, ll. 6-16; Ex.

2  1132,[18] ¶¶ 64, 69-76).  Clark points out that Dr. Damha admitted, on cross-

3  examination, that none of the references on which he relied for this contention

4  actually show fluorination of a tertiary alcohol at a nucleoside's 2′ position using

5  DAST.  *Id.* (citing Ex. 1194, p. 125, ll. 4-18; Ex. 2145,[19] ¶ 96; Ex. 1148,[20] pp.

6  10761-10770; Ex. 1160,[21] pp. 65-96; Ex. 1161,[22] pp. 574-578).

7      Storer argues that the S1 application provides precursor molecules and

8  guidance that would have enabled one skilled in the art to synthesize a 2′-methyl

9  ("up") 2′-fluoro ("down") nucleoside without undue experimentation.  Storer Opp.

10  1, Paper 402 at 4-5.  Storer points to compound 17 of Exhibit 1140, Akira Matsuda

11  et al., *Alkyl addition reaction of pyrimidine 2′-Ketonucleosides: Synthesis of 2′-*

12  *Branched-Chain Sugar Pyrimidine Nucleosides (Nucleosides and Nucleotides.*

13  *LXXXI[t]*), 36(3) CHEM. PHARM. BULL. 945-953 (1988) ("Matsuda").  Storer

14  contends that a skilled artisan would have recognized that compound 17 of Exhibit

15  1140 was a precursor to the claimed compound.  *Id.* at 4-5 (citing Ex. 1200, ¶ 91;

16  Ex. 2139, at 110-112, ll. 25-7; Ex. 1144, p 949; Ex. 2001, ¶ 323).  Compound 17 of

17  Matsuda is reproduced below:

---

[18] Paper No. 679
[19] Paper No. 400
[20] Paper No. 345
[21] Paper No. 309
[22] Paper No. 310

11

Interference 105,981
Clark v. Storer



1

2    Compound 17 of Matsuda depicts 2′-hydroxy-2′-methyl cytidine

3    Storer argues that a skilled artisan, when looking at the structure of the

4    claimed compound, would necessarily have recognized the need for a fluorinating

5    reagent for synthesis and that replacement of a hydroxyl (OH) group with fluorine

6    (deoxyfluorination) was a well-known organic transformation, as cited in such

7    reference texts such as Richard C. Larock, COMPREHENSIVE ORGANIC

8    TRANSFORMATIONS: A GUIDE TO FUNCTIONAL GROUP PREPARATIONS (2nd ed.)

9    (1999) ("Larock 1999") (Ex. 1199).  Storer Opp. 1, Paper 402 at 5 (citing Ex.

10   1200, ¶ 89; Ex. 2139, p. 100-101, ll. 22-15; Ex. 1248,[23] p. 90, ll. 13-19, p. 91, ll.

11   14-21, Ex. 1200, ¶ 79; Ex. 2139, p. 127, ll. 4-7; Ex. 1199, at 689 to 690 (Chapter 8,

12   "Halogenation of Alcohols")).

13   Storer also points out that Larock teaches the use of DAST in the

14   deoxyfluorination of a "variety of chemical compounds with success" and argues

15   that, by 2002, DAST was known as "the most convenient and powerful reagent for

16   deoxyfluorination" reactions.[24]  Storer Opp. 1, Paper 402 at 5-6 (citing Ex. 2014, p.

---

[23] Paper No. 549
[24] DAST is a nucleophilic fluorinating agent and acts by displacing the hydroxyl group and inverting the position of the methyl group.  Thus, a 2′-hydroxy ("up") –

12

Interference 105,981
Clark v. Storer

1  259; Ex. 1200, ¶ 82; Ex. 1223,[25] p. 2357; Ex. 2139, pp. 126-127, ll. 17-3).

2  Therefore, argues Storer, a skilled artisan would have appreciated that DAST could

3  have been used to transform the hydroxyl group of known nucleosides, such as

4  Matsuda Compound 17, into the 2´ ("down") fluorinated nucleosides recited in

5  Count 1. *Id.* at 6 (citing Ex. 1200, ¶ 85). Accordingly, contends Storer, the prior

6  art disclosed information that would have enabled a skilled artisan to synthesize a

7  2´-methyl ("up") 2´-fluoro ("down") nucleoside within the scope of Count 1. *Id.*

8  (citing Ex. 1200, ¶¶.74-99).

9  By way of example, Storer points out that an Idenix scientist, Jingyang

10  Wang, synthesized the compound, using DAST, on her first attempt without the

11  benefit of Clark's publication. Storer Opp. 1, Paper 402 at 6 (citing Ex 1232,[26] ¶¶

12  17-20; Ex. 1233,[27] p. 70, ll. 5-11; *see also* Ex. 1231[28]). Storer argues that is also

13  informative that Clark, a chemist without a Ph.D., was allegedly able to make a 2´-

14  methyl (up)-2´-fluoro (down) nucleoside in just a few months using DAST. *Id.*

15  (citing Ex. 1246,[29] p. 40, ll. 2-3; Ex. 1247,[30] ¶¶ 32, 39, 41).

---

2´ methyl ("down") cyclic sugar may become a 2´-methyl ("up") -2´-fluoro
("down") cyclic sugar. *See, e.g.*, Ex. 2014.
[25] Paper No. 527
[26] Paper No. 535
[27] Paper No. 536
[28] Paper No. 534
[29] Paper No. 547
[30] Paper No. 548

13

Interference 105,981
Clark v. Storer

1    Consequently, argues Storer, the synthesis of a 2´-fluoro-2´-methyl

2  nucleoside would not have required undue experimentation by one skilled in the

3  art.

4    We find it informative that Idenix's research team in Montpellier, France,

5  repeatedly attempted without success to synthesize a 2´-methyl ("up") 2´-fluoro

6  ("down") nucleoside during the interval between December, 2002 and September,

7  2004.  *See, generally*, Ex. 2128; 2129.  Regular progress reports and

8  correspondence of the Montpellier team during this interval demonstrate that

9  synthesis of a 2´-fluoro-2´-methyl nucleoside during this interval was considered to

10  be a high-priority result.  Exs. 2026-2044; *see, e.g.*, Ex. 2037, p. 3 (report dated

11  July, 31, 2003:  stating that synthesis of a 2´-fluoro-2´-methyl nucleoside with the

12  fluoro substituent in the "down" position "still a high priority").

13    During this interval, Idenix scientists also corresponded with consultants Dr.

14  George Fleet and Dr. Paul Coe in an attempt to effect a synthesis of the desired

15  compound.  *See, e.g.*, Ex. 2034[31] ("Prioritized Summary of Idenix Meeting with

16  G.W. J. Fleet held on 10th May 2004"); Ex. 2038 (communication from Dr. Coe to

17  Dr. Storer entitled "Thoughts on your synthesis problems").  Dr. Richard Storer,

18  one of the inventors of the S1 application, describes Dr. Fleet as "an expert in

19  carbohydrate chemistry" and "one of the best in the world" and describes Dr. Coe

20  as "an expert in organofluorine chemistry."  Ex. 2131[32], pp. 35, 74.  Both

21  consultants suggested possible schemes for the synthesis of a 2´-fluoro-2´-methyl

_____

[31] Paper No. 74
[32] Paper No. 625

14

Interference 105,981
Clark v. Storer

1 nucleoside with the fluorine substituent in the "down" position. Ex. 2034; Ex.

2 2038. In the latter communication, Dr. Coe related that:

3       [I]n our experience and indeed in that of manner [sic] other[,]
4       particularly the de Clerc group[,] the most viable routes to fluoro
5       nucleosides are by sugar/base condensation methods the anomer
6       problem notwithstanding, for the very reasons you have discovered, in
7       that leaving groups generated in situ[,] e.g.[,] in DAST reactions are
8       readily attacked by the pyrimidine ring nucleophiles or elimination
9       and/or participation of the blocking groups. Further migrations of
10      groups can readily occur.
11
12 Ex. 2038, p. 1.

13      Idenix personnel also attended a "Scientific Update Course" entitled

14 "Making and Using Fluoroorganic Molecules" in April, 2003, and submitted a

15 report summarizing the course content. Ex. 2039.

16      Nevertheless, despite these consultations, the Montpellier team was never

17 able to successfully synthesize a 2′-fluoro-2′-methyl nucleoside with the fluorine

18 substituent in the "down" position. Dr. Jean-François Griffon,[33] leader of the

19 Montpellier group, testified that he attempted at least seven different synthetic

20 schemes, including several suggested by Dr. Coe, and in some cases employing

21 DAST, without success. Ex. 2128, ¶¶ 8-64; Ex. 2132, p. 57. As Dr. Griffon

22 reported in an email to Dr. Storer on March 4, 2003: "As I told you last week at the

23 end of the Summary Meeting, the compound I obtained after treatment with

―――――――――――――

[33] By the standard we determined *infra*, we find that Dr. Griffon qualifies as a
person skilled in the art. *See* Ex. 2152 (Paper No. 542).

15

Interference 105,981
Clark v. Storer

1   DeoxoFluor[34] and deprotection was not the (very!) expected Fluoro derivative but

2   the 2´-methylene derivative." Ex. 2029, p. 1. A diagram in the accompanying

3   report documents the failure of this synthetic scheme, the end product having a 2´-

4   methylene group rather than the desired 2´-methyl-2´-fluoro groups:



5
6   Illustration from Ex. 2029 indicating synthesis of an undesired 2´-methylene
7   nucleoside (6b) rather than a 2´ (down) fluorination (6a).
8
9   *Id.*, p. 3

10      Furthermore, attempts by the Montpellier team to use DAST in the synthesis

11  of a 2´-fluoro-2´-methyl nucleoside produced similar failures, as this diagram from

12  an Idenix summary of results indicates:

_____

[34] Deoxo-Fluor® is, like DAST, a nucleophilic organic fluorinating agent. *See,
e.g.,* R.P. Singh and M.S. Jean'ne, *Recent advances in nucleophilic fluorination
reactions of organic compounds using deoxofluor and DAST*, 17 SYNTHESIS 2561-
2578 (2002).

16

Interference 105,981
Clark v. Storer



1

2       <u>Illustration from Ex. 2041 indicating synthesis of an</u>
3       <u>undesired 2′-methylene nucleoside via DAST reaction.</u>

4

5       Ex. 2041, p. 2.  The difficulties experienced by Idenix in synthesizing a 2′-fluoro-

6       2′-methyl nucleoside are expressed in a November 11, 2014 email from Dr. Storer

7       stating:

8            When we get this information together we'll decide what, if anything,
9            we will do in house and how it it [sic] fits with what anyone else
10           knows. *A lot of things which look simple on paper in related systems*
11           *have been tried and don't work in this series. Having to make the*
12           *tertiary fluoride is very different to having to make a secondary.*
13
14      Ex. 2044, p. 1 (emphasis added).

15           With respect to the testimony of Jingyang Wang who allegedly synthesized

16      the desired compound in a single attempt in January, 2015, at Idenix's research

17      facility in Cambridge, Massachusetts, we note that, prior to beginning her

18      synthesis, Ms. Wang had received the reports from the Montpellier group as well

19      as intermediate compositions synthesized at Montpellier.  Ex. 1233, pp. 99-101.

20      Consequently, Ms. Wang was not, as Storer seems to suggest, attempting synthesis

21      of a 2′-fluoro-2′-methyl nucleoside *ab initio*, but rather had the hindsight benefit of

22      the Montpellier group's efforts.  *Id.*

17

Interference 105,981
Clark v. Storer

1    Similarly, Storer's expert, Dr. Damha, points in his Declaration to what he

2  terms Scheme A, of which the first step is disclosed by the S1 application.  Ex.

3  1132, ¶ 67; *see also* Ex. 1003, p. 120.  Scheme A of Dr. Damha's declaration is

4  reproduced below:



**Scheme A**

5

6    <u>Scheme A shows a sequence of two steps by which a 2′-keto group is</u>
7    <u>replaced by a 2′-hydroxyl (up) - 2′-methyl (down) nucleoside which</u>
8    <u>is in turn replaced by DAST with a</u>
9    <u>2′-methyl (up)-2′-fluoro (down) nucleoside.</u>

10

11  Ex. 1132, ¶ 67.  The intermediate form 2 in Scheme A also corresponds to Matsuda

12  compound 17.  *Id.*, ¶ 69, fn. 5.  According to Dr. Damha:

13      A person skilled in the art as of June 28, 2002 could therefore simply
14      look at the 2′-F-2′-methyl-ribonucleoside species disclosed in the
15      '350 Application, and synthesize it without undue experimentation
16      using: (i) the starting materials and reagents disclosed in the '350
17      Application and known in the art [i.e., Matsuda compound 17], and
18      (ii) the then-existing routine DAST chemistry. It is well known that all
19      organic reactions produce by-product(s). As of June 28, 2002, it
20      would not have been a surprise to a person skilled in the art that
21      DAST fluorination might lead to elimination, rearrangement, or other
22      by-products. However, just like all other organic reactions, the DAST
23      fluorination does not need to be perfect to be useful in organic
24      synthesis, as separation and purification techniques were well-known
25      as a [sic] of June 2002.

18

Interference 105,981
Clark v. Storer

1    *Id.*, ¶ 76.  However, Dr. Damha's opinion is not borne out by the fact that this very

2    reaction was attempted by the Montpellier group and was not successful: attempts

3    to fluorinate compound 17 with DAST yielded a 2′-methylene nucleoside.  *See* Ex.

4    2041, p. 2.  Such a result is supported by Dr. Coe's suggestion that "leaving groups

5    generated in … DAST reactions are readily attacked by the pyrimidine ring

6    nucleophiles or elimination and/or participation of the blocking groups."  Ex. 2038,

7    p. 1.  The use of other fluorinating agents yielded similarly unsuccessful results.

8    *See, e.g.,* Ex. 2029, p. 3 (using DeoxoFluor® as the fluorinating agent).

9         We therefore find, based upon the proffered evidence, that a high amount of

10   experimentation is necessary to synthesize a 2′-fluoro-2′-methyl nucleoside with

11   the fluoro moiety in the "down" position requiring at least two years of a high

12   priority experimentation by persons skilled in the art, including multiple

13   consultations with experts at the top of their fields and additional formal training.

14        With respect to the second *Wands* factor, the amount of direction or

15   guidance presented, Clark argues, and Storer does not contest, that the S1

16   application provides no explicit explanation or example describing synthesis of a

17   2′-flouro "down" nucleoside as embodied in Count 1.  *See* Clark Subs. Motion 1,

18   Paper 389 12; Storer Opp. 1, Paper 402 at 12.  Clark also argues that no synthesis

19   of a 2′-fluoro-2′-C(H/F)$_3$ nucleoside, including any 2′-fluoro-2′-methyl

20   nucleoside, had been reported in the available art as of the S1 application's June

21   28, 2002 filing date.  Clark Subs. Motion 1, Paper 389 at 9 (citing Ex. 2001, ¶¶

19

A19

Interference 105,981
Clark v. Storer

1    137, 231; Ex. 2005, p. 22, ll. 4-8; Ex. 1194,[35] p. 91, ll. 12-16).  Rather, argues

2    Clark, its own US Appl. Pub. No. 2005/0009737 A1 (the "C2 application"),

3    published on January 13, 2005 (subsequent to the S1 application's June 28, 2002

4    filing date), was the first reported synthesis of a 2′-fluoro-2′-methyl nucleoside, an

5    embodiment of Count 1.  *Id.* at 9-10 (citing Ex. 2001, ¶¶ 137, 162; Ex. 2003, ¶¶

6    221, 222; Ex. 2005, p. 22, ll. 4-8; Ex. 2013,[36] cover page (item 43), ¶ [0294]-

7    [0035]).

8          Furthermore, argues Clark, the S1 application's failure to disclose any

9    specific starting materials or conditions under which such a compound could be

10   made cannot be rectified by reliance on the prior art for all of the required

11   teachings.  *Id.* (citing *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1366

12   (Fed. Cir. 1997); also citing Ex 2005, pp. 24-25, ll. 13-10, 26, ll. 2-5).  Clark

13   contends that Storer and its expert, Dr. Damha, argue that the S1 application

14   discloses "starting materials" and reagents (e.g., methyl lithium) for making 2′-

15   fluoro-2′-methyl nucleosides, and that an artisan purportedly would have

16   "immediately identified" operative methods for making such compounds by

17   reacting DAST with a 2′-methyl-2′-hydroxy nucleoside. Clark Subs. Motion 1,

18   Paper 389 at 13.

19         However, Clark relates, Dr. Damha, on cross-examination, admitted that: (1)

20   no such methods are found in the S1 application; (2) the S1 application does not

21   discuss any fluorinating reagents, including DAST; (3) the S1 application does not

_____

[35] Paper No. 498
[36] Paper No. 56

20

Interference 105,981
Clark v. Storer

1    disclose intermediate Compound 2 and final Compound 3 shown in Dr. Damha's

2    "Scheme A"; (4) nothing in Scheme 4 of the S1 application suggests isolating the

3    intermediate Compound 2 needed for the Damha "Scheme A" route, which has a

4    methyl group "down" and a hydroxyl group "up" at the 2′ position (the opposite 2′

5    stereochemistry from the compounds in Scheme 4); and (5) contrary to his

6    declaration, the S1 application does not "explicitly disclose" the reagent methyl

7    lithium.  Clark Subs. Motion 1, Paper 389 at 14 (citing Ex. 1194, pp. 97, ll. 5-8, 98,

8    ll. 11-17, 98-99, ll. 22-17, 101, ll. 15-16, 110, ll. 14-24, 121-122, ll. 19-11, 130, ll.

9    7-16).

10        Clark also argues that Dr. Damha's opinion relies on references not

11    mentioned in the S1 application, and he did not consider whether the S1

12    application would have guided an artisan to such literature.  Clark Subs. Motion 1,

13    Paper 389 at 14 (citing Ex. 1194, pp. 102, ll.12-17, 133-135, ll. 24-2).

14        Storer responds that the S1 application provides adequate guidance for

15    synthesizing compounds within Count 1.  Storer Opp. 1, Paper 402 at 9-10.  Storer

16    argues that the fluorination reagent DAST was known to the skilled artisan for

17    substituting fluorine for a hydroxyl group with inversion.  *Id.* at 10.  Therefore,

18    argues Storer, recognizing that inversion will occur, a skilled artisan would have

19    known to start with a nucleoside having a similar structure to that defined by Count

20    1, but with a 2′-OH (up) group, in order to obtain the desired 2′-F (down) structure

21    of the compounds within Count 1.  *Id.*at 12. (citing Ex. 1200, ¶ 90).

21

Interference 105,981
Clark v. Storer

1    Storer points out that Clark's expert, Dr. Stanislaus Wnuk[37] agreed that a

2    skilled artisan would have recognized Matsuda Compound 17 as a potential

3    precursor to the subject matter of count 1, which is depicted at paragraph 323 of

4    his Declaration.  Storer Opp. 1, Paper 402 at 12 (citing Ex. 2001).  Storer points

5    out that Matsuda Compound 17 differs from the claimed compound in that the

6    configuration at the 2′-position is inverted with a 2′-OH (up) instead of a 2′-fluoro

7    (down).  *Id.* at 12-13 (citing Ex. 1200, ¶ 92; Ex. 2139, pp. 107-108, ll. 18-6).

8    Further, alleges Storer, both parties' experts agree that the synthesis of the

9    compound of Count 1 would have been essentially a one-step reaction of Matsuda

10   Compound 17 with DAST.  *Id.* at 13 (citing Ex. 1200, ¶ 94; Ex. 2139, p. 156, ll. 2-

11   12).  Store contends that the synthesis of Matsuda Compound 17 is the same as the

12   product of the first steps of Scheme 4 of the S1 application which is reproduced, in

13   part, below:

---

[37] Clark's expert witness, Dr. Stanislaus F. Wnuk received his Ph.D. in organic
chemistry from Adam Mickiewicz University in Poznan, Poland in 1983 and is
currently Professor of Chemistry at Florida International University, a position he
has held since 1997.  Ex. 2001, ¶¶ 8-9.  He is the author of over 120 publications,
more than 80 of which pertain to nucleosides or nucleotides, with approximately
30 of those relating to fluorinated nucleosides or nucleotides.  *Id.*, ¶ 12.  He has
also received a number of research and teaching awards.  *Id.*, ¶ 11.  Upon review of
his curriculum vitae, we find that Dr. Wnuk is sufficiently qualified as an expert to
opine on the synthesis of fluorinated nucleosides.

22

Interference 105,981
Clark v. Storer



**Scheme 4**

1
2    <u>The initial reaction steps of Scheme 4 depicts synthesis of Compound 17 of</u>
3    <u>Matsuda, where $R^6$ is methyl, $R^1$ and $R^2$ are protective groups, and</u>
4    <u>the base is uracil</u>
5
6    *Id.* (citing Ex 1132, ¶¶ 65, 66; Ex. 1003, p. 120).  Storer points out that the

7    intermediate compound (2′-keto) of Scheme 4 is the starting material of Matsuda

8    Compound 17, wherein $R^1$ and $R^2$ form protecting groups and the Base is uracil.

9    *Id.* (citing Ex. 1132, ¶¶ 65-66; Ex. 1003, p. 120; Ex 1144, pp. 945-953).

10        As such, contends Storer, the specification of the S1 application teaches the

11    starting materials and methods for making Matsuda Compound 17, which is a

12    precursor to the claimed compound.  Storer Opp. 1, Paper 402 at 13.  Storer

13    concludes that the S1 application therefore provides a skilled artisan with the

14    starting materials and guidance for making the compounds within Count 1 without

15    undue experimentation.  *Id.* (citing Ex. 1200, ¶ 97).

16        We agree with Clark that the S1 application provides no explicit explanation

17    or guidance as to how to synthesize a 2′-flouro "down" nucleoside as embodied in

18    Count 1.  Moreover, we have related *supra* how the Idenix team identified such a

19    molecule as a high-priority target, but failed to synthesize such a compound for

20    approximately two years subsequent to the submission of the S1 application.

21    Moreover, we have related how the Idenix team attempted the very syntheses that

23

Interference 105,981
Clark v. Storer

1    Storer's expert Dr. Damha states would be suggested by the disclosures of the S1

2    document, but were unable to successfully synthesize the target molecule.  We

3    therefore find that the S1 application provides little in the way of direction or

4    guidance as to how to synthesize a 2′-fluoro-2′-methyl nucleoside with the fluoro

5    moiety in the "down" position.

6        The third *Wands* factor enquires into the presence or absence of working

7    examples of the invention.  It is uncontested by the parties that there were no

8    examples of such a molecule reported in the art prior to submission of the S1

9    application.  Clark Subs. Motion 1, Paper 389 at 9.  Clark contends, and Storer

10   does not contest, that the S1 application lacks a single, specific example teaching

11   how to synthesize any nucleoside having a fluorine atom substituent on the ribose

12   ring.  Clark Subs. Motion 1, Paper 389 at 12-13 (citing Ex. 2001, ¶¶ 138, 186, 202,

13   214, 230, 249; Ex. 2049, pp. 1-5297, ll. 1-21, Figs. 1-4).  Additionally, argues

14   Clark, the S1 application lacks any working example that an artisan could have

15   modified, without extensive experimentation, to make a compound falling within

16   either of Count 1's chemical formulae.  *Id.* at 13 (Ex. 2001, ¶¶ 138-141, 186, 202,

17   214, 229, 230, 235, 248, 249; Ex. 2049, pp. 1, ll.1-5297, Figs. 1-4; Ex. 2005, pp.

18   23-24, ll. 18-3).

19       With respect to the fourth *Wands* factor, the nature of the invention, Clark

20   contends that Count 1 is directed to methods for treating HCV infection using

21   certain 2′-fluoro-2′-C(H/F)$_3$ nucleosides, including certain 2′-fluoro-2′-methyl

22   nucleosides.  Clark Subs. Motion 1, Paper 389 at 9 (citing Ex. 2001, ¶¶ 45-50; Ex.

24

Interference 105,981
Clark v. Storer

1   2003,[38] ¶¶ 26, 28, 31-33, 40-42; Ex 2012,[39] p. 2:8-17; Ex. 2098,[40] col. 2221, ll. 9-

2   52).  According to Clark, because such compounds were not commercially

3   available as of June 28, 2002, it would have been necessary for an artisan to make

4   a compound falling within one of Count 1's chemical formulae.  *Id.* (citing Ex.

5   2001, ¶ 136; Ex. 2005, p. 20, ll. 23-26).

6        Storer does not contest Clark's characterization of the nature of the

7   invention, but responds that the nature of the invention is such as to require a high

8   level of skill in the art, so much so that a skilled artisan would have been familiar

9   with the methods for synthesizing nucleosides of the type within Count 1.

10       We find that the nature of the invention, as recite in Count 1 is best

11  characterized as the administration of a genus of nucleosides used in the treatment

12  of viruses, particularly those of the family *Flaviviridae* (which includes HBV and

13  HCV[41]).  We also find that, as of the time of filing of the S1 application, although

14  organic fluoridation mechanisms were generally well-known in the art a 2′-fluoro-

15  2′-methyl nucleoside with the fluoro substituent in the "down" position had not yet

16  been synthesized.

17       With respect to the fifth *Wands* factor, the state of the prior art, Clark argues

18  that no synthesis of a 2′-fluoro-2′-C(H/F)$_3$ nucleoside, including any 2′-fluoro-2′-

19  methyl nucleoside, had been reported in the available art as of S1's June 28, 2002

20  filing date.  Clark Subs. Motion 1, Paper 389 at 9 (Ex. 2001, ¶¶ 137, 231; Ex.

---

[38] Paper No. 47
[39] Paper No. 55
[40] Paper No. 137
[41] *See, e.g.*, Clark Subs. Motion 1, Paper 398 at 2

25

Interference 105,981
Clark v. Storer

1   2005, p. 22, ll. 4-8; Ex. 1194,[42] p. 91, ll. 12-16).  Rather, argues Clark, its US Appl.

2   Pub. No. 2005/0009737 A1 (the "C2 application"), published on January 13, 2005

3   (subsequent to the S1 application's June 28, 2002 filing date), was the first

4   reported synthesis of a 2´-fluoro-2´-methyl nucleoside.  *Id.* at 9-10 (citing Ex.

5   2001, ¶¶ 137, 162; Ex. 2003, ¶¶ 221, 222; Ex. 2005, p. 22, ll. 4-8; Ex. 2013,[43]

6   cover page (item 43), ¶ [0294]-[0035]).

7        Storer argues that the specification of the S1 application, when viewed in

8   light of the prior art, discloses sufficient information to enable a skilled artisan to

9   synthesize a 2´-methyl (up)-2´-F (down) nucleoside without undue

10  experimentation.  Storer Opp. 1, Paper 402 at 4.  According to Storer, and as

11  argued *supra*, a skilled artisan would have readily recognized that a well-known

12  precursor to the nucleoside, such as Matsuda Compound 17, could have been

13  transformed in a single step to a nucleoside within the scope of the count.  *Id.*

14  (citing Ex. 1132, ¶25; Ex. 1144,[44] p. 949; Ex 1115,[45] pp. 40-45).  Storer argues that

15  compounds that were one reaction step away from the compounds of Count 1, such

16  as 2´-methyl (down)-2´-OH (up) nucleosides, were well known by June 2002.  *Id.*

17  (citing Ex. 1132, ¶ 25; Ex. 1144, p. 949; Ex. 1115, pp. 40-45).

18       Reviewing the evidence before us, we find, with respect to the prior art, that

19  certain methods of organic fluoridation were well-known at the time of invention,

20  but that synthesis of a 2´-fluoro-2´-methyl nucleoside had not yet been reported in

---

[42] Paper No. 498
[43] Paper No. 56
[44] Paper No. 293
[45] Paper No. 269

26

Interference 105,981
Clark v. Storer

1   the prior art.  *See* Ex. 1132, ¶ 33.  The fluorinating agent DAST was well-known in

2   the prior art to be useful in the fluorination of nucleosides and nucleoside analogs.

3   For example, Johanna Wachtmeister et al., *Synthesis of 4-substituted carbocyclic*

4   *2,3-dideoxy-3-C-hydroxymethyl nucleoside analogues as potential anti-viral*

5   *agents*, 55 TETRAHEDRON 10761 (1999) ("Wachtmeister") teaches the use of

6   DAST in the fluoridation of certain carbocyclic nucleoside analogs in which the

7   oxygen in the five-member ribose ring is replaced with a carbon atom and

8   fluoridation takes place at the C-4 position.  Ex. 1148, p. 10763.  Similarly, P.

9   Herdewijn et al., *Synthesis of nucleosides fluorinated in the sugar moiety. The*

10  *application of diethylaminosulfur trifluoride to the synthesis of fluorinated*

11  *nucleosides*, 8(1) NUCLEOSIDES AND NUCLEOTIDES 65 (1989) ("Herdewijn")

12  teaches using DAST for, *inter alia*, fluoridation of nucleosides at the 2′ position.

13  Ex. 1160, pp. 65-96.  A. Van Aerschot et al., *2′,3′-difluoro- and 3′-azido-2′-fluoro*

14  *substituted dideoxypyrimidines as potential anti-HIV agents*, 98(12) BULL. SOC.

15  CHIM. BELG. 937 (1989) ("Van Aerschot") teaches the use of DAST to produce

16  various 2′-fluoro-nucleoside analogs.  Ex. 1151,[46] pp. 938-941.  Hiroyuki

17  Hayakawa et al., *Diethylaminosulfur trifluoride (DAST) as a fluorinating agent of*

18  *pyrimidine nucleosides having a 2′,3′-vicinal diol system*, 38(5) CHEM. PHARM.

19  BULL. 1136 (1990) ("Hayakawa") teaches that although "participation of the base

20  moiety often thwarts the desired introduction of a fluorine atom … appropriate

21  modification of the base and/or sugar moieties allowed the desired

22  fluorodehydroxylation to occur, giving 5′-, 3′-β, and 2′-α-fluorinated

---

[46] Paper No. 300

27

Interference 105,981
Clark v. Storer

1  uracilnucleosides in good yields." Ex. 1152, p. 1136. Consequently, we find that

2  it was well-known in the prior art that DAST could be employed in the 2′

3  fluoridation of nucleosides and nucleoside analogs.

4      Dr. Damha cites these prior art references, among others, as demonstrating

5  that:

6      The fluorinating reagent, DAST, may be used to prepare a 2′-F-
7      ribonucleoside in a single step from an "arabinonucleoside"
8      (compound 2 of Scheme A, above). As of June 28, 2002, DAST had
9      routinely been used in the nucleoside field to install a fluoro group at
10     the 2′-position of nucleosides, often with an unprotected nucleobase,
11     in a single step under very mild conditions.
12
13  Ex. 1132, ¶ 71. However, Dr. Damha admits that none of these references teaches

14  using DAST to convert a tertiary alcohol at a nucleoside 2′ position to a tertiary

15  fluoride at the nucleoside 2′ position:

16     Q. [Ms. Austin]    I just want to make sure the record is clear. So just
17         maybe a yes or a no, did any of these references describe using DAST
18         to convert a tertiary alcohol at a nucleoside 2′ position to a tertiary
19         fluoride at the nucleoside 2′ position?
20
21     […]
22
23     A. [Dr. Damha]    No.
24
25  Ex. 1194, p. 125. And Dr. Wnuk opined in response that "I believe it is an

26  oversimplification to assert that, because DAST had been used to fluorinate certain

28

Interference 105,981
Clark v. Storer

1   secondary and tertiary alcohols[47] with inversion of stereochemistry, it was

2   therefore well-known that it would react similarly with significantly different

3   substrates." Ex. 2145, ¶ 96.

4       We consequently find, with respect to the fifth *Wands* factor, that although

5   DAST was well-known in the prior art as fluoridating agent for nucleosides and

6   nucleoside analogs, the prior art did not teach, or explicitly suggest, the use of

7   DAST in the fluoridation of a tertiary alcohol to convert a tertiary alcohol at a

8   nucleoside 2′ position to a tertiary fluorine at the nucleoside 2′ "down" position.

9   We further find that, although organic fluoridation techniques were well-known in

10  the art at the time the S1 application was filed, fluoridation of tertiary alcohols to

11  produce a 2′ "down" tertiary fluorine was not taught or suggested by the prior art.

12      The sixth *Wands* factor is the relative level of skill of those in the art.  The

13  parties largely agree that the level of skill in the art is very high and on the

---------------------

[47] In a secondary alcohol, the carbon atom binding the hydroxyl group is attached
directly to two alkyl groups, which may be the same or different.  In a tertiary
alcohol, the carbon atom binding the hydroxyl group is attached directly to three
alkyl groups, any combination of same or different.  By way of example, Matsuda
compound 17:



is a tertiary alcohol because the 2′ carbon binding the hydroxyl group is bound to
three carbons: the 1′ and 3′ ring carbons and the carbon of the methyl (Me) group.

29

Interference 105,981
Clark v. Storer

1    qualifications of a person of ordinary skill.  *See* Ex. 1132, ¶ 14; Ex. 2001, ¶¶ 60-61.

2    We therefore find that a person possessing the ordinary level of skill in this art, as

3    of the time of invention, would hold a doctoral degree in the field of organic,

4    synthetic, or medicinal chemistry with at least a year's experience in the field of

5    nucleoside synthesis or relevant drug discovery.  Alternatively, that artisan could

6    hold a master's degree in one of those same fields with at least three years of

7    practical experience in the field of nucleoside synthesis or relevant drug discovery.

8         With respect to the seventh *Wands* factor, the predictability or

9    unpredictability of the art, Clark argues that the fluorination chemistry involved in

10   attempting to synthesize 2′-fluoro ("down") 2′-C(H/F)$_3$ ("up") nucleosides was

11   unpredictable at the time of Idenix's attempts to do so, because there was no

12   precedent in the literature for making such a substitution on tertiary carbons of the

13   ribose ring.  Clark Subs. Motion 1, Paper 389 at 12 (citing Ex. 2001, ¶¶ 154-159,

14   231; Ex. 2005, p. 22, ll. 12-17, Ex. 2007, pp. 19, ll. 4-12, 22, ll. 5-18; Ex. 2022,[48]

15   pp. 65-96; Ex. 2023,[49] pp. 574-78; Ex. 2024,[50] pp. 2315-16; Ex. 2025,[51] pp. 251-

16   54; Ex. 1194, pp. 91, ll. 12-16, 92, ll. 3-93:18, 125, ll. 4-18).  Clark maintains that

17   the prior art demonstrated that attempted fluorination reactions (including those

18   involving DAST) could fail, resulting in unfluorinated elimination and/or

19   rearrangement products, or products with incorrect stereochemistry. *Id.* (citing Ex.

--------

[48] Paper No. 62
[49] Paper No. 63
[50] Paper No. 64
[51] Paper No. 65

30

Interference 105,981
Clark v. Storer

1   2001, ¶¶ 156, 231; Ex. 2014,[52] p. 259, ll. 15-20; Ex. 2015,[53] pp. 7570-7571, ll. 18-

2   4; Ex. 2016,[54] pp. 2563 (left col, ll. 11-14, Scheme 5), 2564 (Scheme 9); Ex.

3   2017,[55] pp. 1090-91; Ex. 2018,[56] pp. 554-55; Ex. 2139,[57] pp. 156-157, ll. 15-3).

4        Clark argues further that the documents that produced by Storer in the

5   related 105,871 Interference demonstrate that DAST treatment of tertiary and

6   secondary alcohols failed to produce fluorinated products.  Clark points out that

7   Dr. Paul Coe, an expert in organofluorines expressed skepticism regarding the use

8   of DAST; and Dr. Richard Storer stated that "[a] lot of things which look simple

9   on paper in related systems have been tried and don't work in this series.  Having

10  to make the tertiary fluoride is very different to [sic] having to make secondary."

11  *Id.* (citing Ex. 2001, ¶¶ 157, 158, 174; Ex. 2007, pp. 15-17, ll. 15-2; 20, ll. 3-8; Ex.

12  2029, p. 2 (numbered p. 1); Ex. 2035, p. 3 (numbered p. 2); Ex. 2038, pp. 1-3, 5-

13  10; Ex. 2041,[58] p. 1; Ex. 2042,[59] p. 1; Ex. 2043,[60] pp. 38, 40; Ex. 2044,[61] p. 1; Ex

14  2139, pp. 146, ll. 9-22, 147, ll. 14-23).

15       Storer responds that deoxyfluorination with DAST was highly predictable.

16  Storer Opp. 1, Paper 402 at 7 (citing Ex. 1200, ¶¶ 100-131).  According to Storer,

---

[52] Paper No. 57
[53] Paper No. 58
[54] Paper No. 59
[55] Paper No. 60
[56] Paper No. 61
[57] Paper No. 368
[58] Paper No. 81
[59] Paper No. 82
[60] Paper No. 83
[61] Paper No. 84

31

Interference 105,981
Clark v. Storer

1   the references that Clark and its expert, Dr. Wnuk, rely on in support of their

2   argument that fluorination with DAST was unpredictable are Exhibit 2018,

3   Krzysztof W. Pankiewicz et al., *A synthesis of 9-(2-deoxy-2-fluoro-β-D-*

4   *arabinofuranosyl) adenine and hypoxanthine. An effect of C3´-endo to C2´-endo*

5   *conformational shift on the reaction course of 2´-hydroxyl group with DAST*, 57 J.

6   ORG. CHEM. 553-59 (1992)[62] ("Pankiewicz") and Exhibit 1152, Hiroyuki Hyakawa

7   et al., *Diethylaminosulfur trifluoride (DAST) as a fluoridating agent of pyrimidine*

8   *nucleosides having a 2´,3´-vicinal diol system*, (38(5) CHEM. PHARM BULL. 1136-

9   39 (1990) ("Hayakawa")[63].   Storer argues that Clark relies upon these references

10  to demonstrate that using DAST in the preparation of fluoridated nucleosides may

11  result in a "rearrangement product" and an "unfluorinated 2´-cyclo derivative."  *Id.*

12  (citing Storer Motion 1, p. 12, ll. 6-11; Ex. 2001, ¶ 156; Ex. 2145, ¶ 98).  However,

13  argues Storer, both Pankiewicz and Hayakawa teach that DAST deoxyfluorination

14  of a nucleoside with a 2´-OH (up) proceeded with inversion to form a nucleoside

15  with a 2´-F (down) in over 80% yields without any alleged rearrangement or

16  unfluorinated products reported.  *Id.* (citing Ex. 1152, p. 1139; Ex. 2018, p. 559;

17  Ex. 2139, p. 149-150, ll. 10-11. Ex. 1248, p. 87, ll. 2-11).

18      Storer also disputes that Exhibit 2015 teaches that fluorination with DAST

19  may proceed with double inversion resulting in a "product with unexpected

20  stereochemistry" as Clark and its expert suggest.  Storer Opp. 1, Paper 402 at 8

21  (citing Clark Motion 1, p 12, ll. 6-11; Ex. 2001, ¶ 156).  Exhibit 2015 is Lak S.

———————————————

[62] Paper No. 61
[63] Paper No. 301

32

Interference 105,981
Clark v. Storer

1   Jeong et al., *Unanticipated retention of configuration in the DAST fluorination of*

2   *Deoxy-4´-thiopyrimidine nucleosides with "up" hydroxyl groups*, 35(41)

3   TETRAHEDRON LETTERS, 7569-72 (1994) ("Jeong").  According to Storer, the title

4   of the article explains that the double inversion was not the norm.  *Id.*  According

5   to Storer, Jeong teaches that the double inversion was a result of the sulfur atom in

6   the thiofuranose ring, which is not present in the compounds of Count 1.  *Id.*

7   (citing Ex. 2139, p. 136, ll. 8-12).

8       Storer also points to Exhibits 2014, 2016, and 2017, which Clark and its

9   expert rely upon to argue that deoxyfluorination with DAST may result in an

10  "unfluorinated dehydration product," a "rearrangement product," or an

11  "elimination product."  Storer Opp. 1, Paper 402 at 9 (citing Storer Motion 1, p. 12,

12  ll. 6-11; Ex. 2001, ¶ 156).  According to Storer, none of the DAST reactions relied

13  upon by Clark was performed on a nucleoside.  *Id.*  Nevertheless, argues Storer,

14  Exhibit 2014 teaches that "diethylaminosulfur trifluoride (DAST) appears to be the

15  most convenient and powerful reagent for deoxyfluorination," and Exhibit 2016

16  teaches that "Deoxo-Fluor …and DAST … are widely used in one-step reactions

17  for the introduction of fluorine into organic compounds."  *Id.* (quoting Ex. 2014, p.

18  259; Ex. 2016, p. 2561).  Moreover, argues Storer, Dr. Wnuk agreed that the latter

19  statement describes the state of the art for fluorination in 2002.  *Id.* (citing Ex.

20  2139, p. 139, ll. 13-21).

21      Having reviewed the parties' arguments, and the proffered evidence, we find

22  that the art, with respect to fluoridation of tertiary alcohols, was highly

23  unpredictable, as evidenced by Idenix's repeatedly unsuccessful attempts to

33

Interference 105,981
Clark v. Storer

1    synthesize its high-priority target nucleoside, and as further evinced by the

2    statements of Dr. Coe and Dr. Storer.  *See* Ex. 2038, p. 1; Ex. 2044, p. 1.

3         In summary, having reviewed the *Wands* factors argued by the parties,[64] we

4    find that (1) synthesis of a 2′-fluoro-2′-methyl nucleoside with the fluoro moiety in

5    the "down" position required at least two years of a high-priority experimentation

6    by persons skilled in the art, including multiple consultations with experts at the

7    top of their fields and additional formal training; (2) the S1 application provides

8    little in the way of direction or guidance as to how to synthesize such a compound;

9    (3) the S1 application provides no explicit example of  a 2′-fluoro-2′-methyl

10   nucleoside, nor was an example provided by the relevant art as of the S1

11   application's filing date; (4) the invention is characterized as the administration of

12   a genus of nucleosides used in the treatment of viruses, particularly those of the

13   family *Flaviviridae* (which includes HBV and HCV) and an embodiment of the

14   count requires a 2′-fluoro ("down") 2′-methyl nucleoside; (5) although organic

15   fluoridation techniques were well-known in the art at the time the S1 application

16   was filed, fluoridation of tertiary alcohols to produce a 2′ "down" tertiary fluorine

17   was not taught or suggested by the prior art; (6) the level of skill in the art was

18   highly sophisticated: a person possessing the ordinary level of skill in this art, as of

19   the time of invention, would hold a doctoral degree in the field of organic,

20   synthetic, or medicinal chemistry with at least a year's experience in the field of

21   nucleoside synthesis or relevant drug discovery; and (7) the art, at least with

22   respect to fluoridation of tertiary alcohols to produce a tertiary fluorine in the 2′

_____

[64] Neither party argued the eighth *Wands* factor, the breadth of the claims.

34

Interference 105,981
Clark v. Storer

1   "down" position, was highly unpredictable.  We therefore find that *Wands* factors

2   1, 2, 3, 5, and 7 strongly indicate that a person skilled in the art would not arrive at

3   the claimed invention without undue experimentation.  We therefore conclude that

4   the S1 application does not enable any species of Count 1, all of which require a

5   fluorine atom in the 2′ "down" position.

6        A party is accorded benefit of the date of an earlier application if its earlier

7   application constitutes a constructive reduction to practice of the count.  Bd.R.

8   41.201.  Clark, as the party challenging Storer's accorded benefit of the S1

9   application, must therefore demonstrate that the S1 application does not provide a

10  constructive reduction to practice of Count 1.   SO ¶ 208.4.2.  Constructive

11  reduction to practice means a described and enabled anticipation under 35 U.S.C.

12  102(g)(1) in a patent application of the subject matter of Count 1.  Bd.R. 41.201.

13  Thus, even if the S1 application does not describe and enable the full scope of

14  Count 1, Storer cannot be deprived of the filing date of the S1 application if the S1

15  application describes a single embodiment or species that meets all of Count 1's

16  limitations.

17       Neither party disputes that all of the species of the genus contemplated

18  within the scope of Count 1 require a fluorine atom in the "down" position and a

19  $C(H/F)_3$ moiety in the "up" position at the 2′ carbon of the sugar ring.  We have

20  found that the analysis of the factors set forth in *Wands* compel the conclusion that,

21  at the time the S1 application was filed, a person skilled in the art would not have

22  been able to synthesize any of the 2′-fluoro ("down") nucleosides of Count 1

23  without undue experimentation.  We therefore conclude that the S1 application

35

Interference 105,981
Clark v. Storer

1  does not enable a single species of Count 1 and, consequently, the S1 application is

2  not a constructive reduction to practice of Count 1.  Because we find this issue to

3  be dispositive of the motion, we do not reach Clark's other arguments.  Clark

4  Substantive Motion 1 to deny Storer the accorded benefit of its S1 application is

5  granted.

6

7  **B. Clark Substantive Motions 2 and 3**

8      Clark Substantive Motion 2 seeks to deprive Storer of the benefit accorded

9  with respect to Count 1 of its U.S. Appl. No. 60/466,194 (the "S2 application")

10  filed April 28, 2003.  Clark Subs. Motion 2, Paper 390 at 1.  Clark Substantive

11  Motion 3 seeks to deprive Storer of the benefit accorded with respect to Count 1 of

12  its US Appl. No. 60/470,949 (the "S3 application") filed May 14, 2003.  Clark

13  Subs. Motion 3, Paper 391 at 1.

14      Clark argues that although Storer was accorded benefit of the S2 and S3

15  applications when the present interference was declared, Storer has not relied upon

16  either in any of its motions in the present interference.  Clark Subs. Motion 2,

17  Paper 390 at 9; Clark Substantive Motion 3, Paper 391 at 9.  According to Clark,

18  that constitutes an admission by Storer that the S2 and S3 applications are

19  unrelated to the subject matter in dispute between the parties.  Clark Subs. Motion

20  2, Paper 390 at 9; Clark Substantive Motion 3, Paper 391 at 9.

21      Clark argues that Count 1 of the interference pertains to a method for

22  treating HCV infection.  Clark Subs. Motion 2, Paper 390 at 10; Clark Subs.

36

Interference 105,981
Clark v. Storer

1   Motion 3 Paper 391 at 10 (citing Declaration,[65] p. 3, ll. 16-17; Ex. 2001, ¶¶ 45-50;

2   Ex 2003, ¶¶ 26, 28, 29, 31-33; 40-42; Ex. 2012,[66] p. 2:8-17; Ex. 2098, col. 2221, ll.

3   9-52).  However, argues Clark, the S2 and S3 applications are deficient because it

4   fails to mention HCV or methods for treating HCV infection, as required by Count

5   1.  *Id.* (citing Ex. 2001, ¶¶ 256-261; Ex. 2003, ¶¶ 140-141, 145-147; Ex. 2050,[67]

6   pp. 1-36, Figs. 1-3).  According to Clark, the S2 and S3 applications disclose

7   processes for chemically synthesizing certain prodrugs of antiviral nucleosides.  *Id.*

8   (citing Ex. 2001, ¶¶ 58, 59; Ex. 2003, ¶¶ 49, 136-137; Ex. 2050, pp. 1, ll. 3-6, 6-9,

9   ll. 24-9).

10      Clark also argues that Count 1 requires certain compounds, specifically,

11   certain $2'$-fluoro-$2'$-C(H/F)$_3$ nucleosides, which the S2 and S3 applications fail to

12   disclose.  Clark Subs. Motion 2, Paper 390 at 10; Clark Subs. Motion 3, Paper 391

13   at 10 (citing Ex. 2001, ¶ 256-261; Ex. 2050, pp. 1-36, Fig. 1-3).  Therefore, argues

14   Clark, as of the filing dates of the S2 and S3 applications, an artisan would not

15   have believed that S2 and S3's applicants were in possession of any compound(s)

16   falling within either of Count 1's chemical formulae, or any method(s) for treating

17   HCV infection involving such compound(s).  Clark Subs. Motion 2, Paper 390 at

18   11; Clark Subs. Motion 3, Paper 391 at 13 (citing Ex. 2001, ¶¶ 256-261).

19      Clark also argues that the S2 and S3 applications fail to provide an enabling

20   anticipation of Count 1 because it does not teach an artisan as how to make any

─────────────────────

[65] Paper No. 1
[66] Paper No. 55
[67] Paper No. 112

37

Interference 105,981
Clark v. Storer

1    nucleoside falling within the scope of Count 1, or teach how to treat HCV infection

2    using any such nucleoside, without undue experimentation. Clark Subs. Motion 2,

3    Paper 390 at 11; Clark Subs. Motion 3, Paper 391 at 13 (citing Ex. 2001, ¶¶ 256-

4    261; Ex. 2003, ¶¶ 136-147; Ex. 2050, pp. 1-36, Fig. 1-3).

5        Storer argues only that Clark has failed to establish that it is entitled to the

6    relief requested.  Storer Opp. 2, Paper 403 at 2; Storer Opp. 3, Paper 403 at 2

7    Storer does not provide substantive argument and does not direct us to evidence to

8    contradict Clark's arguments.

9        We have reviewed the disclosures of the S2 and S3 applications.  For the

10   reasons stated with respect of the S1 application, we agree with Clark that the S2

11   and S3 applications do not describe either the genus of Count 1 or an embodiment

12   that meets all the limitations of that count.  Clark Substantive Motions 2 and 3 to

13   deprive Storer of the benefit accorded with respect to Count 1 of its S2 and S3

14   applications are granted.

15

16   **C. Clark Substantive Motion 7**

17       Clark's Substantive Motion 7 seeks judgment against Storer on the grounds

18   that involved claims 1-12, 17, 18, 20, 33, 34, 36, 38, 49-57, 62, 64, and 76-85 of

19   Storer's involved US Patent No. 7,608,600 B2 (the "'600 Patent") are unpatentable

20   under 35 U.S.C. § 112, 1st paragraph for lack of enablement and written

21   description.  Clark Subs. Motion 7, Paper 154 at 1.  To prevail, Clark must

22   demonstrate that the Specification of the '600 patent does not support the full

23   scope of the claimed subject matter.

38

Interference 105,981
Clark v. Storer

1    Claim 1 of the '600 patent has been recited *supra* as part of Count 1 and we

2    do not repeat it here.  As we have related, Cark argues that the salient limitation of

3    Storer claim 1, for purposes of enablement, is the fluorine atom in the 2´ "down"

4    position, thus:



5

6    Ex. 1001-2, col. 2221, ll. 14-24.  Storer's involved dependent claims 2-12, 17, 18,

7    20, 33, 34, 36, 38, and 49 all depend from claim 1 and all claim a fluorine atom in

8    the 2´ "down" position.  Ex. 1001-2.  Storer's involved claims 51-57, 62, 64, and

9    76-85 all depend from independent claim 50, which also claims a fluorine atom in

10   the 2´ "down" position, as do all of the involved claims depending from it.  *Id.*

11   Storer's '600 patent issued from Storer's S4 application, which claims

12   priority benefit of the S1 application.  *See* Ex. 1001, p. 1.  Clark argues that, as of

13   June 27, 2003, the filing date of the S4 application, there was no available prior art

14   reporting synthesis of a 2´-fluoro-2´-C(H/F)$_3$.  Clark Motion 7, paper 154, at 9,

15   citing Wnuk Decl., Ex. 2001, ¶¶ 136, 137.  Clark argues further that the prior art as

16   of 27 June 2003 would not have taught an ordinarily skilled artisan how to make

17   the recited nucleoside without undue experimentation.  *Id.* at 10.

18   Storer does not argue or direct us to evidence of art available prior to the

19   June 27, 2003 filing of the S4 application that reporting or describing synthesis of

39

Interference 105,981
Clark v. Storer

1   the recited nucleosides.  Accordingly, because we have found *supra* that the S1

2   application does not enable a nucleoside as recited in Count 1, we find that the

3   specification of the '600 patent does not enable Storer's involved claims.  We

4   therefore conclude that the involved claims 1-12, 17, 18, 20, 33, 34, 36, 38, 49-57,

5   62, 64, and 76-85 of '600 patent are unpatentable under 35 U.S.C. § 112, 1st

6   paragraph, for lack of enablement.[68]  Clark Substantive Motion 7 for judgment

7   against the involved claims of Storer's '600 patent is granted.

8

9   **D. Clark Substantive Motion 10**

10          Clark next moves to deprive Storer of the benefit accorded with respect to

11   Count 1 of US Appl. No. 10/608,907, filed June 27, 2003 (the "S4" application).

12   Motion at 1.  Clark contends that the S4 application ~~S4~~ lacks enablement, written

13   description, and utility for subject matter anticipating Count 1.  Clark Subs. Motion

14   10, Paper 392 at 1.  Storer has opposed.  Storer Opp. 10, Paper 405.  Clark has

15   replied.  Clark Reply 10, Paper 422.

16          Because we have determined *supra* that Storer's involved claims -12, 17, 18,

17   20, 33, 34, 36, 38, 49-57, 62, 64, and 76-85 are unpatentable under 35 U.S.C. §

18   112, first paragraph, for lack of enablement, we need not reach this motion. ~~.~~

19

_____

[68] We note that all of the remaining claims of the '600 patent similarly recite a
fluorine atom in the 2´ "down" position and may likewise be unpatentable under 35
U.S.C. § 112, first paragraph, for the same reasons.  Storer may wish to seek re-
examination of these claims.

40

Interference 105,981
Clark v. Storer

1   **E. Clark Substantive Motion 5**

2       Clark next moves to substitute its proposed count 2 or, alternatively, its

3   proposed count 3, for Count 1.  Clark Subs. Motion 5, Paper 192 at 1.  Clark's

4   Proposed Count 2 is simply its Count 164 of its '218 application.  *Id.*

5       However, because we have already determined that Storer's involved claims

6   are unpatentable, we *sua sponte* remove Storer's unpatentable claim 1 from the

7   count and reformulate Count 1 as Clark's claim 164.

8       We therefore need not reach Clark's Substantive Motion 5.

9

10  **F. Clark's Substantive Motion 8**

11      Clark's Substantive Motion 8 seeks judgment against Storer on the ground

12  that all of Storer's involved claims, claims 1-12, 17, 18, 20, 33, 34, 36, 38, 49-57,

13  62, 64, and 76-85 of Storer's '600 patent are unpatentable under 35 U.S.C. § 101,

14  for lack of utility and, accordingly under 35 U.S.C. § 112, 1st paragraph, for lack

15  of enablement.  Clark Subs. Motion 8, Paper 155 at 1.

16      Our decision on Clark's Substantive Motion 7 that Storer's involved claims

17  are unpatentable under 35 U.S.C. § 112, 1st paragraph, for lack of enablement is

18  dispositive of the patentability of Storer's claims.  Therefore, it is unnecessary for

19  us to reach this motion.  Clark's Substantive Motion 8 is consequently dismissed.

20

21  **G. Clark Substantive Motion 9**

22      Clark Substantive Motion 9 seeks judgment against Storer on the ground that

23  all of Storer's involved claims, claims 1-12, 17, 18, 20, 33, 34, 36, 38, 49-57, 62,

41

Interference 105,981
Clark v. Storer

1  64, and 76-85 of Storer's '600 patent are unpatentable under 35 U.S.C. §§ 102(e)

2  or 103 as being either anticipated by, or obvious over, Clark's US Appl. No.

3  10/828,753 (the "C2 application"), filed April 21, 2004.   Clark Subs. Motion 9,

4  Paper 156 at 1.

5       Our decision on Clark's Substantive Motion 7 that Storer's involved claims

6  are unpatentable under 35 U.S.C. § 112, 1st paragraph, for lack of enablement is

7  dispositive of the patentability of Storer's claims.   Therefore, it is unnecessary for

8  us to reach Clark Substantive Motion 9.

9

10  **H. Clark Miscellaneous Motion 18**

11       Clark has moved to exclude the following Storer Exhibits: 1132, 1175-76,

12  1177, 1200, 1201, 1228, 1229, 1231, 1232, and 1233.   Clark Misc. Motion 18,

13  Paper 427 at 1.

14

15  <u>1. Storer Exhibit 1132</u>

16       Clark argues that Storer Exhibit 1132, the Declaration of Masad J. Damha,

17  Ph.D., (the "Damha Declaration") is inadmissible under SO ¶ 105.6 because it is

18  an affidavit without an original signature.   Clark Misc. Motion 18, Paper 427 at 1.

19  According to Clark, Dr. Damha, Storer's declarant, testified at his deposition that

20  he did not sign a paper copy of Exhibit 1132 in ink, but instead inserted a digital

21  image of his signature.   *Id.* (citing Ex. 1194 , p. 26, ll. 14-24).   Furthermore, argues

22  Clark, there is no original copy of Exhibit 1132 with a handwritten original

42

Interference 105,981
Clark v. Storer

1  signature that could have been retained or made available on demand, which is also

2  in violation of SO ¶ 105.6.  *Id.*  (citing Ex. 1194, pp. 26-27, ll. 25-4).

3         Alternatively, argues Clark, paragraphs 61-81 of the Damha Declaration

4  should be excluded under Federal Rule of Evidence 702 because Dr. Damha's

5  opinions expressed in these paragraphs are not based on sufficient facts or data.

6  Clark Misc. Motion 18, Paper 427 at 2.  According to Clark, when opining that it

7  would have been trivial for an artisan to make 2′-fluoro-2′-methyl nucleosides, Dr.

8  Damha did not take into account Storer's own documents from the prior

9  '871 interference (e.g., Ex. 2029, Ex. 2035, Ex. 2041, Ex. 2042, and Ex. 2043).

10        Storer responds that Dr. Damha verified during his deposition that he

11  personally inserted his digital signature into his Declaration.  Storer Opp. 18, Paper

12  29 at 1 (citing Ex. 1194, p. 26, ll. 19-24.  Therefore, argues Storer, although Dr.

13  Damha did not handwrite his signature on a paper copy of his declaration, he did

14  verify that he personally electronically signed the declaration.  *Id.*  Storer submits

15  that the Board should accept this as sufficient.  *Id.*

16        Storer also argues that Clark did not timely object to Exhibit 1132 at the

17  deposition and also failed to request a conference call with the Administrative

18  Patent Judge managing the interference to seek authorization to belatedly object to

19  Exhibit 1132.  Storer Opp. 18, Paper 29 at 1 (citing 37 C.F.R. § 41.155(a)).

20        Dr. Damha has affirmed that the digital signature is a reproduction of his

21  own signature and that the declaration was his own.  We therefore decline to

22  exclude the Exhibit on this ground.

43

Interference 105,981
Clark v. Storer

1    More substantially, we agree with Storer that whether Dr. Damha examined

2    the '871 interference documents prior to forming his opinion on whether a person

3    of ordinary skill could have synthesized 2´-fluoro-2´-methyl nucleoside

4    compounds is a question of the probative weight of the opinion testimony and not

5    one of admissibility. We held, *supra*, that Dr. Damha was qualified as an expert.

6    He may express his opinions on matters relevant to this interference.  Federal Rule

7    of Evidence 702 states that a "witness who is qualified as an expert by knowledge,

8    skill, experience, training, or education may testify in the form of an opinion or

9    otherwise if … the testimony is based on sufficient facts or data."  Fed. R. Evid.

10   702(b).

11   We therefore decline to exclude Exhibit 1132.

12

13   2. Storer Exhibits 1175 and 1176

14   Clark next argues that Storer Exhibits 1175[69] and 1176[70], which comprise

15   two emails to the Patent Trial and Appeal Board concerning the '871 interference,

16   with copies to Administrative Patent Judge New, discuss Storer's allegations of

17   inequitable conduct and request authorization to move for additional discovery in

18   the present interference, are inadmissible in their entirety because they are

19   irrelevant under Rule 402, as well as confusing and a waste of time under Rule

20   403.  Clark Misc. Motion 18, Paper 427 at 3.

_____

[69] Paper No. 458
[70] Paper No. 459

44

Interference 105,981
Clark v. Storer

1    Storer was not authorized to file a motion asserting inequitable conduct and

2    has not raised the issue in any of its substantive or contingent motions considered

3    herein.  Because this evidence is unrelated to any of the matters before us we

4    decline to address the admissibility of Exhibits 1175 and 1176 as an evidentiary

5    matter.  However, because the exhibits are extraneous to this proceeding we order

6    that they be expunged from the record.  Bd.R. 7(a) & 122(c)(1)(iii).

7

8    3. Storer Exhibit 1177

9    Storer Exhibit 1177[71] is a copy of an order (Docket No. T-1156-12) from

10   Federal Court of Canada, regarding the litigation with respect to the Canadian

11   versions of Storer's involved patent and Clark's involved application in that venue.

12   Clark seeks exclusion of Exhibit 1177 on substantially the same grounds that it

13   seeks exclusion of Exhibits 1175 and 1176.  Clark Misc. Motion 18, Paper 427

14   at 4.

15   Storer has not raised, in any of its substantive or contingent motions, any

16   argument that relies upon this Exhibit and, having reviewed the Exhibit, we can

17   discern no purpose for it to be included in this proceeding.  Because the exhibit

18   appears to be extraneous to this proceeding, we decline to consider it as an

19   evidentiary matter and order that it be expunged from the record of this

20   proceeding.  Bd.R. 7(a) & 122(c)(1)(iii).

21

_____

[71] Paper No. 460

45

Interference 105,981
Clark v. Storer

1   4. Storer Exhibit 1200

2       Clark next seeks exclusion of Exhibit 1200, the Second Declaration of

3   Dr. Damha.  Clark Misc. Motion 18, Paper 427 at 5.  According to Clark, Dr.

4   Damha failed to consider relevant information.  Clark argues that Dr. Damha did

5   not take into account the Storer Documents when forming his view that it would

6   have been trivial for an artisan to make 2′-fluoro-2′-methyl nucleosides as of June

7   28, 2002.  *Id.* (citing Ex. 1244, pp. 26-40, ll. 19-15).  Clark argues further that Dr.

8   Damha testified that such evidence was not important and that there was not "any

9   chance" that it could have affected his opinions, despite the Board having

10  previously found it significant.  *Id.* (citing Ex. 1244, pp. 31-40, ll. 15-15).

11      We have related *supra*, with respect to Storer's Exhibit 1132, why the

12  credibility of Dr. Damha's opinion testimony is a probative question on the merits

13  of Storer's substantive motions.  The issue is one of the weight of the testimony

14  rather than one of admissibility.  We employ the same reasoning here.  Clark's

15  motion to exclude Exhibit 1200 is denied.

16

17  5. Storer Exhibit 1201

18      Storer Exhibit 1201 is the Second Declaration of Raffaele De Francesco,

19  Ph.D.  According to Clark, Dr. De Francesco opines on an artisan's ability to

20  perform high throughput testing of compounds for activity against hepatitis C virus

21  ("HCV") using an HCV replicon assay during the 2000-2003 timeframe.  Clark

22  Misc. Motion 18, Paper 427 at 5 (citing Ex. 1201, ¶¶ 82, 95-101).  Clark argues

23  that Dr. De Francesco's opinions are based on unpublished techniques allegedly

46

Interference 105,981
Clark v. Storer

1    used in his own labs. Because the reaction conditions and experimental processes

2    for these screening experiments were not published, argues Clark, they were not

3    available to the artisan to utilize, test or publicly critique. Clark Misc. Motion 18,

4    Paper 427 at 5-6 (citing Ex. 2171, ¶ 128). Therefore, contends Clark, De

5    Francesco's testimony regarding his non-public activities within his laboratory

6    does not provide any insight whatsoever into any issue pending in this. Motion at

7    6.

8         Storer did not oppose Clark's motion to exclude Exhibit 1201. Nevertheless,

9    we are not persuaded by Clark's arguments. As we have related *supra*, with

10   respect to Storer's Exhibits 1132 and 1200, the credibility of Dr. De Francesco's

11   opinion testimony is a probative question on the merits of Storer's motions. The

12   issue is one of weight and not one of admissibility. We employ the same reasoning

13   here. Clark's motion to exclude Exhibit 1201 is denied.

14

15   6. Storer Exhibit 1228 and 1229

16        Storer Exhibit 1228[72] is the transcript of the deposition of Stanley Moncrief

17   Lemon and Storer Exhibit 1229[73] is the transcript of the deposition of Jeffrey Scott

18   Glenn, both taken on Tuesday, July 31, 2012. Clark Misc. Motion 18, Paper 427 at

19   7. Clark argues that both transcripts are inadmissible as hearsay under Rule 802,

20   and under SO ¶¶ 157.1 and 157.3, because they are transcripts of depositions taken

21   in the prior 105,871 interference. *Id.* Clark contends that if Storer wanted to rely

_____

[72] Paper No. 531
[73] Paper No. 532

47

Interference 105,981
Clark v. Storer

1  on the testimonies of Drs. Lemon and Glenn, it should have submitted a new

2  declaration from both individuals in the present case, thereby making them subject

3  to cross-examination in this interference. *Id.*

4      Storer points out that Clark has failed to demonstrate that Storer relies on

5  Exhibits 1228 and 1229 to prove the truth of any statements therein. Storer Opp.

6  18, Paper 429 at 7, 8. Storer points out that Clark has not directed the Board to any

7  statements in either Exhibit that Storer relies on to prove the truth of an asserted

8  matter. *Id.* Finally, Storer argues that that Clark was a party to the prior 105,871

9  interference and that Clark cross-examined both deponents during their respective

10  depositions. *Id.* (citing Exs. 1228; 1229). Moreover, contends Storer, Clark

11  submitted the Declarations of Drs. Lemon and Glenn, which was the basis for the

12  deposition as Exhibit 2167. *Id.* Therefore, argues Storer, Clark is not prejudiced

13  by the introduction of Exhibits 1228 into evidence. *Id.*

14      We agree that Storer has not relied upon Exhibits 1228 and 1229 in support

15  of any of its arguments in its substantive or contingent motions. Accordingly, we

16  can discern no purpose for it to be included in this proceeding. We decline to

17  consider it as an evidentiary matter and order that it be expunged from the record

18  of this proceeding. Bd.R. 7(a) & 122(c)(1)(iii).

19

20  <u>7. Storer Exhibits 1231, 1232, and 1233</u>

21      Storer Exhibit 1231 is the laboratory notebook by Jingyang Wang, an

22  employee of Idenix Pharmaceuticals, Inc., one of the Storer real parties-in-interest.

48

Interference 105,981
Clark v. Storer

1  Clark contends that Exhibit 1231 is inadmissible under Rules 402, 403, 802, and

2  901(a), and SO ¶¶ 152.2.2 and 157.1.  Clark Misc. Motion 18, Paper 427 at 7.

3      We considered Exhibits 1232 and 1233 with respect to our conclusion that

4  the S1 application did not enable the embodiments of a 2′ fluoro "down"

5  nucleoside within the scope of Count 1.  Clark prevailed upon that issue

6  notwithstanding the consideration of these exhibits.  Exclusion of the exhibits

7  would not influence the outcome of our review.  It is therefore unnecessary for us

8  to consider the admissibility of the exhibits.

9

10  8. Summary

11      For the reasons set forth above, Clark's Miscellaneous Motion 18 is denied.

12

13                    III. STORER MOTIONS

14

15  **A.  Storer Substantive Motion 5**

16      Storer moves to substitute proposed Count B for Count 1 and to be accorded

17  benefit of the S1 application.  Motion at 1.  All of the species encompassed by

18  Storer's proposed Count B and disclosed in the Genus Disclosure of Storer's

19  involved application have a fluorine atom in the 2′ "down" position.  *See* Storer

20  Subs. Motion 5, Paper 157 at App'x 8-2 ("$R^7$ is F"; "[F is shown in the 2' "down"

21  position of the above formula]").  We have related *supra* that the claims of Storer's

22  involved application fail to provide an enabling disclosure for any of the

23  embodiments of the nucleosides within the scope of its involved claims.  All of

49

Interference 105,981
Clark v. Storer

1   those claims are characterized by a fluorine in the 2´ "down" position. As a result

2   of our determination we removed Storer's claim 1 as an alternative of the count.

3   Storer's proposed Count B broadens the species substituents at other positions of

4   the nucleotide but includes the fluorine in the 2´ "down" position. Thus, Storer's

5   proposed Count B is unsuitable as a vehicle for determining priority in this

6   interference for the same reasons that Storer's Claim 1 was unsuitable. We

7   therefore deny Storer's Substantive Motion 5.

8

9   **B. Storer Substantive Motion 11**

10      Storer next argues that Clark's involved claims are unpatentable under 35

11   U.S.C. § 102(e)(2) and/or 35 U.S.C. §§ 102(e)(2)/103(a) over Storer's '600 patent.

12   Storer Subs. Motion 11, Paper 158 at 1. Storer does not challenge that the Clark

13   '218 application has an effective filing date of May 30, 2003, the date Clark's '368

14   provisional application was filed. *Id.*

15      Storer argues that its '600 patent, which it cites as prior art under 35 U.S.C.

16   § 102(e), has an effective filing date of June 28, 2002, the filing date of its S1

17   application, which precedes the May 30, 2003, filing date of Clark's '368

18   application. Storer Subs. Motion 5, Paper 157 at 2. Therefore, argues Storer, the

19   '600 patent is prior art to the Clark claims. *Id.*

20      We have related *supra* why Storer's involved claims are not supported

21   by an enabling disclosure of an embodiment having a 2´-fluoro "down" nucleoside.

22   For the same reason, the earlier S1 application fails to provide an enabling

23   disclosure for nucleoside with the fluorine in the down position. Storer is not

50

Interference 105,981
Clark v. Storer

1 entitled to the benefit of the June 28, 2002, filing date of the S1 application.

2 Storer's '600 patent is not prior art for Clark's '638 application. We therefore

3 deny Storer's Substantive Motion 11.

4

5 **C. Storer Contingent Responsive Motion 14**

6       Storer Contingent Responsive Motion 14 seeks to add a new claim, claim 14

7 to the interference if any of Clark Substantive Motions 7, 8, or 9 are granted.

8 Storer Cont. Motion 14, Paper No. 327 at 1.

9       Because we have granted Clark Substantive Motion 8, we now address

10 Storer Contingent Motion 14.

11       Storer Claim 14 recites:

12     14.    A method for the treatment of a host infected with a hepatitis C
13 virus, comprising administering to the host infected with a hepatitis C
14 virus an effective amount of a compound of the formula:
15



16
17
18     or a pharmaceutically acceptable salt thereof, wherein:
19
20     Base is selected from the group consisting of thymine, cytosine, 5-
21 fluorocytosine, 5-methylcytosine, 6-azapyrimidine, 6-azacytosine, 2-
22 and/or 4 mercaptopyrimidine, uracil, 5-halouracil, 5-fluorouracil, $C^5$-
23 alkylpyrimidine, $C^5$-benzylpyrimidine, $C^5$-halopyrimidine, C5-
24 vinylpyrimidine, $C^5$-acetylenic pyrimidine, $C^5$-acyl pyrimidine, $C^5$-

51

Interference 105,981
Clark v. Storer

1      amidopyrimidine, $C^5$-cyanopyrimidine, $C^5$-iodopyrimidine, $C^6$-iodo-
2      pyrimidine, $C^5$-Br-vinyl pyrimidine, $C^6$-Br-vinyl pyrimidine, $C^5$-
3      nitropyrimidine, $C^5$-aminopyrimidine, 5-azacytidinyl, 5-azauracilyl;

5      $R^7$ is F;

7      $R^1$ is H; phosphate; monophosphate, diphosphate; triphosphate; a
8      stabilized phosphate prodrug; acyl; lower acyl; alkyl; lower alkyl;
9      sulfonate ester; alkyl or arylalkyl sulfonyl; methanesulfonyl;
10     benzylsulfonyl; a lipid; a phospholipid; an amino acid; a
11     carbohydrate; a peptide; a cholesterol; or other pharmaceutically
12     acceptable leaving group which when administered in vivo provides a
13     compound wherein $R^1$ is H or phosphate;

15     $R^2$ is phosphate; monophosphate; diphosphate; triphosphate; a
16     stabilized phosphate prodrug; acyl; lower acyl; alkyl; lower alkyl;
17     sulfonate ester; alkyl or arylalkyl sulfonyl; methanesulfonyl;
18     benzylsulfonyl; a lipid; a phospholipid; an amino acid; a
19     carbohydrate; a peptide; a cholesterol; or other pharmaceutically
20     acceptable leaving group which when administered in vivo provides a
21     compound wherein $R^2$ is H or phosphate; and wherein each $Y^3$ is H.

23 Motion App'x at 2-1-2. We note that all of the embodiments of Storer's proposed

24 claim 14 possess a fluorine atom in the 2′ "down" position.

25     Responsive motions may be filed to cure a claim defect raised on a notice of

26 requested relief or a substantive motion. Bd.R. 41.121(a)(2). However, we have

27 related *supra* why the S1 application fails to enable a fluorine atom in the 2′

28 "down" position of any of the embodiments of the nucleoside species within the

29 scope of count 1. Storer's proposed claim 14 fails to cure this defect of the Storer

30 claims corresponding to Count 1. We therefore deny Storer's Contingent

31 Responsive Motion 14.

52

Interference 105,981
Clark v. Storer

1    **D. Storer Contingent Miscellaneous Motion 15**

2    Storer Contingent Motion 15 seeks the addition to this interference of Storer

3    US Appl. No. 14/220,534, (the "'534 application") filed March 20, 2014.  Storer

4    Cont. Motion 15, Paper 328 at 1.  Storer's proposed Claim 14 is the sole claim

5    pending in the '534 application.  *Id.*  The '534 application claims the benefit

6    accorded the S1 and S4 applications.  *Id.* at 2.

7    When Storer was authorized to file the contingent responsive motion to add

8    Storer's new claim 14, Storer was also required to file a contingent miscellaneous

9    motion to add the new continuation application with the new claim to the

10   interference. *See* Order Responsive Motion Bd.R. 41.121(a)(2), Paper 326, at 3:1-

11   3.  Storer Contingent Miscellaneous Motion 15 serves that purpose.  Storer Cont.

12   Motion 15, Paper 328 at 1.

13   Because we have denied Storer's Contingent Responsive Motion 14 to add

14   its new claim 14, we do not reach Storer's Contingent Motion 15 to add the '534

15   application to the instant interference.

16

17   **E. Storer Miscellaneous Motion 16**

18   Storer seeks to exclude the following Exhibits, in full or in part:  Storer

19   Exhibits 1194, 1243, 1244, and exclusion of Clark Exhibits 2088, and 2100.  Storer

20   Misc. Motion 16, Paper 425 at 1-5.

21

53

Interference 105,981
Clark v. Storer

1    1. Storer Exhibit 1194

2        Storer Exhibit 1194 is the deposition of Dr. Damha, taken on April 15, 2014.

3    Storer argues that the questions posed by Clark's counsel at page 81, lines 9 to

4    19 page 85, lines 14 were beyond the scope of Dr. Damha's direct testimony given

5    in Exhibit 1132 and/or were irrelevant as to whether one of ordinary skill in the art

6    as of June 28, 2002 would have been able to synthesize a 2′-fluoro-2′-methyl-

7    nucleoside at issue.  Storer Misc. Motion 16, Paper 427 at 1.  Specifically, Storer

8    argues that Dr. Damha did not, in his Declaration, address Idenix's post-June 28,

9    2002 efforts to synthesize a 2′-fluoro-2′-methyl-nucleoside, which was the subject

10   of the questions posed by Clark's counsel in the disputed pages.  *Id.* at 1-2.

11       Clark responds that, first, impeachment evidence is always relevant and

12   within the scope of permissible cross-examination.  Clark Opp. 16, Paper 430 at 1

13   (citing Fed. R. Evid. 611(b); 702).

14       Second, Clark denies that, in the disputed questions in Exhibit 1194, the

15   questions exceeded the scope of Dr. Damha's direct testimony.  Clark Opp. 16,

16   Paper 430 at 3.  Clark contends that the questions went to the bases for the

17   opinions proffered in Exhibit 1132 and, specifically, whether those opinions took

18   into account Idenix's synthesis efforts.  *Id.*

19       Third, Clark points out that Storer's counsel did not object to the questions

20   posed by Clark's counsel pp. 82, ll.11-13; 82, ll. 15-18; 82, ll. 20-21; 82, l. 23; 82,

21   l. 25; 83, ll. 3-4; 83, ll. 6-7; and 85, ll. 10-13 of Exhibit 1194, and to which Dr.

22   Damha at pp. 82, l. 14; 82; l. 19, 82, l. 22; 82, l. 24; 83, l. 2; 83, l. 5; 83, l. 8; and

54

Interference 105,981
Clark v. Storer

1    85, l. 14, respectively, responded.  Clark Opp. 16, Paper 430 at 3 (citing Ex. 1194).

2    Therefore, argues Clark, these questions and answers should not be excluded.  *Id.*

3          We are not persuaded by Storer's arguments.  In the disputed passages of

4    Exhibit 1132, Dr. Damha is questioned repeatedly whether, in arriving at his

5    opinion that one of ordinary skill in the art would be aware of "a method for

6    preparing a 2´-F-2´-methyl-ribonucleoside of the '350 Application and within the

7    scope of Claim 38 of the Storer Patent," he had been made aware of, or considered,

8    any of Idenix's efforts to synthesize the compound during the interval between

9    2002 and 2005.  For example, during the Dr. Damha's deposition, he responded to

10   the questions as below:

11          Q. So you're not aware that in the prior interference Idenix put forth
12          its story about how its chemists tried to make 2´-fluoro-2´-methyl
13          nucleosides during the 2002 to 2005 time period?

15          MR. KINTON: Same objection. Beyond the scope.

17          A. No.

19          Q. So then you couldn't have considered any of Idenix's story about its
20          attempt to make those compounds in forming your opinions?

22          A. None whatsoever.

24          Q. And did you consider any Idenix documents about trying to make
25          2´-fluoro-2´-methyl nucleosides when you formed your opinion?

27          A. No.

29          Q. Did you consider any Idenix lab notebooks when forming your
30          opinion?

55

Interference 105,981
Clark v. Storer

1
2          A. On how to make these compounds, no.
3
4          Q. What about Idenix's meeting minutes?
5
6          A. No.
7
8          …
9
10         Q. Did you ever ask to see such information when forming your
11         opinions?
12
13         A. No.
14
15         Q. Why not?
16
17         MR. KINTON: Objection.  Irrelevant.
18
19   Ex. 1194, p. 82, ll. 3-24; p. 83, ll. 6-10.  These, and the other disputed passages, all

20   inquire whether Dr. Damha had reviewed, or had knowledge of, any documents

21   concerning Idenix's research efforts between 2002 and 2005.  Dr. Damha

22   responded in the negative to this entire line of questioning:

23         Q. Do you think what Idenix actually tried in terms of attempting to
24         make a 2′-fluoro-2′-methyl nucleoside might be important when
25         forming your opinion?
26
27         MR. KINTON: Objection.  Irrelevant.  Assumes facts.
28
29         A. No, not at all.  I formed my opinion on literature and knowledge
30         that I have gained as a nucleoside nucleic acid chemist.  And in fact,
31         having used procedures that are directly applied to the synthesis of the
32         2′-methyl-2'-fluoro compounds.
33

56

Interference 105,981
Clark v. Storer

1  Ex. 1194, pp. 84-85, ll. 22-9.  Thus, this line of questioning by Clark inquires as to

2  the materials that formed the basis for Dr. Damha's opinion expressed in his

3  Declaration.  As such, it is neither beyond the scope of Dr. Damha's declaration,

4  nor is it irrelevant.  Moreover, Clark is entitled to attempt to impeach the

5  credibility of Storer's expert on cross-examination.  FRE 611(b).  Storer's motion

6  to exclude the cited passages of Storer's Exhibit 1194 is consequently denied.

7

8  2. Storer Exhibit 1243

9      Storer Exhibit 1243[74] is the transcript of the deposition of Dr. De Francesco.

10  Storer moves to exclude certain passages in the Exhibit, *viz.*, page 81, lines 12-13

11  and 21-22 and page 82, lines 6-8 as exceeding the scope of Dr. De Francesco's

12  direct testimony in his Declaration (Ex 1201).  Storer Misc. Motion 16, Paper 427

13  at 3.  According to Storer, Dr. De Francesco did not address in his declaration the

14  disclosure in Exhibit 1003 of the bases for particular compounds, including

15  Formula (IV), which was the subject of the questions posed by Clark's counsel.

16      Clark responds that, first, Dr. De Francesco's testimony in the contested

17  passages is admissible because Clark's counsel's questions were within the scope

18  of Dr. De Francesco's direct testimony in his Declaration or, alternatively, went to

19  a matter affecting Dr. De Francesco's credibility.  Clark Opp. 16, Paper 430 at 4

20  (citing FRE 611(b), 702).

21      We are not persuaded by Storer's arguments.  In his Declaration, Dr. De

22  Francesco opined:

_____

[74] Paper No. 544

57

A57

Interference 105,981
Clark v. Storer

1    The '350 and '907 applications state that the compounds of the
2    invention exhibit antiviral activity against *Flaviviridae* viruses such as
3    HCV, and can be used to treat infections by those viruses. Ex 1003, at
4    44:3-4, 57:15-19; Ex 1002, at 46:3-4, 58:4-9. As of June 28, 2002 and
5    June 27, 2003, persons skilled in the art would have believed that the
6    Relevant Compounds could have anti-HCV activity because: (i) the
7    Relevant Compounds are nucleoside analogs, and it was known at the
8    time that certain nucleoside analogs exhibit antiviral activity due to
9    interference with viral polymerases required for replication of viral
10   genetic material (referred to herein as "genome replication"), as
11   described in ¶¶39-40;
12
13   (ii) it had been shown experimentally at the time that certain 2´-
14   modified nucleosides exhibit anti-*Flaviviridae* activity, in particular
15   against BVDV and YFV, as described in ¶¶41-46;
16
17   (iii) persons skilled in the art would have believed that nucleoside
18   analogs that exhibit activity against BVDV are likely to also exhibit
19   activity against HCV, and that nucleoside analogs that exhibit activity
20   against BVDV and YFV are highly likely to also exhibit activity
21   against HCV, as described in ¶¶47-67;
22
23   (iv) as of June 27, 2003, it had been experimentally shown that certain
24   2´- modified nucleosides exhibit anti-HCV activity, as described in
25   ¶¶68-70; and
26
27   (v) there were no specific reasons to doubt anti-HCV activity of the
28   Relevant Compounds, as described in ¶71.
29
30   Ex. 1201, ¶ 21. In the contested passages of Exhibit 1243, Dr. De Francesco

31   states:

32   Q. Would you turn back to page 57 of the '350 application, which is
33   Exhibit 1003?
34   …

58

Interference 105,981
Clark v. Storer

1      A. Uh-huh.
2
3      Q. And could you identify for me what the base is for that formula?
4
5      MR. FRIEBEL: Objection, beyond the scope of his declaration.
6      …
7      A. (Perusing.) No. Sorry. This is — I think this is beyond my — it
8      would require a better understanding of chemistry than I have.
9
10     Q. So you have no idea what the base would be?
11
12     MR. FRIEBEL: Same objection.
13
14     A. (Perusing.)  I didn't review these as part of my opinion because I
15     don't think this was requested to me. Tentatively, I would say it's one
16     of the group — must be one of the group of bases described in the
17     previous pages, I guess.
18
19     Q. So we were talking about the compounds at pages 1551 previously.
20     Would that be previous pages?
21
22     MR. FRIEBEL: Same objection, beyond the scope of his original —
23     of his second declaration.
24
25     A. (Perusing.) Yeah, I believe herein means one of the bases described
26     in pages 48, 49 to 54, but I'm not sure.  I mean, again, I'm not a
27     chemist, so I don't — it's a tentative answer.
28
29    Ex. 1243, pp. 81-82, ll. 7-16.

30       Determining the scope of cross-examination is within the sound discretion of

31 the administrative tribunal.  *See, e.g., Guise v. Dep't of Justice*, 330 F.3d 1376,

32 1379 (Fed. Cir. 2003).  Dr. De Francesco has explicitly declared that he has studied

33 Storer Exhibit 1003, the '350 application, as part of the preparation for giving his

<div align="center">59</div>

Interference 105,981
Clark v. Storer

1    expert opinion.  Ex. 1243, ¶ 10.  Because Dr. De Francesco places no limiting

2    language on this statement in his Declaration, we assume that he has reviewed the

3    entire document and that questions concerning the contents of the document on

4    cross-examination are not beyond the scope of his Declaration.  Therefore, the

5    contents of the '350 application are within the scope of his Declaration.  The line

6    of questioning in the disputed passages goes to the basis for the formation of that

7    opinion, although his statements ("it would require a better understanding of

8    chemistry than I have") may undermine his credibility as an expert witness with

9    respect to the chemistry of nucleoside bases.  Nevertheless, the credibility of a

10   witness' opinion, and the probative weight we consequently ascribe to that

11   testimony, is a substantive issue and not one of admissibility.  We consequently

12   deny Storer's motion to exclude the contested passages of Exhibit 1243.

13

14   <u>3. Storer Exhibit 1244</u>

15         Storer Exhibit 1244[75] is the Second Deposition of Dr. Damha, taken on June

16   20, 2014.  Storer moves to exclude certain passages in the Exhibit, *viz.*, page 26,

17   line 19 to page 29, line 25; page 33, line 11 to page 36, line 2; and page 36, line18

18   to page 40, line 15 as exceeding the scope of Dr. Damha's direct testimony in his

19   Declaration (Ex. 1200).  Storer Misc. Motion 16, Paper 427 at 4.  Specifically,

20   Clark contends that Dr. Damha did not address, in his Declaration, Idenix's post-

21   June 28, 2002 effort in synthesizing a 2′-fluoro-2′-methyl nucleoside, the subject

22   of the questions posed by Clark's counsel in the contested passages.  *Id.*

_____

[75] Paper No. 545

60

Interference 105,981
Clark v. Storer

1      In response, Clark repeats the argument that it made with respect to Ex. 1195

2    *supra*: that the testimony that Storer seeks to exclude is relevant to determining

3    whether Dr. Damha's direct testimony in Exhibit 1200 should be given any weight,

4    and whether it is relevant to assessing Dr. Damha's credibility, particularly with

5    regard to Dr. Damha's opinions about whether an artisan could have made 2′-

6    fluoro-2′-methyl nucleosides without undue experimentation.  Clark Opp. 16,

7    Paper 430 at 5.  Clark also contends that Dr. Damha's alleged failure to consider

8    Idenix's extended efforts to synthesize the compounds affects his credibility as an

9    expert witness.  *Id.*

10    We agree with Clark.  As we related *supra*, the lines of questioning objected

11    to by Storer inquire as to the materials that formed the basis for Dr. Damha's

12    opinion, as expressed in his Declaration and the extent of Dr. Damha's knowledge

13    of Idenix's efforts at synthesis of 2′-fluoro-2′-methyl nucleosides.  Moreover,

14    Clark is entitled to attempt to impeach the credibility of Storer's expert in cross-

15    examination.  FRE 611(b).  As such, it is neither beyond the scope of Dr. Damha's

16    declaration, nor is it irrelevant.  Storer's motion to exclude the cited passages of

17    Storer's Exhibit 1194 is denied.

18

19    <u>4. Clark Exhibit 2088</u>

20    Clark Exhibit 2088[76] is the Declaration and curriculum vitae of Dr. Jean-

21    Pierre Sommadossi, one of the inventors of Storer's '600 patent.  Storer Misc.

22    Motion 16, Paper 427 at 5.  Storer argues that although Exhibit 2088 refers to

_____

[76] Paper No. 568

61

Interference 105,981
Clark v. Storer

1  Exhibit 1 (a copy of Tables 4 and 5 from Chapter Two of B.N. Fields et al., *Fields*

2  *Virology*, Lippincott-Raven, Philadelphia (3rd ed. 1996)) at 3, ¶ 11.), Exhibit 2088

3  does not in fact contain an Exhibit 1. *Id.* Therefore, argues Storer, Exhibit 2088 is

4  incomplete and should be excluded under Federal Rule of Evidence 106. *Id.*

5      Storer also argues that Clark relies on Exhibit 2088, and particularly ¶ 15, to

6  prove that one cannot predict a compound's activity against another virus without

7  testing it. Storer Misc. Motion 16, Paper 427 at 5 (citing Clark Substantive Motion

8  8[77], at 11, ll. 13-14). Consequently, argues Storer, Clark Exhibit 2088 is an out-of-

9  court statement made by a declarant who has not testified in this proceeding and

10  the statement is offered to prove its truth. *Id.* Therefore, Storer contends, Exhibit

11  2088 is also inadmissible as impermissible hearsay. *Id.* (citing FRE 802).

12      As an initial matter, Federal Rule 106 is not an exclusionary rRule. Federal

13  Rule 106 states: "If a party introduces all or part of a writing or recorded statement,

14  an adverse party may require the introduction, at that time, of any other part--or

15  any other writing or recorded statement--that in fairness ought to be considered at

16  the same time." Fed. R. Evid. 106. Storer has not requested completion of the

17  record, and we therefore consider any such request waived.

18

19  5. Clark Exhibit 2100

20      Clark Exhibit 2100[78] is a document of the European Patent Office ("EPO"),

21  purportedly reporting of a consultation by the EPO with applicant/representative

_____

[77] Paper No. 155
[78] Paper No. 576

62

Interference 105,981
Clark v. Storer

1   Idenix Pharmaceuticals, Inc., the real party-in-interest in the instant interference,

2   with respect to EPO Application No. 03 761 744.6.

3       Storer argues that Clark relies on Exhibit 2100 to prove that Exhibit 1002's[79]

4   Formula (IX) does not provide for $R^1$ to be di- or triphosphate and thus does not

5   describe certain Storer claims.  Storer Misc. Motion 16, Paper 427 at 5-6.  As such,

6   contends Storer, Exhibit 2100 constitutes impermissible hearsay and should be

7   excluded.  *Id.* at 6.

8       We do not see the relationship of Exhibit 2100 to the dispositive issue

9   with respect to Storer's involved claims, *viz.*, the enablement of a 2′-fluoro "down"

10  nucleoside.  Accordingly, we can discern no purpose for it to be included in this

11  proceeding.  We decline to consider it as an evidentiary matter and order that it be

12  expunged from the record.  Bd.R. 7(a) & 122(c)(1)(iii).

13

14  6. Summary

15      For the reasons set forth above, Storer's Miscellaneous Motion 16 is denied.

16

17                  IV. CONCLUSION

18      For the reasons set forth above:

19  1. Clark Substantive Motion 1 to deprive Storer of the benefit of its US
20     Appl. No. 60/392,350 is GRANTED.
21

---

[79] Papers Nos. 319-322

63

Interference 105,981
Clark v. Storer

2.  Clark Substantive Motion 2 to deprive Storer of the benefit accorded
    with respect to Count 1 of its U.S. Appl. No. 60/466,194 is
    GRANTED.

3.  Clark Substantive Motion 3 to deprive Storer of the benefit accorded
    with respect to Count 1 of its U.S. Appl. No. 60/470,949 is
    GRANTED.

4.  Clark Substantive Motion 10 to deprive Storer of the benefit accorded
    with respect to Count 1 of US Appl. No. 10/608,907 is DISMISSED.

5.  Clark Substantive Motion 7 for judgment against Storer's US Patent
    No. 7,608,600 B2 on the grounds of unpatentability under 35 U.S.C. §
    112, 1st paragraph for lack of enablement and written description is
    GRANTED.

6.  Clark Substantive Motion 5 to substitute its proposed alternate count 2
    for the present Count 1 of the interference is DISMISSED.

7.  Clark Substantive Motion 8 for judgment against Storer's US Patent
    No. 7,608,600 B2 on the ground of unpatentability under 35 U.S.C. §
    101, for lack of utility, and accordingly under 35 U.S.C. § 112, 1st
    paragraph, for lack of enablement is DISMISSED.

8.  Clark Substantive Motion 9 for judgment against Storer's US Patent
    No. 7,608,600 B2 on the ground of unpatentability under 35 U.S.C.
    §§ 102(e) or 103 as being either anticipated by, or obvious over,
    Clark's US Appl. No. 10/828,753 is DISMISSED.

9.  Clark Miscellaneous Motion 18 to exclude evidence is DENIED. We
    *sua sponte* order that Storer Exhibits 1175, 1176, 1177, 1228, and
    1229 be expunged.

10. Storer Substantive Motion 5 to substitute proposed count B for Count
    1 is DENIED.

64

Interference 105,981
Clark v. Storer

11. Storer Substantive Motion 11 for judgment against Clark on the
    grounds of unpatentability of all of Clark's involved claims as
    anticipated under 35 U.S.C. § 102(e) and/or 103 is DENIED.

12. Storer Contingent Motion 14 to add a new claim is DENIED.

13. Storer Contingent Motion 15 to add an application to the interference
    is DISMISSED.

14. Storer Miscellaneous Motion 16 to exclude evidence is DENIED.
    We *sua sponte* order that Clark Exhibit 2100 be expunged.

15. Party Clark shall be designated Senior Party for any further
    proceedings according to the Redeclaration issued herewith.

                         IT IS SO ORDERED

65

Interference 105,981
Clark v. Storer

1    cc:

2    Attorney for Senior Party Clark:

3    Anthony M. Zupcic
4    Alicia A. Russo
5    Daniel S. Glueck
6    Fitzpatrick, Cella, Harper & Scinto
7    azupcic@fchs.com
8    arusso@fchs.com
9    dglueck@fchs.com
10
11   Attorney for Junior Party Storer:

12   Thomas E. Friebel
13   Anthony M. Insogna
14   Dale L. Rieger
15   Jones Day
16   TEFriebel@JonesDay.com
17   AMInsogna@JonesDay.com
18   DRieger@JonesDay.com

66

Boxinterferences@uspto.gov
571-272-4683                                          Filed: January 16, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

RICHARD STORER, GILLES GOSSELIN, JEAN-PIERRE SOMADOSSI,
and PAOLA LACOLLA
Junior Party
(US 7,608,600 B2)

v.

JEREMY CLARK
Senior Party
(Application No. 11/854,218)
_____

Interference No. 105,981 (JGN)
Technology Center 1600
_____

**REDECLARATION — BD.R. 203(c)**
_____

*Before* RICHARD E. SCHAFER, DEBORAH KATZ, and JOHN G. NEW,
*Administrative Patent Judges.*

NEW, *Administrative Patent Judge.*

Interference No. 105,981

## A. REDECLARATION OF INTERFERENCE

A merits panel of the Board has entered an order – Decision on Motions – in the Substantive Motions Phase of this interference.  Paper 687.

As a result of the decision on motions, and to conform the interference to that decision on motions, the interference is redeclared as indicated below.

This redeclaration governs proceedings in the Priority Phase of this interference.  Bd.R. 41.203(c).

## B. THE PARTIES TO THIS INTERFERENCE

*Junior Party*

Patent No.          US 7,608,600 B2, filed June 27, 2003
                    granted October 27, 2009

Title:              Modified 2´ and 3´- Nucleoside Prodrugs for Treating
                    *Flaviviridae* Infections

Inventors:          Richard Storer, of Kent in the United Kingdom,
                    Gilles Gosselin, of Montpellier, France,
                    Jean-Pierre Sommadossi, of Cambridge, MA
                    Paola LaColla of Cagliari, Italy

*Senior Party*

Application No.     11/854,218, filed September 12, 2007

Title:              Modified Fluorinated Nucleoside Analogues

Inventors:          Jeremy Clark of Snellvile, GA

Initiating Settlement Discussions: SO ¶ 126

Senior party Clark is now responsible to initiating settlement discussions.

2

Interference No. 105,981

## C. COUNTS AND CLAIMS OF THE PARTIES

*Count 2*

The method of 11/854,218, claim 164.

The claims of the parties corresponding to the count are:

Clark: 164 and 165

Storer: Claims 1-12, 17, 18, 20, 33, 34, 36, 38, 49-57, 62, 64, and 76-85

The benefit accorded for Count 1:

Clark:       11/854,218: filed September 12, 2007
             10/828,753: filed April 21, 2004
             60/474,368: filed May 30, 2003

Storer:      None

## D. HEADING TO BE USED ON PAPERS; EXHIBIT NUMBERS

In the future, the heading set out above should be used in filing future paper.

The numbering of Exhibits shall continue as indicated below with the next available Exhibit number:

Junior party Storer: Exhibit Numbers: 1001-1999.

Senior party Clark: Exhibit Numbers: 2001-2999.

Board: Exhibit Numbers:  3001-3999.

3

Interference No. 105,981


cc:

Attorney for Senior Party Clark:

Anthony M. Zupcic
Alicia A. Russo
Daniel S. Glueck
Fitzpatrick, Cella, Harper & Scinto
azupcic@fchs.com
arusso@fchs.com
dglueck@fchs.com

Attorney for Junior Party Storer:

Thomas E. Friebel
Anthony M. Insogna
Dale L. Rieger
Jones Day
TEFriebel@JonesDay.com
AMInsogna@JonesDay.com
DRieger@JonesDay.com

4

Boxinterferences@uspto.gov
571-272-4683                                         Filed: January 16, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

RICHARD STORER, GILLES GOSSELIN, JEAN-PIERRE SOMADOSSI,
and PAOLA LACOLLA
Junior Party
(US 7,608,600 B2)

v.

JEREMY CLARK
Senior Party
(Application No. 11/854,218)
_____

Interference No. 105,981 (JGN)
Technology Center 1600
_____

**Order to Show Cause – Bd.R. 104(a)**
_____

*Before* RICHARD E. SCHAFER, DEBORAH KATZ, and JOHN G. NEW,
*Administrative Patent Judges.*

NEW, *Administrative Patent Judge*.

1

1      On January 16, 2015, a merits panel of the Board entered its Decision on the

2  Parties' Substantive Motions (the "Decision").  In the Decision, Storer was held

3  not to be entitled to the benefit of the filing dates of its parent applications.  As a

4  result Clark became the senior party.  The Decision also held that Storer's involved

5  claims were unpatentable under 35 U.S.C. § 112, first paragraph, for lack of

6  enablement and written description.  Because the claims were found to be

7  unpatentable, the Board substituted a new count that deleted Storer's now

8  unpatentable claim 1 as an alternative.[1]  The interference was redeclared reflecting

9  the changed order of the parties and the new Count 2.[2]

10      The count of this interference is directed to a method of treating hepatitis C

11  viral infection by administering a specified group of compounds defined in terms

12  of structure and substituents at identified locations.  Another interference,

13  Interference 105,871 (the "'871 interference"), was between a different Clark

14  application and a different "Storer" patent.[3]  The count in the '871 interference is

15  directed to a specified group of compounds *per se*.  The group of compounds in the

16  '871 count is a subset of those recited in instant Count 2.[4]

17      The '871 interference concluded with a judgment on priority against Storer,

18  holding that Storer had failed to prove either conception of the compounds or

19  diligence to a reduction to practice.  Specifically, the Board held that at the time of

20  Storer's alleged conception, one skilled in the art would not have been able to

---

[1] Original Count 1 stated: "The method of [Clark Application] 11/854, 218 claim 164 or [Storer Patent] US 7,608,600 B2 claim 1."  Paper 1, p. 3.

[2] Paper 688.

[3] The caption of the '871 interference was *Clark v. Somadossi et al*.  The real parties-in-interest and the named inventors are the same as those in this interference.

[4] Count 2 adds an additional substituent (H-phosphonate) to the listing of substituents at two locations of the compounds.

2

1   make the compounds.[5]  Storer's priority statement in this interference[6] asserts the

2   same exact basis for priority as the priority statement in the '871 interference.[7]  In

3   order to establish conception and diligence to reduction to practice of the method

4   in this interference, Storer would necessarily have to prove prior conception and

5   diligence of essentially the same compounds as in the '871 interference.  Storer

6   had an adequate opportunity and was unsuccessful in proving priority as to those

7   compounds in the '871 interference.  Under these circumstances, we see no reason

8   proceed to priority in this interference and revisit those conception and diligence

9   determinations.[8]  Accordingly, Storer is ordered to show cause why judgment on

10  priority should not be awarded against the involved claims of Patent 7,608,600 B2,

11  based on the priority determination in the '871 interference.

12      Storer shall respond to this order on or before **February 20, 2015**.  No

13  opposition or reply is authorized at this time.  Storer's response must include (1) an

14  explanation of why the decision on priority in '871 should not control the outcome

15  in this interference, (2) provide a summary of all the arguments it will make to

16  establish priority, (3) identify which of those arguments relate to the ability of a

17  person skilled in the art to make the compounds recited in count that were not

18  made in the '871, interference, (4) make a proffer summarizing the substance of

19  any evidence related to the ability of a person skilled in the art to make the

20  compounds that was not submitted in the '871 interference, and (5) explain why

---

[5] Interference 105,871, Paper 1007, pp. 17-25.

[6] Paper 161

[7] Interference 105,871, Paper 24.

[8] We are aware that the decision in the '871 interference is undergoing judicial review.  However, we perceive no adequate reason why the resources of the parties and the scarce resources of the Board should be expended on reviewing the same issues and evidence that is substantively the same as that presented in the '871 interference.  *See* Bd. R. 41.1(b) and 41.104(b).

3

1    the new arguments and evidence could not have been submitted in the '871

2    interference.

4

cc:

Attorney for Senior Party Clark:

Anthony M. Zupcic
Alicia A. Russo
Daniel S. Glueck
Fitzpatrick, Cella, Harper & Scinto
azupcic@fchs.com
arusso@fchs.com
dglueck@fchs.com

Attorney for Junior Party Storer:

Thomas E. Friebel
Anthony M. Insogna
Dale L. Rieger
Jones Day
TEFriebel@JonesDay.com
AMInsogna@JonesDay.com
DRieger@JonesDay.com

5

Boxinterferences@uspto.gov
571-272-4683                                         Filed: March 23, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

RICHARD STORER, GILLES GOSSELIN, JEAN-PIERRE SOMADOSSI,
and PAOLA LACOLLA
Junior Party
(US 7,608,600 B2)


v.

JEREMY CLARK
Senior Party
(Application No. 11/854,218)
_____

Interference No. 105,981 (JGN)
Technology Center 1600
_____

**JUDGMENT - REQUEST FOR ADVERSE**
**Bd.R. 127(b)(4)**


*Before* RICHARD SCHAFER, DEBORAH KATZ, and
JOHN G. NEW, *Administrative Patent Judges*.


NEW, Administrative Patent Judge

1                                I.

2          On January 16, 2015, a merits panel of the Board entered a decision

3    on then-Senior Party Richard Storer, Gilles Gosselin, Jean-Pierre

4    Sommadossi, and Paola LaColla's ("Storer") and then-Junior Party Jeremy

5    Clark's ("Clark") substantive motions.[1]  Paper No. 687.  The panel

6    concluded, *inter alia*, that Storer's US Appl. No. 60/392,350 (the

7    "'350 application"), for which Storer had been accorded priority benefit,

8    failed to enable any of the 2´-fluoro-2´-C-methyl nucleosides that are

9    required by the count.  *Id.* at 35–36.  The panel consequently granted Clark's

10   motion 1 to deprive Storer of the benefit accorded with respect to Count 1 of

11   the '350 application.  *Id.*

12         As a result, the interference was redeclared with Storer as the Junior

13   Party, Clark as the Senior Party, and with Clark's involved claims 164 and

14   165 and Storer's involved claims 1-12, 17, 18, 20, 33, 34, 36, 38, 49-57, 62,

15   64, and 76-85 corresponding to the new Count 2.  Paper No. 688.  A

16   scheduling order for the priority phase was also entered on January 16, 2015.

17   Paper No. 689.  Storer's priority motion was due on February 27, 2015.

18   Paper 689, Appendix.  Rather than filing its priority motion, Storer contacted

19   the Board via email to indicate that it did not intend to file a priority motion.

20   *See* Paper No. 692.

---

[1] On January 16, 2015, the Board also entered an order for Storer to show cause why, in view of the Board's decision on the parties' substantive motions, judgment should not be entered against it.  Paper 690.  Storer timely responded.  Paper No. 691.  Although the panel finds Storer's response to the order to show cause to be insufficient, Storer's response to the order to show cause played no role in the entry of this judgment.

2

1                                    II.

2            As Senior Party, Clark is entitled to the presumption under

3    Bd.R. 207(a)(1) that it is the prior inventor.  *See also* Bd.R. 201, definition

4    of senior party.  As the Junior Party, Storer therefore bears the burden of

5    establishing a date of inventorship prior to Clark's accorded benefit date of

6    May 30, 2003.  *See* Bd. Rs. 121(b) and 208(b).  By declining to file a

7    priority motion and forgoing the opportunity to prove an earlier date of

8    invention, Storer has effectively abandoned the contest.  Storer's

9    abandonment of the contest is construed as a request for adverse judgment.

10   *See* Bd.R. 127(b)(4).

11           It is therefore—

12

13           ORDERED that judgment on priority be entered against Junior Party

14   Storer for the subject matter of count 2;

15

16           FURTHER ORDERED that claims 1-12, 17, 18, 20, 33, 34, 36, 38,

17   49-57, 62, 64, and 76-85 of Storer's involved U.S. Patent No. US 7,608,600

18   B2 be CANCELED, 35 U.S.C. 135(a)[2]; and

19

20           FURTHER ORDERED that a copy of this judgment be entered in the

21   administrative records of Storer's involved US 7,608,600 B2 patent and

22   Clark's involved US Appl. No. 11/854,218.

───────────────────────

[2] As was in effect on March 15, 2013.  *See* Pub. L. 112-29, § 3(n),
125 Stat. 284, 293 (2011).

3

1    FURTHER ORDERED that if a party seeks judicial review, the party

2    must file a notice with the Board (37 C.F.R. § 41.8(b)) within seven days of

3    initiating judicial review.

4

5    We also direct the parties' attention to *Biogen Idec MA, Inc., v.*

6    *Japanese Foundation for Cancer Research*, Civil No. 13–13061–FDS, 2014

7    WL 2167677 (D. Mass. May 22, 2014).

8

NOTICE: "Any agreement or understanding between parties to an
interference, including any collateral agreements referred to therein, made in
connection with or in contemplation of the termination of the interference,
shall be in writing and a true copy thereof filed in the Patent and Trademark
Office before the termination of the interference as between the said parties
to the agreement or understanding." 35 U.S.C. 135(c); see also Bd.R. 205
(settlement agreements).

4

cc (via electronic transmission):

Attorney for Senior Party Clark:

Anthony M. Zupcic
Alicia A. Russo
Daniel S. Glueck
Fitzpatrick, Cella, Harper & Scinto
azupcic@fchs.com
arusso@fchs.com
dglueck@fchs.com

Attorney for Junior Party Storer:

Thomas E. Friebel
Anthony M. Insogna
Dale L. Rieger
Jones Day
TEFriebel@JonesDay.com
AMInsogna@JonesDay.com
DRieger@JonesDay.com

# STATUTORY ADDENDUM



PUBLIC LAW 112–274—JAN. 14, 2013

# LEAHY-SMITH AMERICA INVENTS
# TECHNICAL CORRECTIONS

126 STAT. 2456          PUBLIC LAW 112–274—JAN. 14, 2013

## Public Law 112–274
## 112th Congress

### An Act

Jan. 14, 2013
[H.R. 6621]

To correct and improve certain provisions of the Leahy-Smith America Invents Act and title 35, United States Code.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Patents.

**SECTION 1. TECHNICAL CORRECTIONS.**

Applicability.
35 USC 298 note.

(a) ADVICE OF COUNSEL.—Notwithstanding section 35 of the Leahy-Smith America Invents Act (35 U.S.C. 1 note), section 298 of title 35, United States Code, shall apply to any civil action commenced on or after the date of the enactment of this Act.

(b) TRANSITIONAL PROGRAM FOR COVERED BUSINESS METHOD PATENTS.—Section 18 of the Leahy-Smith America Invents Act (35 U.S.C. 321 note) is amended—

(1) in subsection (a)(1)(C)(i), by striking "of such title" the second place it appears; and

(2) in subsection (d)(2), by striking "subsection" and inserting "section".

(c) JOINDER OF PARTIES.—Section 299(a) of title 35, United States Code, is amended in the matter preceding paragraph (1) by striking "or counterclaim defendants only if" and inserting "only if".

(d) DEAD ZONES.—

35 USC 311 note.

(1) INTER PARTES REVIEW.—Section 311(c) of title 35, United States Code, shall not apply to a petition to institute an inter partes review of a patent that is not a patent described in section 3(n)(1) of the Leahy-Smith America Invents Act (35 U.S.C. 100 note).

(2) REISSUE.—Section 311(c)(1) of title 35, United States Code, is amended by striking "or issuance of a reissue of a patent".

(e) CORRECT INVENTOR.—

(1) IN GENERAL.—Section 135(e) of title 35, United States Code, as amended by section 3(i) of the Leahy-Smith America Invents Act, is amended by striking "correct inventors" and inserting "correct inventor".

35 USC 135 note.

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall be effective as if included in the amendment made by section 3(i) of the Leahy-Smith America Invents Act.

(f) INVENTOR'S OATH OR DECLARATION.—Section 115 of title 35, United States Code, as amended by section 4 of the Leahy-Smith America Invents Act, is amended—

(1) by striking subsection (f) and inserting the following:

"(f) TIME FOR FILING.—The applicant for patent shall provide each required oath or declaration under subsection (a), substitute

statement under subsection (d), or recorded assignment meeting the requirements of subsection (e) no later than the date on which the issue fee for the patent is paid."; and

    (2) in subsection (g)(1), by striking "who claims" and inserting "that claims".

    (g) TRAVEL EXPENSES AND PAYMENT OF ADMINISTRATIVE JUDGES.—Notwithstanding section 35 of the Leahy-Smith America Invents Act (35 U.S.C. 1 note), the amendments made by section 21 of the Leahy-Smith America Invents Act (Public Law 112–29; 125 Stat. 335) shall be effective as of September 16, 2011.

<div style="float:right">35 USC 2 note.<br>Effective date.</div>

    (h) PATENT TERM ADJUSTMENTS.—Section 154(b) of title 35, United States Code, is amended—

        (1) in paragraph (1)—

            (A) in subparagraph (A)(i)(II), by striking "on which an international application fulfilled the requirements of section 371 of this title" and inserting "of commencement of the national stage under section 371 in an international application"; and

            (B) in subparagraph (B), in the matter preceding clause (i), by striking "the application in the United States" and inserting "the application under section 111(a) in the United States or, in the case of an international application, the date of commencement of the national stage under section 371 in the international application";

        (2) in paragraph (3)(B)(i), by striking "with the written notice of allowance of the application under section 151" and inserting "no later than the date of issuance of the patent"; and

        (3) in paragraph (4)(A)—

            (A) by striking "a determination made by the Director under paragraph (3) shall have remedy" and inserting "the Director's decision on the applicant's request for reconsideration under paragraph (3)(B)(ii) shall have exclusive remedy"; and

            (B) by striking "the grant of the patent" and inserting "the date of the Director's decision on the applicant's request for reconsideration".

    (i) IMPROPER APPLICANT.—Section 373 of title 35, United States Code, and the item relating to that section in the table of sections for chapter 37 of such title, are repealed.

<div style="float:right">Repeal.</div>

    (j) FINANCIAL MANAGEMENT CLARIFICATIONS.—Section 42(c)(3) of title 35, United States Code, is amended—

        (1) in subparagraph (A)—

            (A) by striking "sections 41, 42, and 376," and inserting "this title,"; and

            (B) by striking "a share of the administrative costs of the Office relating to patents" and inserting "a proportionate share of the administrative costs of the Office"; and

        (2) in subparagraph (B), by striking "a share of the administrative costs of the Office relating to trademarks" and inserting "a proportionate share of the administrative costs of the Office".

    (k) DERIVATION PROCEEDINGS.—

        (1) IN GENERAL.—Section 135(a) of title 35, United States Code, as amended by section 3(i) of the Leahy-Smith America Invents Act, is amended to read as follows:

    "(a) INSTITUTION OF PROCEEDING.—

<div style="float:right">Petition.</div>

126 STAT. 2458        PUBLIC LAW 112–274—JAN. 14, 2013

"(1) IN GENERAL.—An applicant for patent may file a petition with respect to an invention to institute a derivation proceeding in the Office. The petition shall set forth with particularity the basis for finding that an individual named in an earlier application as the inventor or a joint inventor derived such invention from an individual named in the petitioner's application as the inventor or a joint inventor and, without authorization, the earlier application claiming such invention was filed. Whenever the Director determines that a petition filed under this subsection demonstrates that the standards for instituting a derivation proceeding are met, the Director may institute a derivation proceeding.

"(2) TIME FOR FILING.—A petition under this section with respect to an invention that is the same or substantially the same invention as a claim contained in a patent issued on an earlier application, or contained in an earlier application when published or deemed published under section 122(b), may not be filed unless such petition is filed during the 1-year period following the date on which the patent containing such claim was granted or the earlier application containing such claim was published, whichever is earlier.

"(3) EARLIER APPLICATION.—For purposes of this section, an application shall not be deemed to be an earlier application with respect to an invention, relative to another application, unless a claim to the invention was or could have been made in such application having an effective filing date that is earlier than the effective filing date of any claim to the invention that was or could have been made in such other application.

"(4) NO APPEAL.—A determination by the Director whether to institute a derivation proceeding under paragraph (1) shall be final and not appealable.".

35 USC 135 note.

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall be effective as if included in the amendment made by section 3(i) of the Leahy-Smith America Invents Act.

Applicability.
35 USC 135 note.

(3) REVIEW OF INTERFERENCE DECISIONS.—The provisions of sections 6 and 141 of title 35, United States Code, and section 1295(a)(4)(A) of title 28, United States Code, as in effect on September 15, 2012, shall apply to interference proceedings that are declared after September 15, 2012, under section 135 of title 35, United States Code, as in effect before the effective date under section 3(n) of the Leahy-Smith America Invents Act. The Patent Trial and Appeal Board may be deemed to be the Board of Patent Appeals and Interferences for purposes of such interference proceedings.

(l) PATENT AND TRADEMARK PUBLIC ADVISORY COMMITTEES.—

(1) IN GENERAL.—Section 5(a) of title 35, United States Code, is amended—

Appointment.
Time period.
Effective date.
Deadline.

(A) in paragraph (1), by striking "Members of" and all that follows through "such appointments." and inserting the following: "In each year, 3 members shall be appointed to each Advisory Committee for 3-year terms that shall begin on December 1 of that year. Any vacancy on an Advisory Committee shall be filled within 90 days after it occurs. A new member who is appointed to fill a vacancy shall be appointed to serve for the remainder of the predecessor's term.";

PUBLIC LAW 112–274—JAN. 14, 2013          126 STAT. 2459

(B) by striking paragraph (2) and inserting the following:

"(2) CHAIR.—The Secretary of Commerce, in consultation with the Director, shall designate a Chair and Vice Chair of each Advisory Committee from among the members appointed under paragraph (1). If the Chair resigns before the completion of his or her term, or is otherwise unable to exercise the functions of the Chair, the Vice Chair shall exercise the functions of the Chair."; and

Designation.

(C) by striking paragraph (3).

(2) TRANSITION.—

(A) IN GENERAL.—The Secretary of Commerce shall, in the Secretary's discretion, determine the time and manner in which the amendments made by paragraph (1) shall take effect, except that, in each year following the year in which this Act is enacted, 3 members shall be appointed to each Advisory Committee (to which such amendments apply) for 3-year terms that begin on December 1 of that year, in accordance with section 5(a) of title 35, United States Code, as amended by paragraph (1) of this subsection.

35 USC 5 note.
Determination.
Appointment.
Time period.
Effective date.

(B) DEEMED TERMINATION OF TERMS.—In order to implement the amendments made by paragraph (1), the Secretary of Commerce may determine that the term of an existing member of an Advisory Committee under section 5 of title 35, United States Code, shall be deemed to terminate on December 1 of a year beginning after the date of the enactment of this Act, regardless of whether December 1 is before or after the date on which such member's term would terminate if this Act had not been enacted.

(m) CLERICAL AMENDMENT.—Section 123(a) of title 35, United States Code, is amended in the matter preceding paragraph (1) by inserting "of this title" after "For purposes".

(n) EFFECTIVE DATE.—Except as otherwise provided in this Act, the amendments made by this Act shall take effect on the date of enactment of this Act, and shall apply to proceedings commenced on or after such date of enactment.

Applicability.
35 USC 5 note.

Approved January 14, 2013.

LEGISLATIVE HISTORY—H.R. 6621:

CONGRESSIONAL RECORD:
    Vol. 158 (2012): Dec. 18, considered and passed House.
                     Dec. 28, considered and passed Senate, amended.
                     Dec. 30, House considered concurring in Senate amendment.
    Vol. 158 (2013): Jan. 1, House concurred in Senate amendment.

○


PUBLIC LAW 112–29—SEPT. 16, 2011

LEAHY–SMITH AMERICA INVENTS ACT

125 STAT. 284        PUBLIC LAW 112–29—SEPT. 16, 2011

## Public Law 112–29
## 112th Congress

### An Act

Sept. 16, 2011
[H.R. 1249]

Leahy-Smith
America Invents
Act.

35 USC 1 note.

To amend title 35, United States Code, to provide for patent reform.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Leahy-Smith America Invents Act".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.
Sec. 3. First inventor to file.
Sec. 4. Inventor's oath or declaration.
Sec. 5. Defense to infringement based on prior commercial use.
Sec. 6. Post-grant review proceedings.
Sec. 7. Patent Trial and Appeal Board.
Sec. 8. Preissuance submissions by third parties.
Sec. 9. Venue.
Sec. 10. Fee setting authority.
Sec. 11. Fees for patent services.
Sec. 12. Supplemental examination.
Sec. 13. Funding agreements.
Sec. 14. Tax strategies deemed within the prior art.
Sec. 15. Best mode requirement.
Sec. 16. Marking.
Sec. 17. Advice of counsel.
Sec. 18. Transitional program for covered business method patents.
Sec. 19. Jurisdiction and procedural matters.
Sec. 20. Technical amendments.
Sec. 21. Travel expenses and payment of administrative judges.
Sec. 22. Patent and Trademark Office funding.
Sec. 23. Satellite offices.
Sec. 24. Designation of Detroit satellite office.
Sec. 25. Priority examination for important technologies.
Sec. 26. Study on implementation.
Sec. 27. Study on genetic testing.
Sec. 28. Patent Ombudsman Program for small business concerns.
Sec. 29. Establishment of methods for studying the diversity of applicants.
Sec. 30. Sense of Congress.
Sec. 31. USPTO study on international patent protections for small businesses.
Sec. 32. Pro bono program.
Sec. 33. Limitation on issuance of patents.
Sec. 34. Study of patent litigation.
Sec. 35. Effective date.
Sec. 36. Budgetary effects.
Sec. 37. Calculation of 60-day period for application of patent term extension.

35 USC 1 note.

**SEC. 2. DEFINITIONS.**

In this Act:

(1) DIRECTOR.—The term "Director" means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

(2) OFFICE.—The term "Office" means the United States Patent and Trademark Office.

(3) PATENT PUBLIC ADVISORY COMMITTEE.—The term "Patent Public Advisory Committee" means the Patent Public Advisory Committee established under section 5(a) of title 35, United States Code.

(4) TRADEMARK ACT OF 1946.—The term "Trademark Act of 1946" means the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes", approved July 5, 1946 (15 U.S.C. 1051 et seq.) (commonly referred to as the "Trademark Act of 1946" or the "Lanham Act").

(5) TRADEMARK PUBLIC ADVISORY COMMITTEE.—The term "Trademark Public Advisory Committee" means the Trademark Public Advisory Committee established under section 5(a) of title 35, United States Code.

## SEC. 3. FIRST INVENTOR TO FILE.

(a) DEFINITIONS.—Section 100 of title 35, United States Code, is amended—

(1) in subsection (e), by striking "or inter partes reexamination under section 311"; and

(2) by adding at the end the following:

"(f) The term 'inventor' means the individual or, if a joint invention, the individuals collectively who invented or discovered the subject matter of the invention.

"(g) The terms 'joint inventor' and 'coinventor' mean any 1 of the individuals who invented or discovered the subject matter of a joint invention.

"(h) The term 'joint research agreement' means a written contract, grant, or cooperative agreement entered into by 2 or more persons or entities for the performance of experimental, developmental, or research work in the field of the claimed invention.

"(i)(1) The term 'effective filing date' for a claimed invention in a patent or application for patent means—

"(A) if subparagraph (B) does not apply, the actual filing date of the patent or the application for the patent containing a claim to the invention; or

"(B) the filing date of the earliest application for which the patent or application is entitled, as to such invention, to a right of priority under section 119, 365(a), or 365(b) or to the benefit of an earlier filing date under section 120, 121, or 365(c).

"(2) The effective filing date for a claimed invention in an application for reissue or reissued patent shall be determined by deeming the claim to the invention to have been contained in the patent for which reissue was sought.

"(j) The term 'claimed invention' means the subject matter defined by a claim in a patent or an application for a patent.".

(b) CONDITIONS FOR PATENTABILITY.—

(1) IN GENERAL.—Section 102 of title 35, United States Code, is amended to read as follows:

## "§ 102. Conditions for patentability; novelty

"(a) NOVELTY; PRIOR ART.—A person shall be entitled to a patent unless—

"(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention; or

"(2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention.

"(b) EXCEPTIONS.—

"(1) DISCLOSURES MADE 1 YEAR OR LESS BEFORE THE EFFECTIVE FILING DATE OF THE CLAIMED INVENTION.—A disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention under subsection (a)(1) if—

"(A) the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or

"(B) the subject matter disclosed had, before such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.

"(2) DISCLOSURES APPEARING IN APPLICATIONS AND PATENTS.—A disclosure shall not be prior art to a claimed invention under subsection (a)(2) if—

"(A) the subject matter disclosed was obtained directly or indirectly from the inventor or a joint inventor;

"(B) the subject matter disclosed had, before such subject matter was effectively filed under subsection (a)(2), been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or

"(C) the subject matter disclosed and the claimed invention, not later than the effective filing date of the claimed invention, were owned by the same person or subject to an obligation of assignment to the same person.

"(c) COMMON OWNERSHIP UNDER JOINT RESEARCH AGREEMENTS.—Subject matter disclosed and a claimed invention shall be deemed to have been owned by the same person or subject to an obligation of assignment to the same person in applying the provisions of subsection (b)(2)(C) if—

"(1) the subject matter disclosed was developed and the claimed invention was made by, or on behalf of, 1 or more parties to a joint research agreement that was in effect on or before the effective filing date of the claimed invention;

"(2) the claimed invention was made as a result of activities undertaken within the scope of the joint research agreement; and

"(3) the application for patent for the claimed invention discloses or is amended to disclose the names of the parties to the joint research agreement.

"(d) PATENTS AND PUBLISHED APPLICATIONS EFFECTIVE AS PRIOR ART.—For purposes of determining whether a patent or

application for patent is prior art to a claimed invention under subsection (a)(2), such patent or application shall be considered to have been effectively filed, with respect to any subject matter described in the patent or application—

"(1) if paragraph (2) does not apply, as of the actual filing date of the patent or the application for patent; or

"(2) if the patent or application for patent is entitled to claim a right of priority under section 119, 365(a), or 365(b), or to claim the benefit of an earlier filing date under section 120, 121, or 365(c), based upon 1 or more prior filed applications for patent, as of the filing date of the earliest such application that describes the subject matter.".

(2) CONTINUITY OF INTENT UNDER THE CREATE ACT.—The enactment of section 102(c) of title 35, United States Code, under paragraph (1) of this subsection is done with the same intent to promote joint research activities that was expressed, including in the legislative history, through the enactment of the Cooperative Research and Technology Enhancement Act of 2004 (Public Law 108–453; the "CREATE Act"), the amendments of which are stricken by subsection (c) of this section. The United States Patent and Trademark Office shall administer section 102(c) of title 35, United States Code, in a manner consistent with the legislative history of the CREATE Act that was relevant to its administration by the United States Patent and Trademark Office. 35 USC 102 note.

(3) CONFORMING AMENDMENT.—The item relating to section 102 in the table of sections for chapter 10 of title 35, United States Code, is amended to read as follows:

"102. Conditions for patentability; novelty.".

(c) CONDITIONS FOR PATENTABILITY; NONOBVIOUS SUBJECT MATTER.—Section 103 of title 35, United States Code, is amended to read as follows:

## "§ 103. Conditions for patentability; non-obvious subject matter

"A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.".

(d) REPEAL OF REQUIREMENTS FOR INVENTIONS MADE ABROAD.—Section 104 of title 35, United States Code, and the item relating to that section in the table of sections for chapter 10 of title 35, United States Code, are repealed.

(e) REPEAL OF STATUTORY INVENTION REGISTRATION.—

(1) IN GENERAL.—Section 157 of title 35, United States Code, and the item relating to that section in the table of sections for chapter 14 of title 35, United States Code, are repealed.

(2) REMOVAL OF CROSS REFERENCES.—Section 111(b)(8) of title 35, United States Code, is amended by striking "sections 115, 131, 135, and 157" and inserting "sections 131 and 135".

Applicability.
35 USC 111 note.

(3) EFFECTIVE DATE.—The amendments made by this sub-section shall take effect upon the expiration of the 18-month period beginning on the date of the enactment of this Act, and shall apply to any request for a statutory invention registration filed on or after that effective date.

(f) EARLIER FILING DATE FOR INVENTOR AND JOINT INVENTOR.—Section 120 of title 35, United States Code, is amended by striking "which is filed by an inventor or inventors named" and inserting "which names an inventor or joint inventor".

(g) CONFORMING AMENDMENTS.—

(1) RIGHT OF PRIORITY.—Section 172 of title 35, United States Code, is amended by striking "and the time specified in section 102(d)".

(2) LIMITATION ON REMEDIES.—Section 287(c)(4) of title 35, United States Code, is amended by striking "the earliest effective filing date of which is prior to" and inserting "which has an effective filing date before".

(3) INTERNATIONAL APPLICATION DESIGNATING THE UNITED STATES: EFFECT.—Section 363 of title 35, United States Code, is amended by striking "except as otherwise provided in section 102(e) of this title".

(4) PUBLICATION OF INTERNATIONAL APPLICATION: EFFECT.—Section 374 of title 35, United States Code, is amended by striking "sections 102(e) and 154(d)" and inserting "section 154(d)".

(5) PATENT ISSUED ON INTERNATIONAL APPLICATION: EFFECT.—The second sentence of section 375(a) of title 35, United States Code, is amended by striking "Subject to section 102(e) of this title, such" and inserting "Such".

(6) LIMIT ON RIGHT OF PRIORITY.—Section 119(a) of title 35, United States Code, is amended by striking "; but no patent shall be granted" and all that follows through "one year prior to such filing".

(7) INVENTIONS MADE WITH FEDERAL ASSISTANCE.—Section 202(c) of title 35, United States Code, is amended—

(A) in paragraph (2)—

(i) by striking "publication, on sale, or public use," and all that follows through "obtained in the United States" and inserting "the 1-year period referred to in section 102(b) would end before the end of that 2-year period"; and

(ii) by striking "prior to the end of the statutory" and inserting "before the end of that 1-year"; and

(B) in paragraph (3), by striking "any statutory bar date that may occur under this title due to publication, on sale, or public use" and inserting "the expiration of the 1-year period referred to in section 102(b)".

(h) DERIVED PATENTS.—

(1) IN GENERAL.—Section 291 of title 35, United States Code, is amended to read as follows:

## "§ 291. Derived Patents

"(a) IN GENERAL.—The owner of a patent may have relief by civil action against the owner of another patent that claims the same invention and has an earlier effective filing date, if the invention claimed in such other patent was derived from the inventor

of the invention claimed in the patent owned by the person seeking relief under this section.

"(b) FILING LIMITATION.—An action under this section may be filed only before the end of the 1-year period beginning on the date of the issuance of the first patent containing a claim to the allegedly derived invention and naming an individual alleged to have derived such invention as the inventor or joint inventor.".

(2) CONFORMING AMENDMENT.—The item relating to section 291 in the table of sections for chapter 29 of title 35, United States Code, is amended to read as follows:

"291. Derived patents.".

(i) DERIVATION PROCEEDINGS.—Section 135 of title 35, United States Code, is amended to read as follows:

## "§ 135. Derivation proceedings

"(a) INSTITUTION OF PROCEEDING.—An applicant for patent may file a petition to institute a derivation proceeding in the Office. The petition shall set forth with particularity the basis for finding that an inventor named in an earlier application derived the claimed invention from an inventor named in the petitioner's application and, without authorization, the earlier application claiming such invention was filed. Any such petition may be filed only within the 1-year period beginning on the date of the first publication of a claim to an invention that is the same or substantially the same as the earlier application's claim to the invention, shall be made under oath, and shall be supported by substantial evidence. Whenever the Director determines that a petition filed under this subsection demonstrates that the standards for instituting a derivation proceeding are met, the Director may institute a derivation proceeding. The determination by the Director whether to institute a derivation proceeding shall be final and nonappealable.

"(b) DETERMINATION BY PATENT TRIAL AND APPEAL BOARD.—In a derivation proceeding instituted under subsection (a), the Patent Trial and Appeal Board shall determine whether an inventor named in the earlier application derived the claimed invention from an inventor named in the petitioner's application and, without authorization, the earlier application claiming such invention was filed. In appropriate circumstances, the Patent Trial and Appeal Board may correct the naming of the inventor in any application or patent at issue. The Director shall prescribe regulations setting forth standards for the conduct of derivation proceedings, including requiring parties to provide sufficient evidence to prove and rebut a claim of derivation.

"(c) DEFERRAL OF DECISION.—The Patent Trial and Appeal Board may defer action on a petition for a derivation proceeding until the expiration of the 3-month period beginning on the date on which the Director issues a patent that includes the claimed invention that is the subject of the petition. The Patent Trial and Appeal Board also may defer action on a petition for a derivation proceeding, or stay the proceeding after it has been instituted, until the termination of a proceeding under chapter 30, 31, or 32 involving the patent of the earlier applicant.

"(d) EFFECT OF FINAL DECISION.—The final decision of the Patent Trial and Appeal Board, if adverse to claims in an application for patent, shall constitute the final refusal by the Office on those claims. The final decision of the Patent Trial and Appeal

*(marginal notes: Time period. / Time period. / Regulations. / Time period.)*

Board, if adverse to claims in a patent, shall, if no appeal or other review of the decision has been or can be taken or had, constitute cancellation of those claims, and notice of such cancellation shall be endorsed on copies of the patent distributed after such cancellation.

"(e) SETTLEMENT.—Parties to a proceeding instituted under subsection (a) may terminate the proceeding by filing a written statement reflecting the agreement of the parties as to the correct inventors of the claimed invention in dispute. Unless the Patent Trial and Appeal Board finds the agreement to be inconsistent with the evidence of record, if any, it shall take action consistent with the agreement. Any written settlement or understanding of the parties shall be filed with the Director. At the request of a party to the proceeding, the agreement or understanding shall be treated as business confidential information, shall be kept separate from the file of the involved patents or applications, and shall be made available only to Government agencies on written request, or to any person on a showing of good cause.

*Confidentiality.*

"(f) ARBITRATION.—Parties to a proceeding instituted under subsection (a) may, within such time as may be specified by the Director by regulation, determine such contest or any aspect thereof by arbitration. Such arbitration shall be governed by the provisions of title 9, to the extent such title is not inconsistent with this section. The parties shall give notice of any arbitration award to the Director, and such award shall, as between the parties to the arbitration, be dispositive of the issues to which it relates. The arbitration award shall be unenforceable until such notice is given. Nothing in this subsection shall preclude the Director from determining the patentability of the claimed inventions involved in the proceeding.".

*Regulations.*

*Notice.*

(j) ELIMINATION OF REFERENCES TO INTERFERENCES.—(1) Sections 134, 145, 146, 154, and 305 of title 35, United States Code, are each amended by striking "Board of Patent Appeals and Interferences" each place it appears and inserting "Patent Trial and Appeal Board".

(2)(A) Section 146 of title 35, United States Code, is amended—
    (i) by striking "an interference" and inserting "a derivation proceeding"; and
    (ii) by striking "the interference" and inserting "the derivation proceeding".

(B) The subparagraph heading for section 154(b)(1)(C) of title 35, United States Code, is amended to read as follows:
    "(C) GUARANTEE OF ADJUSTMENTS FOR DELAYS DUE TO DERIVATION PROCEEDINGS, SECRECY ORDERS, AND APPEALS.—".

(3) The section heading for section 134 of title 35, United States Code, is amended to read as follows:

**"§ 134. Appeal to the Patent Trial and Appeal Board".**

(4) The section heading for section 146 of title 35, United States Code, is amended to read as follows:

**"§ 146. Civil action in case of derivation proceeding".**

(5) The items relating to sections 134 and 135 in the table of sections for chapter 12 of title 35, United States Code, are amended to read as follows:

"134. Appeal to the Patent Trial and Appeal Board.
"135. Derivation proceedings.".

(6) The item relating to section 146 in the table of sections for chapter 13 of title 35, United States Code, is amended to read as follows:

"146. Civil action in case of derivation proceeding.".

(k) STATUTE OF LIMITATIONS.—

(1) IN GENERAL.—Section 32 of title 35, United States Code, is amended by inserting between the third and fourth sentences the following: "A proceeding under this section shall be commenced not later than the earlier of either the date that is 10 years after the date on which the misconduct forming the basis for the proceeding occurred, or 1 year after the date on which the misconduct forming the basis for the proceeding is made known to an officer or employee of the Office as prescribed in the regulations established under section 2(b)(2)(D).".

(2) REPORT TO CONGRESS.—The Director shall provide on a biennial basis to the Judiciary Committees of the Senate and House of Representatives a report providing a short description of incidents made known to an officer or employee of the Office as prescribed in the regulations established under section 2(b)(2)(D) of title 35, United States Code, that reflect substantial evidence of misconduct before the Office but for which the Office was barred from commencing a proceeding under section 32 of title 35, United States Code, by the time limitation established by the fourth sentence of that section.  *35 USC 32 note.*

(3) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply in any case in which the time period for instituting a proceeding under section 32 of title 35, United States Code, had not lapsed before the date of the enactment of this Act.  *35 USC 32 note.*

(l) SMALL BUSINESS STUDY.—

(1) DEFINITIONS.—In this subsection—

(A) the term "Chief Counsel" means the Chief Counsel for Advocacy of the Small Business Administration;

(B) the term "General Counsel" means the General Counsel of the United States Patent and Trademark Office; and

(C) the term "small business concern" has the meaning given that term under section 3 of the Small Business Act (15 U.S.C. 632).

(2) STUDY.—

(A) IN GENERAL.—The Chief Counsel, in consultation with the General Counsel, shall conduct a study of the effects of eliminating the use of dates of invention in determining whether an applicant is entitled to a patent under title 35, United States Code.

(B) AREAS OF STUDY.—The study conducted under subparagraph (A) shall include examination of the effects

of eliminating the use of invention dates, including examining—

(i) how the change would affect the ability of small business concerns to obtain patents and their costs of obtaining patents;

(ii) whether the change would create, mitigate, or exacerbate any disadvantages for applicants for patents that are small business concerns relative to applicants for patents that are not small business concerns, and whether the change would create any advantages for applicants for patents that are small business concerns relative to applicants for patents that are not small business concerns;

(iii) the cost savings and other potential benefits to small business concerns of the change; and

(iv) the feasibility and costs and benefits to small business concerns of alternative means of determining whether an applicant is entitled to a patent under title 35, United States Code.

(3) REPORT.—Not later than the date that is 1 year after the date of the enactment of this Act, the Chief Counsel shall submit to the Committee on Small Business and Entrepreneurship and the Committee on the Judiciary of the Senate and the Committee on Small Business and the Committee on the Judiciary of the House of Representatives a report on the results of the study under paragraph (2).

(m) REPORT ON PRIOR USER RIGHTS.—

(1) IN GENERAL.—Not later than the end of the 4-month period beginning on the date of the enactment of this Act, the Director shall report, to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives, the findings and recommendations of the Director on the operation of prior user rights in selected countries in the industrialized world. The report shall include the following:

(A) A comparison between patent laws of the United States and the laws of other industrialized countries, including members of the European Union and Japan, Canada, and Australia.

(B) An analysis of the effect of prior user rights on innovation rates in the selected countries.

(C) An analysis of the correlation, if any, between prior user rights and start-up enterprises and the ability to attract venture capital to start new companies.

(D) An analysis of the effect of prior user rights, if any, on small businesses, universities, and individual inventors.

(E) An analysis of legal and constitutional issues, if any, that arise from placing trade secret law in patent law.

(F) An analysis of whether the change to a first-to-file patent system creates a particular need for prior user rights.

(2) CONSULTATION WITH OTHER AGENCIES.—In preparing the report required under paragraph (1), the Director shall consult with the United States Trade Representative, the Secretary of State, and the Attorney General.

(n) EFFECTIVE DATE.—

    (1) IN GENERAL.—Except as otherwise provided in this section, the amendments made by this section shall take effect upon the expiration of the 18-month period beginning on the date of the enactment of this Act, and shall apply to any application for patent, and to any patent issuing thereon, that contains or contained at any time—

        (A) a claim to a claimed invention that has an effective filing date as defined in section 100(i) of title 35, United States Code, that is on or after the effective date described in this paragraph; or

        (B) a specific reference under section 120, 121, or 365(c) of title 35, United States Code, to any patent or application that contains or contained at any time such a claim.

    (2) INTERFERING PATENTS.—The provisions of sections 102(g), 135, and 291 of title 35, United States Code, as in effect on the day before the effective date set forth in paragraph (1) of this subsection, shall apply to each claim of an application for patent, and any patent issued thereon, for which the amendments made by this section also apply, if such application or patent contains or contained at any time—

        (A) a claim to an invention having an effective filing date as defined in section 100(i) of title 35, United States Code, that occurs before the effective date set forth in paragraph (1) of this subsection; or

        (B) a specific reference under section 120, 121, or 365(c) of title 35, United States Code, to any patent or application that contains or contained at any time such a claim.

(o) SENSE OF CONGRESS.—It is the sense of the Congress that converting the United States patent system from "first to invent" to a system of "first inventor to file" will promote the progress of science and the useful arts by securing for limited times to inventors the exclusive rights to their discoveries and provide inventors with greater certainty regarding the scope of protection provided by the grant of exclusive rights to their discoveries.

(p) SENSE OF CONGRESS.—It is the sense of the Congress that converting the United States patent system from "first to invent" to a system of "first inventor to file" will improve the United States patent system and promote harmonization of the United States patent system with the patent systems commonly used in nearly all other countries throughout the world with whom the United States conducts trade and thereby promote greater international uniformity and certainty in the procedures used for securing the exclusive rights of inventors to their discoveries.

### SEC. 4. INVENTOR'S OATH OR DECLARATION.

(a) INVENTOR'S OATH OR DECLARATION.—

    (1) IN GENERAL.—Section 115 of title 35, United States Code, is amended to read as follows:

## "§ 115. Inventor's oath or declaration

    "(a) NAMING THE INVENTOR; INVENTOR'S OATH OR DECLARATION.—An application for patent that is filed under section 111(a) or commences the national stage under section 371 shall include, or be amended to include, the name of the inventor for any invention claimed in the application. Except as otherwise provided in this section, each individual who is the inventor or a joint inventor

*Applicability.*
*35 USC 100 note.*

of a claimed invention in an application for patent shall execute an oath or declaration in connection with the application.

"(b) REQUIRED STATEMENTS.—An oath or declaration under subsection (a) shall contain statements that—

"(1) the application was made or was authorized to be made by the affiant or declarant; and

"(2) such individual believes himself or herself to be the original inventor or an original joint inventor of a claimed invention in the application.

"(c) ADDITIONAL REQUIREMENTS.—The Director may specify additional information relating to the inventor and the invention that is required to be included in an oath or declaration under subsection (a).

"(d) SUBSTITUTE STATEMENT.—

Regulations.

"(1) IN GENERAL.—In lieu of executing an oath or declaration under subsection (a), the applicant for patent may provide a substitute statement under the circumstances described in paragraph (2) and such additional circumstances that the Director may specify by regulation.

"(2) PERMITTED CIRCUMSTANCES.—A substitute statement under paragraph (1) is permitted with respect to any individual who—

"(A) is unable to file the oath or declaration under subsection (a) because the individual—

"(i) is deceased;

"(ii) is under legal incapacity; or

"(iii) cannot be found or reached after diligent effort; or

"(B) is under an obligation to assign the invention but has refused to make the oath or declaration required under subsection (a).

"(3) CONTENTS.—A substitute statement under this subsection shall—

"(A) identify the individual with respect to whom the statement applies;

"(B) set forth the circumstances representing the permitted basis for the filing of the substitute statement in lieu of the oath or declaration under subsection (a); and

"(C) contain any additional information, including any showing, required by the Director.

"(e) MAKING REQUIRED STATEMENTS IN ASSIGNMENT OF RECORD.—An individual who is under an obligation of assignment of an application for patent may include the required statements under subsections (b) and (c) in the assignment executed by the individual, in lieu of filing such statements separately.

"(f) TIME FOR FILING.—A notice of allowance under section 151 may be provided to an applicant for patent only if the applicant for patent has filed each required oath or declaration under subsection (a) or has filed a substitute statement under subsection (d) or recorded an assignment meeting the requirements of subsection (e).

"(g) EARLIER-FILED APPLICATION CONTAINING REQUIRED STATEMENTS OR SUBSTITUTE STATEMENT.—

"(1) EXCEPTION.—The requirements under this section shall not apply to an individual with respect to an application for patent in which the individual is named as the inventor or

a joint inventor and who claims the benefit under section 120, 121, or 365(c) of the filing of an earlier-filed application, if—

"(A) an oath or declaration meeting the requirements of subsection (a) was executed by the individual and was filed in connection with the earlier-filed application;

"(B) a substitute statement meeting the requirements of subsection (d) was filed in connection with the earlier filed application with respect to the individual; or

"(C) an assignment meeting the requirements of subsection (e) was executed with respect to the earlier-filed application by the individual and was recorded in connection with the earlier-filed application.

"(2) COPIES OF OATHS, DECLARATIONS, STATEMENTS, OR ASSIGNMENTS.—Notwithstanding paragraph (1), the Director may require that a copy of the executed oath or declaration, the substitute statement, or the assignment filed in connection with the earlier-filed application be included in the later-filed application.

"(h) SUPPLEMENTAL AND CORRECTED STATEMENTS; FILING ADDITIONAL STATEMENTS.—

"(1) IN GENERAL.—Any person making a statement required under this section may withdraw, replace, or otherwise correct the statement at any time. If a change is made in the naming of the inventor requiring the filing of 1 or more additional statements under this section, the Director shall establish regulations under which such additional statements may be filed.

Regulations.

"(2) SUPPLEMENTAL STATEMENTS NOT REQUIRED.—If an individual has executed an oath or declaration meeting the requirements of subsection (a) or an assignment meeting the requirements of subsection (e) with respect to an application for patent, the Director may not thereafter require that individual to make any additional oath, declaration, or other statement equivalent to those required by this section in connection with the application for patent or any patent issuing thereon.

"(3) SAVINGS CLAUSE.—A patent shall not be invalid or unenforceable based upon the failure to comply with a requirement under this section if the failure is remedied as provided under paragraph (1).

"(i) ACKNOWLEDGMENT OF PENALTIES.—Any declaration or statement filed pursuant to this section shall contain an acknowledgment that any willful false statement made in such declaration or statement is punishable under section 1001 of title 18 by fine or imprisonment of not more than 5 years, or both.".

(2) RELATIONSHIP TO DIVISIONAL APPLICATIONS.—Section 121 of title 35, United States Code, is amended by striking "If a divisional application" and all that follows through "inventor.".

(3) REQUIREMENTS FOR NONPROVISIONAL APPLICATIONS.—Section 111(a) of title 35, United States Code, is amended—

(A) in paragraph (2)(C), by striking "by the applicant" and inserting "or declaration";

(B) in the heading for paragraph (3), by inserting "OR DECLARATION" after "AND OATH"; and

(C) by inserting "or declaration" after "and oath" each place it appears.

(4) CONFORMING AMENDMENT.—The item relating to section 115 in the table of sections for chapter 11 of title 35, United States Code, is amended to read as follows:

"115. Inventor's oath or declaration.".

(b) FILING BY OTHER THAN INVENTOR.—

(1) IN GENERAL.—Section 118 of title 35, United States Code, is amended to read as follows:

## "§ 118. Filing by other than inventor

"A person to whom the inventor has assigned or is under an obligation to assign the invention may make an application for patent. A person who otherwise shows sufficient proprietary interest in the matter may make an application for patent on behalf of and as agent for the inventor on proof of the pertinent facts and a showing that such action is appropriate to preserve the rights of the parties. If the Director grants a patent on an application filed under this section by a person other than the inventor, the patent shall be granted to the real party in interest and upon such notice to the inventor as the Director considers to be sufficient.".

(2) CONFORMING AMENDMENT.—Section 251 of title 35, United States Code, is amended in the third undesignated paragraph by inserting "or the application for the original patent was filed by the assignee of the entire interest" after "claims of the original patent".

(c) SPECIFICATION.—Section 112 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "The specification" and inserting "(a) IN GENERAL.—The specification"; and

(B) by striking "of carrying out his invention" and inserting "or joint inventor of carrying out the invention";

(2) in the second undesignated paragraph—

(A) by striking "The specification" and inserting "(b) CONCLUSION.—The specification"; and

(B) by striking "applicant regards as his invention" and inserting "inventor or a joint inventor regards as the invention";

(3) in the third undesignated paragraph, by striking "A claim" and inserting "(c) FORM.—A claim";

(4) in the fourth undesignated paragraph, by striking "Subject to the following paragraph," and inserting "(d) REFERENCE IN DEPENDENT FORMS.—Subject to subsection (e),";

(5) in the fifth undesignated paragraph, by striking "A claim" and inserting "(e) REFERENCE IN MULTIPLE DEPENDENT FORM.—A claim"; and

(6) in the last undesignated paragraph, by striking "An element" and inserting "(f) ELEMENT IN CLAIM FOR A COMBINATION.—An element".

(d) CONFORMING AMENDMENTS.—

(1) Sections 111(b)(1)(A) of title 35, United States Code, is amended by striking "the first paragraph of section 112 of this title" and inserting "section 112(a)".

(2) Section 111(b)(2) of title 35, United States Code, is amended by striking "the second through fifth paragraphs of

section 112," and inserting "subsections (b) through (e) of section 112,".

(e) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent application that is filed on or after that effective date.

Applicability.
35 USC 111 note.

### SEC. 5. DEFENSE TO INFRINGEMENT BASED ON PRIOR COMMERCIAL USE.

(a) IN GENERAL.—Section 273 of title 35, United States Code, is amended to read as follows:

### "§ 273. Defense to infringement based on prior commercial use

"(a) IN GENERAL.—A person shall be entitled to a defense under section 282(b) with respect to subject matter consisting of a process, or consisting of a machine, manufacture, or composition of matter used in a manufacturing or other commercial process, that would otherwise infringe a claimed invention being asserted against the person if—

"(1) such person, acting in good faith, commercially used the subject matter in the United States, either in connection with an internal commercial use or an actual arm's length sale or other arm's length commercial transfer of a useful end result of such commercial use; and

"(2) such commercial use occurred at least 1 year before the earlier of either—

"(A) the effective filing date of the claimed invention; or

"(B) the date on which the claimed invention was disclosed to the public in a manner that qualified for the exception from prior art under section 102(b).

"(b) BURDEN OF PROOF.—A person asserting a defense under this section shall have the burden of establishing the defense by clear and convincing evidence.

"(c) ADDITIONAL COMMERCIAL USES.—

"(1) PREMARKETING REGULATORY REVIEW.—Subject matter for which commercial marketing or use is subject to a premarketing regulatory review period during which the safety or efficacy of the subject matter is established, including any period specified in section 156(g), shall be deemed to be commercially used for purposes of subsection (a)(1) during such regulatory review period.

"(2) NONPROFIT LABORATORY USE.—A use of subject matter by a nonprofit research laboratory or other nonprofit entity, such as a university or hospital, for which the public is the intended beneficiary, shall be deemed to be a commercial use for purposes of subsection (a)(1), except that a defense under this section may be asserted pursuant to this paragraph only for continued and noncommercial use by and in the laboratory or other nonprofit entity.

"(d) EXHAUSTION OF RIGHTS.—Notwithstanding subsection (e)(1), the sale or other disposition of a useful end result by a person entitled to assert a defense under this section in connection with a patent with respect to that useful end result shall exhaust the patent owner's rights under the patent to the extent that

such rights would have been exhausted had such sale or other disposition been made by the patent owner.

"(e) LIMITATIONS AND EXCEPTIONS.—

"(1) PERSONAL DEFENSE.—

"(A) IN GENERAL.—A defense under this section may be asserted only by the person who performed or directed the performance of the commercial use described in subsection (a), or by an entity that controls, is controlled by, or is under common control with such person.

"(B) TRANSFER OF RIGHT.—Except for any transfer to the patent owner, the right to assert a defense under this section shall not be licensed or assigned or transferred to another person except as an ancillary and subordinate part of a good-faith assignment or transfer for other reasons of the entire enterprise or line of business to which the defense relates.

"(C) RESTRICTION ON SITES.—A defense under this section, when acquired by a person as part of an assignment or transfer described in subparagraph (B), may only be asserted for uses at sites where the subject matter that would otherwise infringe a claimed invention is in use before the later of the effective filing date of the claimed invention or the date of the assignment or transfer of such enterprise or line of business.

"(2) DERIVATION.—A person may not assert a defense under this section if the subject matter on which the defense is based was derived from the patentee or persons in privity with the patentee.

"(3) NOT A GENERAL LICENSE.—The defense asserted by a person under this section is not a general license under all claims of the patent at issue, but extends only to the specific subject matter for which it has been established that a commercial use that qualifies under this section occurred, except that the defense shall also extend to variations in the quantity or volume of use of the claimed subject matter, and to improvements in the claimed subject matter that do not infringe additional specifically claimed subject matter of the patent.

"(4) ABANDONMENT OF USE.—A person who has abandoned commercial use (that qualifies under this section) of subject matter may not rely on activities performed before the date of such abandonment in establishing a defense under this section with respect to actions taken on or after the date of such abandonment.

"(5) UNIVERSITY EXCEPTION.—

"(A) IN GENERAL.—A person commercially using subject matter to which subsection (a) applies may not assert a defense under this section if the claimed invention with respect to which the defense is asserted was, at the time the invention was made, owned or subject to an obligation of assignment to either an institution of higher education (as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)), or a technology transfer organization whose primary purpose is to facilitate the commercialization of technologies developed by one or more such institutions of higher education.

PUBLIC LAW 112–29—SEPT. 16, 2011          125 STAT. 299

"(B) EXCEPTION.—Subparagraph (A) shall not apply if any of the activities required to reduce to practice the subject matter of the claimed invention could not have been undertaken using funds provided by the Federal Government.

"(f) UNREASONABLE ASSERTION OF DEFENSE.—If the defense under this section is pleaded by a person who is found to infringe the patent and who subsequently fails to demonstrate a reasonable basis for asserting the defense, the court shall find the case exceptional for the purpose of awarding attorney fees under section 285.

"(g) INVALIDITY.—A patent shall not be deemed to be invalid under section 102 or 103 solely because a defense is raised or established under this section.".

(b) CONFORMING AMENDMENT.—The item relating to section 273 in the table of sections for chapter 28 of title 35, United States Code, is amended to read as follows:

"273. Defense to infringement based on prior commercial use.".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to any patent issued on or after the date of the enactment of this Act.

Applicability.
35 USC 273 note.

**SEC. 6. POST-GRANT REVIEW PROCEEDINGS.**

(a) INTER PARTES REVIEW.—Chapter 31 of title 35, United States Code, is amended to read as follows:

## "CHAPTER 31—INTER PARTES REVIEW

"Sec.
"311. Inter partes review.
"312. Petitions.
"313. Preliminary response to petition.
"314. Institution of inter partes review.
"315. Relation to other proceedings or actions.
"316. Conduct of inter partes review.
"317. Settlement.
"318. Decision of the Board.
"319. Appeal.

## "§ 311. Inter partes review

"(a) IN GENERAL.—Subject to the provisions of this chapter, a person who is not the owner of a patent may file with the Office a petition to institute an inter partes review of the patent. The Director shall establish, by regulation, fees to be paid by the person requesting the review, in such amounts as the Director determines to be reasonable, considering the aggregate costs of the review.

Regulations.

"(b) SCOPE.—A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications.

"(c) FILING DEADLINE.—A petition for inter partes review shall be filed after the later of either—

"(1) the date that is 9 months after the grant of a patent or issuance of a reissue of a patent; or

"(2) if a post-grant review is instituted under chapter 32, the date of the termination of such post-grant review.

### "§ 312. Petitions

"(a) REQUIREMENTS OF PETITION.—A petition filed under section 311 may be considered only if—

"(1) the petition is accompanied by payment of the fee established by the Director under section 311;

"(2) the petition identifies all real parties in interest;

"(3) the petition identifies, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim, including—

"(A) copies of patents and printed publications that the petitioner relies upon in support of the petition; and

"(B) affidavits or declarations of supporting evidence and opinions, if the petitioner relies on expert opinions;

"(4) the petition provides such other information as the Director may require by regulation; and

"(5) the petitioner provides copies of any of the documents required under paragraphs (2), (3), and (4) to the patent owner or, if applicable, the designated representative of the patent owner.

"(b) PUBLIC AVAILABILITY.—As soon as practicable after the receipt of a petition under section 311, the Director shall make the petition available to the public.

### "§ 313. Preliminary response to petition

"If an inter partes review petition is filed under section 311, the patent owner shall have the right to file a preliminary response to the petition, within a time period set by the Director, that sets forth reasons why no inter partes review should be instituted based upon the failure of the petition to meet any requirement of this chapter.

### "§ 314. Institution of inter partes review

"(a) THRESHOLD.—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

"(b) TIMING.—The Director shall determine whether to institute an inter partes review under this chapter pursuant to a petition filed under section 311 within 3 months after—

"(1) receiving a preliminary response to the petition under section 313; or

"(2) if no such preliminary response is filed, the last date on which such response may be filed.

"(c) NOTICE.—The Director shall notify the petitioner and patent owner, in writing, of the Director's determination under subsection (a), and shall make such notice available to the public as soon as is practicable. Such notice shall include the date on which the review shall commence.

"(d) NO APPEAL.—The determination by the Director whether to institute an inter partes review under this section shall be final and nonappealable.

### "§ 315. Relation to other proceedings or actions

"(a) INFRINGER'S CIVIL ACTION.—

"(1) INTER PARTES REVIEW BARRED BY CIVIL ACTION.—An inter partes review may not be instituted if, before the date on which the petition for such a review is filed, the petitioner or real party in interest filed a civil action challenging the validity of a claim of the patent.

"(2) STAY OF CIVIL ACTION.—If the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent on or after the date on which the petitioner files a petition for inter partes review of the patent, that civil action shall be automatically stayed until either—

"(A) the patent owner moves the court to lift the stay;

"(B) the patent owner files a civil action or counterclaim alleging that the petitioner or real party in interest has infringed the patent; or

"(C) the petitioner or real party in interest moves the court to dismiss the civil action.

"(3) TREATMENT OF COUNTERCLAIM.—A counterclaim challenging the validity of a claim of a patent does not constitute a civil action challenging the validity of a claim of a patent for purposes of this subsection.

"(b) PATENT OWNER'S ACTION.—An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent. The time limitation set forth in the preceding sentence shall not apply to a request for joinder under subsection (c). Deadline.

"(c) JOINDER.—If the Director institutes an inter partes review, the Director, in his or her discretion, may join as a party to that inter partes review any person who properly files a petition under section 311 that the Director, after receiving a preliminary response under section 313 or the expiration of the time for filing such a response, determines warrants the institution of an inter partes review under section 314.

"(d) MULTIPLE PROCEEDINGS.—Notwithstanding sections 135(a), 251, and 252, and chapter 30, during the pendency of an inter partes review, if another proceeding or matter involving the patent is before the Office, the Director may determine the manner in which the inter partes review or other proceeding or matter may proceed, including providing for stay, transfer, consolidation, or termination of any such matter or proceeding.

"(e) ESTOPPEL.—

"(1) PROCEEDINGS BEFORE THE OFFICE.—The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the real party in interest or privy of the petitioner, may not request or maintain a proceeding before the Office with respect to that claim on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

"(2) CIVIL ACTIONS AND OTHER PROCEEDINGS.—The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the real party in interest or privy of the petitioner, may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any

ground that the petitioner raised or reasonably could have raised during that inter partes review.

## "§ 316. Conduct of inter partes review

"(a) REGULATIONS.—The Director shall prescribe regulations—

"(1) providing that the file of any proceeding under this chapter shall be made available to the public, except that any petition or document filed with the intent that it be sealed shall, if accompanied by a motion to seal, be treated as sealed pending the outcome of the ruling on the motion;

"(2) setting forth the standards for the showing of sufficient grounds to institute a review under section 314(a);

"(3) establishing procedures for the submission of supplemental information after the petition is filed;

"(4) establishing and governing inter partes review under this chapter and the relationship of such review to other proceedings under this title;

"(5) setting forth standards and procedures for discovery of relevant evidence, including that such discovery shall be limited to—

"(A) the deposition of witnesses submitting affidavits or declarations; and

"(B) what is otherwise necessary in the interest of justice;

"(6) prescribing sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding, such as to harass or to cause unnecessary delay or an unnecessary increase in the cost of the proceeding;

"(7) providing for protective orders governing the exchange and submission of confidential information;

"(8) providing for the filing by the patent owner of a response to the petition under section 313 after an inter partes review has been instituted, and requiring that the patent owner file with such response, through affidavits or declarations, any additional factual evidence and expert opinions on which the patent owner relies in support of the response;

"(9) setting forth standards and procedures for allowing the patent owner to move to amend the patent under subsection (d) to cancel a challenged claim or propose a reasonable number of substitute claims, and ensuring that any information submitted by the patent owner in support of any amendment entered under subsection (d) is made available to the public as part of the prosecution history of the patent;

"(10) providing either party with the right to an oral hearing as part of the proceeding;

"(11) requiring that the final determination in an inter partes review be issued not later than 1 year after the date on which the Director notices the institution of a review under this chapter, except that the Director may, for good cause shown, extend the 1-year period by not more than 6 months, and may adjust the time periods in this paragraph in the case of joinder under section 315(c);

"(12) setting a time period for requesting joinder under section 315(c); and

"(13) providing the petitioner with at least 1 opportunity to file written comments within a time period established by the Director.

"(b) CONSIDERATIONS.—In prescribing regulations under this section, the Director shall consider the effect of any such regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter.

"(c) PATENT TRIAL AND APPEAL BOARD.—The Patent Trial and Appeal Board shall, in accordance with section 6, conduct each inter partes review instituted under this chapter.

"(d) AMENDMENT OF THE PATENT.—

"(1) IN GENERAL.—During an inter partes review instituted under this chapter, the patent owner may file 1 motion to amend the patent in 1 or more of the following ways:

"(A) Cancel any challenged patent claim.

"(B) For each challenged claim, propose a reasonable number of substitute claims.

"(2) ADDITIONAL MOTIONS.—Additional motions to amend may be permitted upon the joint request of the petitioner and the patent owner to materially advance the settlement of a proceeding under section 317, or as permitted by regulations prescribed by the Director.

"(3) SCOPE OF CLAIMS.—An amendment under this subsection may not enlarge the scope of the claims of the patent or introduce new matter.

"(e) EVIDENTIARY STANDARDS.—In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.

## "§ 317. Settlement

"(a) IN GENERAL.—An inter partes review instituted under this chapter shall be terminated with respect to any petitioner upon the joint request of the petitioner and the patent owner, unless the Office has decided the merits of the proceeding before the request for termination is filed. If the inter partes review is terminated with respect to a petitioner under this section, no estoppel under section 315(e) shall attach to the petitioner, or to the real party in interest or privy of the petitioner, on the basis of that petitioner's institution of that inter partes review. If no petitioner remains in the inter partes review, the Office may terminate the review or proceed to a final written decision under section 318(a).

"(b) AGREEMENTS IN WRITING.—Any agreement or understanding between the patent owner and a petitioner, including any collateral agreements referred to in such agreement or understanding, made in connection with, or in contemplation of, the termination of an inter partes review under this section shall be in writing and a true copy of such agreement or understanding shall be filed in the Office before the termination of the inter partes review as between the parties. At the request of a party to the proceeding, the agreement or understanding shall be treated as business confidential information, shall be kept separate from the file of the involved patents, and shall be made available only to Federal Government agencies on written request, or to any person on a showing of good cause.

Confidentiality.

## "§ 318. Decision of the Board

"(a) FINAL WRITTEN DECISION.—If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial

and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d).

"(b) CERTIFICATE.—If the Patent Trial and Appeal Board issues a final written decision under subsection (a) and the time for appeal has expired or any appeal has terminated, the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent by operation of the certificate any new or amended claim determined to be patentable.

"(c) INTERVENING RIGHTS.—Any proposed amended or new claim determined to be patentable and incorporated into a patent following an inter partes review under this chapter shall have the same effect as that specified in section 252 for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation therefor, before the issuance of a certificate under subsection (b).

Public information.

"(d) DATA ON LENGTH OF REVIEW.—The Office shall make available to the public data describing the length of time between the institution of, and the issuance of a final written decision under subsection (a) for, each inter partes review.

**"§ 319. Appeal**

"A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) may appeal the decision pursuant to sections 141 through 144. Any party to the inter partes review shall have the right to be a party to the appeal.".

(b) CONFORMING AMENDMENT.—The table of chapters for part III of title 35, United States Code, is amended by striking the item relating to chapter 31 and inserting the following:

"31. Inter Partes Review ............................................................................................ 311".

(c) REGULATIONS AND EFFECTIVE DATE.—

35 USC 311 note.

(1) REGULATIONS.—The Director shall, not later than the date that is 1 year after the date of the enactment of this Act, issue regulations to carry out chapter 31 of title 35, United States Code, as amended by subsection (a) of this section.

35 USC 311 note.

(2) APPLICABILITY.—

(A) IN GENERAL.—The amendments made by subsection (a) shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued before, on, or after effective date.

(B) GRADUATED IMPLEMENTATION.—The Director may impose a limit on the number of inter partes reviews that may be instituted under chapter 31 of title 35, United States Code, during each of the first 4 1-year periods in which the amendments made by subsection (a) are in effect, if such number in each year equals or exceeds the number of inter partes reexaminations that are ordered under chapter 31 of title 35, United States Code, in the last fiscal year ending before the effective date of the amendments made by subsection (a).

(3) TRANSITION.—

(A) IN GENERAL.—Chapter 31 of title 35, United States Code, is amended—

(i) in section 312—

(I) in subsection (a)—

(aa) in the first sentence, by striking "a substantial new question of patentability affecting any claim of the patent concerned is raised by the request," and inserting "the information presented in the request shows that there is a reasonable likelihood that the requester would prevail with respect to at least 1 of the claims challenged in the request,"; and

(bb) in the second sentence, by striking "The existence of a substantial new question of patentability" and inserting "A showing that there is a reasonable likelihood that the requester would prevail with respect to at least 1 of the claims challenged in the request"; and

(II) in subsection (c), in the second sentence, by striking "no substantial new question of patentability has been raised," and inserting "the showing required by subsection (a) has not been made,"; and

(ii) in section 313, by striking "a substantial new question of patentability affecting a claim of the patent is raised" and inserting "it has been shown that there is a reasonable likelihood that the requester would prevail with respect to at least 1 of the claims challenged in the request".

(B) APPLICATION.—The amendments made by this paragraph—

35 USC 312 note.

(i) shall take effect on the date of the enactment of this Act; and

(ii) shall apply to requests for inter partes reexamination that are filed on or after such date of enactment, but before the effective date set forth in paragraph (2)(A) of this subsection.

(C) CONTINUED APPLICABILITY OF PRIOR PROVISIONS.— The provisions of chapter 31 of title 35, United States Code, as amended by this paragraph, shall continue to apply to requests for inter partes reexamination that are filed before the effective date set forth in paragraph (2)(A) as if subsection (a) had not been enacted.

35 USC 312 note.

(d) POST-GRANT REVIEW.—Part III of title 35, United States Code, is amended by adding at the end the following:

## "CHAPTER 32—POST-GRANT REVIEW

"Sec.
"321. Post-grant review.
"322. Petitions.
"323. Preliminary response to petition.
"324. Institution of post-grant review.
"325. Relation to other proceedings or actions.
"326. Conduct of post-grant review.
"327. Settlement.
"328. Decision of the Board.
"329. Appeal.

## "§ 321. Post-grant review

Regulations.

"(a) IN GENERAL.—Subject to the provisions of this chapter, a person who is not the owner of a patent may file with the Office a petition to institute a post-grant review of the patent. The Director shall establish, by regulation, fees to be paid by the person requesting the review, in such amounts as the Director determines to be reasonable, considering the aggregate costs of the post-grant review.

"(b) SCOPE.—A petitioner in a post-grant review may request to cancel as unpatentable 1 or more claims of a patent on any ground that could be raised under paragraph (2) or (3) of section 282(b) (relating to invalidity of the patent or any claim).

"(c) FILING DEADLINE.—A petition for a post-grant review may only be filed not later than the date that is 9 months after the date of the grant of the patent or of the issuance of a reissue patent (as the case may be).

## "§ 322. Petitions

"(a) REQUIREMENTS OF PETITION.—A petition filed under section 321 may be considered only if—

"(1) the petition is accompanied by payment of the fee established by the Director under section 321;

"(2) the petition identifies all real parties in interest;

"(3) the petition identifies, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim, including—

"(A) copies of patents and printed publications that the petitioner relies upon in support of the petition; and

"(B) affidavits or declarations of supporting evidence and opinions, if the petitioner relies on other factual evidence or on expert opinions;

"(4) the petition provides such other information as the Director may require by regulation; and

"(5) the petitioner provides copies of any of the documents required under paragraphs (2), (3), and (4) to the patent owner or, if applicable, the designated representative of the patent owner.

"(b) PUBLIC AVAILABILITY.—As soon as practicable after the receipt of a petition under section 321, the Director shall make the petition available to the public.

## "§ 323. Preliminary response to petition

"If a post-grant review petition is filed under section 321, the patent owner shall have the right to file a preliminary response to the petition, within a time period set by the Director, that sets forth reasons why no post-grant review should be instituted based upon the failure of the petition to meet any requirement of this chapter.

## "§ 324. Institution of post-grant review

"(a) THRESHOLD.—The Director may not authorize a post-grant review to be instituted unless the Director determines that the information presented in the petition filed under section 321, if such information is not rebutted, would demonstrate that it is more likely than not that at least 1 of the claims challenged in the petition is unpatentable.

"(b) ADDITIONAL GROUNDS.—The determination required under subsection (a) may also be satisfied by a showing that the petition raises a novel or unsettled legal question that is important to other patents or patent applications.

"(c) TIMING.—The Director shall determine whether to institute a post-grant review under this chapter pursuant to a petition filed under section 321 within 3 months after—

"(1) receiving a preliminary response to the petition under section 323; or

"(2) if no such preliminary response is filed, the last date on which such response may be filed.

"(d) NOTICE.—The Director shall notify the petitioner and patent owner, in writing, of the Director's determination under subsection (a) or (b), and shall make such notice available to the public as soon as is practicable. Such notice shall include the date on which the review shall commence.

"(e) NO APPEAL.—The determination by the Director whether to institute a post-grant review under this section shall be final and nonappealable.

## "§ 325. Relation to other proceedings or actions

"(a) INFRINGER'S CIVIL ACTION.—

"(1) POST-GRANT REVIEW BARRED BY CIVIL ACTION.—A post-grant review may not be instituted under this chapter if, before the date on which the petition for such a review is filed, the petitioner or real party in interest filed a civil action challenging the validity of a claim of the patent.

"(2) STAY OF CIVIL ACTION.—If the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent on or after the date on which the petitioner files a petition for post-grant review of the patent, that civil action shall be automatically stayed until either—

"(A) the patent owner moves the court to lift the stay;

"(B) the patent owner files a civil action or counterclaim alleging that the petitioner or real party in interest has infringed the patent; or

"(C) the petitioner or real party in interest moves the court to dismiss the civil action.

"(3) TREATMENT OF COUNTERCLAIM.—A counterclaim challenging the validity of a claim of a patent does not constitute a civil action challenging the validity of a claim of a patent for purposes of this subsection.

"(b) PRELIMINARY INJUNCTIONS.—If a civil action alleging infringement of a patent is filed within 3 months after the date on which the patent is granted, the court may not stay its consideration of the patent owner's motion for a preliminary injunction against infringement of the patent on the basis that a petition for post-grant review has been filed under this chapter or that such a post-grant review has been instituted under this chapter.

"(c) JOINDER.—If more than 1 petition for a post-grant review under this chapter is properly filed against the same patent and the Director determines that more than 1 of these petitions warrants the institution of a post-grant review under section 324, the Director may consolidate such reviews into a single post-grant review.

"(d) MULTIPLE PROCEEDINGS.—Notwithstanding sections 135(a), 251, and 252, and chapter 30, during the pendency of any post-

grant review under this chapter, if another proceeding or matter involving the patent is before the Office, the Director may determine the manner in which the post-grant review or other proceeding or matter may proceed, including providing for the stay, transfer, consolidation, or termination of any such matter or proceeding. In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

"(e) ESTOPPEL.—

"(1) PROCEEDINGS BEFORE THE OFFICE.—The petitioner in a post-grant review of a claim in a patent under this chapter that results in a final written decision under section 328(a), or the real party in interest or privy of the petitioner, may not request or maintain a proceeding before the Office with respect to that claim on any ground that the petitioner raised or reasonably could have raised during that post-grant review.

"(2) CIVIL ACTIONS AND OTHER PROCEEDINGS.—The petitioner in a post-grant review of a claim in a patent under this chapter that results in a final written decision under section 328(a), or the real party in interest or privy of the petitioner, may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that post-grant review.

"(f) REISSUE PATENTS.—A post-grant review may not be instituted under this chapter if the petition requests cancellation of a claim in a reissue patent that is identical to or narrower than a claim in the original patent from which the reissue patent was issued, and the time limitations in section 321(c) would bar filing a petition for a post-grant review for such original patent.

## "§ 326. Conduct of post-grant review

"(a) REGULATIONS.—The Director shall prescribe regulations—

"(1) providing that the file of any proceeding under this chapter shall be made available to the public, except that any petition or document filed with the intent that it be sealed shall, if accompanied by a motion to seal, be treated as sealed pending the outcome of the ruling on the motion;

"(2) setting forth the standards for the showing of sufficient grounds to institute a review under subsections (a) and (b) of section 324;

"(3) establishing procedures for the submission of supplemental information after the petition is filed;

"(4) establishing and governing a post-grant review under this chapter and the relationship of such review to other proceedings under this title;

"(5) setting forth standards and procedures for discovery of relevant evidence, including that such discovery shall be limited to evidence directly related to factual assertions advanced by either party in the proceeding;

"(6) prescribing sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding, such

as to harass or to cause unnecessary delay or an unnecessary increase in the cost of the proceeding;

"(7) providing for protective orders governing the exchange and submission of confidential information;

"(8) providing for the filing by the patent owner of a response to the petition under section 323 after a post-grant review has been instituted, and requiring that the patent owner file with such response, through affidavits or declarations, any additional factual evidence and expert opinions on which the patent owner relies in support of the response;

"(9) setting forth standards and procedures for allowing the patent owner to move to amend the patent under subsection (d) to cancel a challenged claim or propose a reasonable number of substitute claims, and ensuring that any information submitted by the patent owner in support of any amendment entered under subsection (d) is made available to the public as part of the prosecution history of the patent;

"(10) providing either party with the right to an oral hearing as part of the proceeding;

"(11) requiring that the final determination in any post-grant review be issued not later than 1 year after the date on which the Director notices the institution of a proceeding under this chapter, except that the Director may, for good cause shown, extend the 1-year period by not more than 6 months, and may adjust the time periods in this paragraph in the case of joinder under section 325(c); and

"(12) providing the petitioner with at least 1 opportunity to file written comments within a time period established by the Director.

"(b) CONSIDERATIONS.—In prescribing regulations under this section, the Director shall consider the effect of any such regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter.

"(c) PATENT TRIAL AND APPEAL BOARD.—The Patent Trial and Appeal Board shall, in accordance with section 6, conduct each post-grant review instituted under this chapter.

"(d) AMENDMENT OF THE PATENT.—

"(1) IN GENERAL.—During a post-grant review instituted under this chapter, the patent owner may file 1 motion to amend the patent in 1 or more of the following ways:

"(A) Cancel any challenged patent claim.

"(B) For each challenged claim, propose a reasonable number of substitute claims.

"(2) ADDITIONAL MOTIONS.—Additional motions to amend may be permitted upon the joint request of the petitioner and the patent owner to materially advance the settlement of a proceeding under section 327, or upon the request of the patent owner for good cause shown.

"(3) SCOPE OF CLAIMS.—An amendment under this subsection may not enlarge the scope of the claims of the patent or introduce new matter.

"(e) EVIDENTIARY STANDARDS.—In a post-grant review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.

## "§ 327. Settlement

"(a) IN GENERAL.—A post-grant review instituted under this chapter shall be terminated with respect to any petitioner upon the joint request of the petitioner and the patent owner, unless the Office has decided the merits of the proceeding before the request for termination is filed. If the post-grant review is terminated with respect to a petitioner under this section, no estoppel under section 325(e) shall attach to the petitioner, or to the real party in interest or privy of the petitioner, on the basis of that petitioner's institution of that post-grant review. If no petitioner remains in the post-grant review, the Office may terminate the post-grant review or proceed to a final written decision under section 328(a).

"(b) AGREEMENTS IN WRITING.—Any agreement or understanding between the patent owner and a petitioner, including any collateral agreements referred to in such agreement or understanding, made in connection with, or in contemplation of, the termination of a post-grant review under this section shall be in writing, and a true copy of such agreement or understanding shall be filed in the Office before the termination of the post-grant review as between the parties. At the request of a party to the proceeding, the agreement or understanding shall be treated as business confidential information, shall be kept separate from the file of the involved patents, and shall be made available only to Federal Government agencies on written request, or to any person on a showing of good cause.

Confidentiality.

## "§ 328. Decision of the Board

"(a) FINAL WRITTEN DECISION.—If a post-grant review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 326(d).

"(b) CERTIFICATE.—If the Patent Trial and Appeal Board issues a final written decision under subsection (a) and the time for appeal has expired or any appeal has terminated, the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent by operation of the certificate any new or amended claim determined to be patentable.

"(c) INTERVENING RIGHTS.—Any proposed amended or new claim determined to be patentable and incorporated into a patent following a post-grant review under this chapter shall have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation therefor, before the issuance of a certificate under subsection (b).

"(d) DATA ON LENGTH OF REVIEW.—The Office shall make available to the public data describing the length of time between the institution of, and the issuance of a final written decision under subsection (a) for, each post-grant review.

Public information.

**"§ 329. Appeal**

"A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 328(a) may appeal the decision pursuant to sections 141 through 144. Any party to the post-grant review shall have the right to be a party to the appeal.".

(e) CONFORMING AMENDMENT.—The table of chapters for part III of title 35, United States Code, is amended by adding at the end the following:

"32. Post-Grant Review ........................................................................................ 321".

(f) REGULATIONS AND EFFECTIVE DATE.—

(1) REGULATIONS.—The Director shall, not later than the date that is 1 year after the date of the enactment of this Act, issue regulations to carry out chapter 32 of title 35, United States Code, as added by subsection (d) of this section.

(2) APPLICABILITY.—

(A) IN GENERAL.—The amendments made by subsection (d) shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and, except as provided in section 18 and in paragraph (3), shall apply only to patents described in section 3(n)(1).

(B) LIMITATION.—The Director may impose a limit on the number of post-grant reviews that may be instituted under chapter 32 of title 35, United States Code, during each of the first 4 1-year periods in which the amendments made by subsection (d) are in effect.

(3) PENDING INTERFERENCES.—

(A) PROCEDURES IN GENERAL.—The Director shall determine, and include in the regulations issued under paragraph (1), the procedures under which an interference commenced before the effective date set forth in paragraph (2)(A) is to proceed, including whether such interference—

(i) is to be dismissed without prejudice to the filing of a petition for a post-grant review under chapter 32 of title 35, United States Code; or

(ii) is to proceed as if this Act had not been enacted.

(B) PROCEEDINGS BY PATENT TRIAL AND APPEAL BOARD.—For purposes of an interference that is commenced before the effective date set forth in paragraph (2)(A), the Director may deem the Patent Trial and Appeal Board to be the Board of Patent Appeals and Interferences, and may allow the Patent Trial and Appeal Board to conduct any further proceedings in that interference.

(C) APPEALS.—The authorization to appeal or have remedy from derivation proceedings in sections 141(d) and 146 of title 35, United States Code, as amended by this Act, and the jurisdiction to entertain appeals from derivation proceedings in section 1295(a)(4)(A) of title 28, United States Code, as amended by this Act, shall be deemed to extend to any final decision in an interference that is commenced before the effective date set forth in paragraph (2)(A) of this subsection and that is not dismissed pursuant to this paragraph.

(g) CITATION OF PRIOR ART AND WRITTEN STATEMENTS.—

(1) IN GENERAL.—Section 301 of title 35, United States Code, is amended to read as follows:

35 USC 321 note.

35 USC 321 note.

35 USC 321 note.

## "§ 301. Citation of prior art and written statements

"(a) IN GENERAL.—Any person at any time may cite to the Office in writing—

"(1) prior art consisting of patents or printed publications which that person believes to have a bearing on the patentability of any claim of a particular patent; or

"(2) statements of the patent owner filed in a proceeding before a Federal court or the Office in which the patent owner took a position on the scope of any claim of a particular patent.

"(b) OFFICIAL FILE.—If the person citing prior art or written statements pursuant to subsection (a) explains in writing the pertinence and manner of applying the prior art or written statements to at least 1 claim of the patent, the citation of the prior art or written statements and the explanation thereof shall become a part of the official file of the patent.

"(c) ADDITIONAL INFORMATION.—A party that submits a written statement pursuant to subsection (a)(2) shall include any other documents, pleadings, or evidence from the proceeding in which the statement was filed that addresses the written statement.

"(d) LIMITATIONS.—A written statement submitted pursuant to subsection (a)(2), and additional information submitted pursuant to subsection (c), shall not be considered by the Office for any purpose other than to determine the proper meaning of a patent claim in a proceeding that is ordered or instituted pursuant to section 304, 314, or 324. If any such written statement or additional information is subject to an applicable protective order, such statement or information shall be redacted to exclude information that is subject to that order.

"(e) CONFIDENTIALITY.—Upon the written request of the person citing prior art or written statements pursuant to subsection (a), that person's identity shall be excluded from the patent file and kept confidential.".

(2) CONFORMING AMENDMENT.—The item relating to section 301 in the table of sections for chapter 30 of title 35, United States Code, is amended to read as follows:

"301. Citation of prior art and written statements.".

<p>35 USC 301 note.</p>

(3) EFFECTIVE DATE.—The amendments made by this subsection shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued before, on, or after that effective date.

(h) REEXAMINATION.—

(1) DETERMINATION BY DIRECTOR.—

(A) IN GENERAL.—Section 303(a) of title 35, United States Code, is amended by striking "section 301 of this title" and inserting "section 301 or 302".

<p>Applicability.<br>35 USC 303 note.</p>

(B) EFFECTIVE DATE.—The amendment made by this paragraph shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued before, on, or after that effective date.

(2) APPEAL.—

(A) IN GENERAL.—Section 306 of title 35, United States Code, is amended by striking "145" and inserting "144".

<p>Applicability.<br>35 USC 306 note.</p>

(B) EFFECTIVE DATE.—The amendment made by this paragraph shall take effect on the date of the enactment

of this Act and shall apply to any appeal of a reexamination before the Board of Patent Appeals and Interferences or the Patent Trial and Appeal Board that is pending on, or brought on or after, the date of the enactment of this Act.

**SEC. 7. PATENT TRIAL AND APPEAL BOARD.**

(a) COMPOSITION AND DUTIES.—

(1) IN GENERAL.—Section 6 of title 35, United States Code, is amended to read as follows:

### "§ 6. Patent Trial and Appeal Board

"(a) IN GENERAL.—There shall be in the Office a Patent Trial and Appeal Board. The Director, the Deputy Director, the Commissioner for Patents, the Commissioner for Trademarks, and the administrative patent judges shall constitute the Patent Trial and Appeal Board. The administrative patent judges shall be persons of competent legal knowledge and scientific ability who are appointed by the Secretary, in consultation with the Director. Any reference in any Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or pertaining to the Board of Patent Appeals and Interferences is deemed to refer to the Patent Trial and Appeal Board.

Establishment.

"(b) DUTIES.—The Patent Trial and Appeal Board shall—

"(1) on written appeal of an applicant, review adverse decisions of examiners upon applications for patents pursuant to section 134(a);

"(2) review appeals of reexaminations pursuant to section 134(b);

"(3) conduct derivation proceedings pursuant to section 135; and

"(4) conduct inter partes reviews and post-grant reviews pursuant to chapters 31 and 32.

"(c) 3-MEMBER PANELS.—Each appeal, derivation proceeding, post-grant review, and inter partes review shall be heard by at least 3 members of the Patent Trial and Appeal Board, who shall be designated by the Director. Only the Patent Trial and Appeal Board may grant rehearings.

"(d) TREATMENT OF PRIOR APPOINTMENTS.—The Secretary of Commerce may, in the Secretary's discretion, deem the appointment of an administrative patent judge who, before the date of the enactment of this subsection, held office pursuant to an appointment by the Director to take effect on the date on which the Director initially appointed the administrative patent judge. It shall be a defense to a challenge to the appointment of an administrative patent judge on the basis of the judge's having been originally appointed by the Director that the administrative patent judge so appointed was acting as a de facto officer.".

(2) CONFORMING AMENDMENT.—The item relating to section 6 in the table of sections for chapter 1 of title 35, United States Code, is amended to read as follows:

"6. Patent Trial and Appeal Board.".

(b) ADMINISTRATIVE APPEALS.—Section 134 of title 35, United States Code, is amended—

(1) in subsection (b), by striking "any reexamination proceeding" and inserting "a reexamination"; and

(2) by striking subsection (c).

(c) CIRCUIT APPEALS.—

(1) IN GENERAL.—Section 141 of title 35, United States Code, is amended to read as follows:

## "§ 141. Appeal to Court of Appeals for the Federal Circuit

"(a) EXAMINATIONS.—An applicant who is dissatisfied with the final decision in an appeal to the Patent Trial and Appeal Board under section 134(a) may appeal the Board's decision to the United States Court of Appeals for the Federal Circuit. By filing such an appeal, the applicant waives his or her right to proceed under section 145.

"(b) REEXAMINATIONS.—A patent owner who is dissatisfied with the final decision in an appeal of a reexamination to the Patent Trial and Appeal Board under section 134(b) may appeal the Board's decision only to the United States Court of Appeals for the Federal Circuit.

"(c) POST-GRANT AND INTER PARTES REVIEWS.—A party to an inter partes review or a post-grant review who is dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) or 328(a) (as the case may be) may appeal the Board's decision only to the United States Court of Appeals for the Federal Circuit.

Deadlines.
Notices.

"(d) DERIVATION PROCEEDINGS.—A party to a derivation proceeding who is dissatisfied with the final decision of the Patent Trial and Appeal Board in the proceeding may appeal the decision to the United States Court of Appeals for the Federal Circuit, but such appeal shall be dismissed if any adverse party to such derivation proceeding, within 20 days after the appellant has filed notice of appeal in accordance with section 142, files notice with the Director that the party elects to have all further proceedings conducted as provided in section 146. If the appellant does not, within 30 days after the filing of such notice by the adverse party, file a civil action under section 146, the Board's decision shall govern the further proceedings in the case.".

(2) JURISDICTION.—Section 1295(a)(4)(A) of title 28, United States Code, is amended to read as follows:

"(A) the Patent Trial and Appeal Board of the United States Patent and Trademark Office with respect to a patent application, derivation proceeding, reexamination, post-grant review, or inter partes review under title 35, at the instance of a party who exercised that party's right to participate in the applicable proceeding before or appeal to the Board, except that an applicant or a party to a derivation proceeding may also have remedy by civil action pursuant to section 145 or 146 of title 35; an appeal under this subparagraph of a decision of the Board with respect to an application or derivation proceeding shall waive the right of such applicant or party to proceed under section 145 or 146 of title 35;".

(3) PROCEEDINGS ON APPEAL.—Section 143 of title 35, United States Code, is amended—

(A) by striking the third sentence and inserting the following: "In an ex parte case, the Director shall submit to the court in writing the grounds for the decision of the Patent and Trademark Office, addressing all of the issues raised in the appeal. The Director shall have the

right to intervene in an appeal from a decision entered by the Patent Trial and Appeal Board in a derivation proceeding under section 135 or in an inter partes or post-grant review under chapter 31 or 32."; and

(B) by striking the last sentence.

(d) Conforming Amendments.—

(1) Atomic energy act of 1954.—Section 152 of the Atomic Energy Act of 1954 (42 U.S.C. 2182) is amended in the third undesignated paragraph—

(A) by striking "Board of Patent Appeals and Interferences" each place it appears and inserting "Patent Trial and Appeal Board"; and

(B) by inserting "and derivation" after "established for interference".

(2) Title 51.—Section 20135 of title 51, United States Code, is amended—

(A) in subsections (e) and (f), by striking "Board of Patent Appeals and Interferences" each place it appears and inserting "Patent Trial and Appeal Board"; and

(B) in subsection (e), by inserting "and derivation" after "established for interference".

(e) Effective Date.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to proceedings commenced on or after that effective date, except that— 35 USC 6 note.

(1) the extension of jurisdiction to the United States Court of Appeals for the Federal Circuit to entertain appeals of decisions of the Patent Trial and Appeal Board in reexaminations under the amendment made by subsection (c)(2) shall be deemed to take effect on the date of the enactment of this Act and shall extend to any decision of the Board of Patent Appeals and Interferences with respect to a reexamination that is entered before, on, or after the date of the enactment of this Act;

(2) the provisions of sections 6, 134, and 141 of title 35, United States Code, as in effect on the day before the effective date of the amendments made by this section shall continue to apply to inter partes reexaminations that are requested under section 311 of such title before such effective date;

(3) the Patent Trial and Appeal Board may be deemed to be the Board of Patent Appeals and Interferences for purposes of appeals of inter partes reexaminations that are requested under section 311 of title 35, United States Code, before the effective date of the amendments made by this section; and

(4) the Director's right under the fourth sentence of section 143 of title 35, United States Code, as amended by subsection (c)(3) of this section, to intervene in an appeal from a decision entered by the Patent Trial and Appeal Board shall be deemed to extend to inter partes reexaminations that are requested under section 311 of such title before the effective date of the amendments made by this section.

**SEC. 8. PREISSUANCE SUBMISSIONS BY THIRD PARTIES.**

(a) In General.—Section 122 of title 35, United States Code, is amended by adding at the end the following:

"(e) Preissuance Submissions by Third Parties.—

"(1) IN GENERAL.—Any third party may submit for consideration and inclusion in the record of a patent application, any patent, published patent application, or other printed publication of potential relevance to the examination of the application, if such submission is made in writing before the earlier of—

"(A) the date a notice of allowance under section 151 is given or mailed in the application for patent; or

"(B) the later of—

"(i) 6 months after the date on which the application for patent is first published under section 122 by the Office, or

"(ii) the date of the first rejection under section 132 of any claim by the examiner during the examination of the application for patent.

"(2) OTHER REQUIREMENTS.—Any submission under paragraph (1) shall—

"(A) set forth a concise description of the asserted relevance of each submitted document;

"(B) be accompanied by such fee as the Director may prescribe; and

"(C) include a statement by the person making such submission affirming that the submission was made in compliance with this section.".

Applicability.
35 USC 122 note.

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent application filed before, on, or after that effective date.

**SEC. 9. VENUE.**

(a) TECHNICAL AMENDMENTS RELATING TO VENUE.—Sections 32, 145, 146, 154(b)(4)(A), and 293 of title 35, United States Code, and section 21(b)(4) of the Trademark Act of 1946 (15 U.S.C. 1071(b)(4)), are each amended by striking "United States District Court for the District of Columbia" each place that term appears and inserting "United States District Court for the Eastern District of Virginia".

Applicability.
35 USC 1071 note.

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to any civil action commenced on or after that date.

35 USC 41 note.

**SEC. 10. FEE SETTING AUTHORITY.**

(a) FEE SETTING.—

(1) IN GENERAL.—The Director may set or adjust by rule any fee established, authorized, or charged under title 35, United States Code, or the Trademark Act of 1946 (15 U.S.C. 1051 et seq.), for any services performed by or materials furnished by, the Office, subject to paragraph (2).

(2) FEES TO RECOVER COSTS.—Fees may be set or adjusted under paragraph (1) only to recover the aggregate estimated costs to the Office for processing, activities, services, and materials relating to patents (in the case of patent fees) and trademarks (in the case of trademark fees), including administrative costs of the Office with respect to such patent or trademark fees (as the case may be).

(b) SMALL AND MICRO ENTITIES.—The fees set or adjusted under subsection (a) for filing, searching, examining, issuing, appealing, and maintaining patent applications and patents shall be reduced by 50 percent with respect to the application of such fees to any

small entity that qualifies for reduced fees under section 41(h)(1) of title 35, United States Code, and shall be reduced by 75 percent with respect to the application of such fees to any micro entity as defined in section 123 of that title (as added by subsection (g) of this section).

(c) REDUCTION OF FEES IN CERTAIN FISCAL YEARS.—In each fiscal year, the Director—

(1) shall consult with the Patent Public Advisory Committee and the Trademark Public Advisory Committee on the advisability of reducing any fees described in subsection (a); and

*Consultation.*

(2) after the consultation required under paragraph (1), may reduce such fees.

(d) ROLE OF THE PUBLIC ADVISORY COMMITTEE.—The Director shall—

(1) not less than 45 days before publishing any proposed fee under subsection (a) in the Federal Register, submit the proposed fee to the Patent Public Advisory Committee or the Trademark Public Advisory Committee, or both, as appropriate;

*Deadline.*

(2)(A) provide the relevant advisory committee described in paragraph (1) a 30-day period following the submission of any proposed fee, in which to deliberate, consider, and comment on such proposal;

*Time period.*

(B) require that, during that 30-day period, the relevant advisory committee hold a public hearing relating to such proposal; and

*Time period.*

(C) assist the relevant advisory committee in carrying out that public hearing, including by offering the use of the resources of the Office to notify and promote the hearing to the public and interested stakeholders;

(3) require the relevant advisory committee to make available to the public a written report setting forth in detail the comments, advice, and recommendations of the committee regarding the proposed fee; and

(4) consider and analyze any comments, advice, or recommendations received from the relevant advisory committee before setting or adjusting (as the case may be) the fee.

(e) PUBLICATION IN THE FEDERAL REGISTER.—

(1) PUBLICATION AND RATIONALE.—The Director shall—

(A) publish any proposed fee change under this section in the Federal Register;

(B) include, in such publication, the specific rationale and purpose for the proposal, including the possible expectations or benefits resulting from the proposed change; and

(C) notify, through the Chair and Ranking Member of the Committees on the Judiciary of the Senate and the House of Representatives, the Congress of the proposed change not later than the date on which the proposed change is published under subparagraph (A).

*Notification.*
*Deadline.*

(2) PUBLIC COMMENT PERIOD.—The Director shall, in the publication under paragraph (1), provide the public a period of not less than 45 days in which to submit comments on the proposed change in fees.

(3) PUBLICATION OF FINAL RULE.—The final rule setting or adjusting a fee under this section shall be published in

the Federal Register and in the Official Gazette of the Patent and Trademark Office.

(4) CONGRESSIONAL COMMENT PERIOD.—A fee set or adjusted under subsection (a) may not become effective—

(A) before the end of the 45-day period beginning on the day after the date on which the Director publishes the final rule adjusting or setting the fee under paragraph (3); or

(B) if a law is enacted disapproving such fee.

(5) RULE OF CONSTRUCTION.—Rules prescribed under this section shall not diminish—

(A) the rights of an applicant for a patent under title 35, United States Code, or for a mark under the Trademark Act of 1946; or

(B) any rights under a ratified treaty.

(f) RETENTION OF AUTHORITY.—The Director retains the authority under subsection (a) to set or adjust fees only during such period as the Patent and Trademark Office remains an agency within the Department of Commerce.

(g) MICRO ENTITY DEFINED.—

(1) IN GENERAL.—Chapter 11 of title 35, United States Code, is amended by adding at the end the following new section:

## "§ 123. Micro entity defined

"(a) IN GENERAL.—For purposes of this title, the term 'micro entity' means an applicant who makes a certification that the applicant—

"(1) qualifies as a small entity, as defined in regulations issued by the Director;

"(2) has not been named as an inventor on more than 4 previously filed patent applications, other than applications filed in another country, provisional applications under section 111(b), or international applications filed under the treaty defined in section 351(a) for which the basic national fee under section 41(a) was not paid;

"(3) did not, in the calendar year preceding the calendar year in which the applicable fee is being paid, have a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding 3 times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census; and

"(4) has not assigned, granted, or conveyed, and is not under an obligation by contract or law to assign, grant, or convey, a license or other ownership interest in the application concerned to an entity that, in the calendar year preceding the calendar year in which the applicable fee is being paid, had a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding 3 times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census.

"(b) APPLICATIONS RESULTING FROM PRIOR EMPLOYMENT.—An applicant is not considered to be named on a previously filed application for purposes of subsection (a)(2) if the applicant has assigned, or is under an obligation by contract or law to assign, all ownership rights in the application as the result of the applicant's previous employment.

"(c) FOREIGN CURRENCY EXCHANGE RATE.—If an applicant's or entity's gross income in the preceding calendar year is not in United States dollars, the average currency exchange rate, as reported by the Internal Revenue Service, during that calendar year shall be used to determine whether the applicant's or entity's gross income exceeds the threshold specified in paragraphs (3) or (4) of subsection (a).

"(d) INSTITUTIONS OF HIGHER EDUCATION.—For purposes of this section, a micro entity shall include an applicant who certifies that—

"(1) the applicant's employer, from which the applicant obtains the majority of the applicant's income, is an institution of higher education as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)); or

"(2) the applicant has assigned, granted, conveyed, or is under an obligation by contract or law, to assign, grant, or convey, a license or other ownership interest in the particular applications to such an institution of higher education.

"(e) DIRECTOR'S AUTHORITY.—In addition to the limits imposed by this section, the Director may, in the Director's discretion, impose income limits, annual filing limits, or other limits on who may qualify as a micro entity pursuant to this section if the Director determines that such additional limits are reasonably necessary to avoid an undue impact on other patent applicants or owners or are otherwise reasonably necessary and appropriate. At least 3 months before any limits proposed to be imposed pursuant to this subsection take effect, the Director shall inform the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate of any such proposed limits.".

*Deadline.*
*Notification.*

(2) CONFORMING AMENDMENT.—Chapter 11 of title 35, United States Code, is amended by adding at the end the following new item:

"123. Micro entity defined.".

(h) ELECTRONIC FILING INCENTIVE.—

(1) IN GENERAL.—Notwithstanding any other provision of this section, an additional fee of $400 shall be established for each application for an original patent, except for a design, plant, or provisional application, that is not filed by electronic means as prescribed by the Director. The fee established by this subsection shall be reduced by 50 percent for small entities that qualify for reduced fees under section 41(h)(1) of title 35, United States Code. All fees paid under this subsection shall be deposited in the Treasury as an offsetting receipt that shall not be available for obligation or expenditure.

(2) EFFECTIVE DATE.—This subsection shall take effect upon the expiration of the 60-day period beginning on the date of the enactment of this Act.

(i) EFFECTIVE DATE; SUNSET.—

(1) EFFECTIVE DATE.—Except as provided in subsection (h), this section and the amendments made by this section shall take effect on the date of the enactment of this Act.

(2) SUNSET.—The authority of the Director to set or adjust any fee under subsection (a) shall terminate upon the expiration of the 7-year period beginning on the date of the enactment of this Act.

(3) PRIOR REGULATIONS NOT AFFECTED.—The termination of authority under this subsection shall not affect any regulations issued under this section before the effective date of such termination or any rulemaking proceeding for the issuance of regulations under this section that is pending on such date.

### SEC. 11. FEES FOR PATENT SERVICES.

(a) GENERAL PATENT SERVICES.—Subsections (a) and (b) of section 41 of title 35, United States Code, are amended to read as follows:

"(a) GENERAL FEES.—The Director shall charge the following fees:

"(1) FILING AND BASIC NATIONAL FEES.—

"(A) On filing each application for an original patent, except for design, plant, or provisional applications, $330.

"(B) On filing each application for an original design patent, $220.

"(C) On filing each application for an original plant patent, $220.

"(D) On filing each provisional application for an original patent, $220.

"(E) On filing each application for the reissue of a patent, $330.

"(F) The basic national fee for each international application filed under the treaty defined in section 351(a) entering the national stage under section 371, $330.

"(G) In addition, excluding any sequence listing or computer program listing filed in an electronic medium as prescribed by the Director, for any application the specification and drawings of which exceed 100 sheets of paper (or equivalent as prescribed by the Director if filed in an electronic medium), $270 for each additional 50 sheets of paper (or equivalent as prescribed by the Director if filed in an electronic medium) or fraction thereof.

"(2) EXCESS CLAIMS FEES.—

"(A) IN GENERAL.—In addition to the fee specified in paragraph (1)—

"(i) on filing or on presentation at any other time, $220 for each claim in independent form in excess of 3;

"(ii) on filing or on presentation at any other time, $52 for each claim (whether dependent or independent) in excess of 20; and

"(iii) for each application containing a multiple dependent claim, $390.

"(B) MULTIPLE DEPENDENT CLAIMS.—For the purpose of computing fees under subparagraph (A), a multiple dependent claim referred to in section 112 or any claim depending therefrom shall be considered as separate dependent claims in accordance with the number of claims to which reference is made.

"(C) REFUNDS; ERRORS IN PAYMENT.—The Director may by regulation provide for a refund of any part of the fee specified in subparagraph (A) for any claim that is canceled before an examination on the merits, as prescribed by the Director, has been made of the application under section 131. Errors in payment of the additional fees under

this paragraph may be rectified in accordance with regulations prescribed by the Director.

"(3) EXAMINATION FEES.—

"(A) IN GENERAL.—

"(i) For examination of each application for an original patent, except for design, plant, provisional, or international applications, $220.

"(ii) For examination of each application for an original design patent, $140.

"(iii) For examination of each application for an original plant patent, $170.

"(iv) For examination of the national stage of each international application, $220.

"(v) For examination of each application for the reissue of a patent, $650.

"(B) APPLICABILITY OF OTHER FEE PROVISIONS.—The provisions of paragraphs (3) and (4) of section 111(a) relating to the payment of the fee for filing the application shall apply to the payment of the fee specified in subparagraph (A) with respect to an application filed under section 111(a). The provisions of section 371(d) relating to the payment of the national fee shall apply to the payment of the fee specified in subparagraph (A) with respect to an international application.

"(4) ISSUE FEES.—

"(A) For issuing each original patent, except for design or plant patents, $1,510.

"(B) For issuing each original design patent, $860.

"(C) For issuing each original plant patent, $1,190.

"(D) For issuing each reissue patent, $1,510.

"(5) DISCLAIMER FEE.—On filing each disclaimer, $140.

"(6) APPEAL FEES.—

"(A) On filing an appeal from the examiner to the Patent Trial and Appeal Board, $540.

"(B) In addition, on filing a brief in support of the appeal, $540, and on requesting an oral hearing in the appeal before the Patent Trial and Appeal Board, $1,080.

"(7) REVIVAL FEES.—On filing each petition for the revival of an unintentionally abandoned application for a patent, for the unintentionally delayed payment of the fee for issuing each patent, or for an unintentionally delayed response by the patent owner in any reexamination proceeding, $1,620, unless the petition is filed under section 133 or 151, in which case the fee shall be $540.

"(8) EXTENSION FEES.—For petitions for 1-month extensions of time to take actions required by the Director in an application—

"(A) on filing a first petition, $130;

"(B) on filing a second petition, $360; and

"(C) on filing a third or subsequent petition, $620.

"(b) MAINTENANCE FEES.—

"(1) IN GENERAL.—The Director shall charge the following fees for maintaining in force all patents based on applications filed on or after December 12, 1980:

"(A) Three years and 6 months after grant, $980.

"(B) Seven years and 6 months after grant, $2,480.

"(C) Eleven years and 6 months after grant, $4,110.

125 STAT. 322          PUBLIC LAW 112–29—SEPT. 16, 2011

Expiration date.

"(2) GRACE PERIOD; SURCHARGE.—Unless payment of the applicable maintenance fee under paragraph (1) is received in the Office on or before the date the fee is due or within a grace period of 6 months thereafter, the patent shall expire as of the end of such grace period. The Director may require the payment of a surcharge as a condition of accepting within such 6-month grace period the payment of an applicable maintenance fee.

"(3) NO MAINTENANCE FEE FOR DESIGN OR PLANT PATENT.— No fee may be established for maintaining a design or plant patent in force.".

(b) DELAYS IN PAYMENT.—Subsection (c) of section 41 of title 35, United States Code, is amended—

(1) by striking "(c)(1) The Director" and inserting:

"(c) DELAYS IN PAYMENT OF MAINTENANCE FEES.—

"(1) ACCEPTANCE.—The Director"; and

(2) by striking "(2) A patent" and inserting:

"(2) EFFECT ON RIGHTS OF OTHERS.—A patent".

(c) PATENT SEARCH FEES.—Subsection (d) of section 41 of title 35, United States Code, is amended to read as follows:

"(d) PATENT SEARCH AND OTHER FEES.—

"(1) PATENT SEARCH FEES.—

"(A) IN GENERAL.—The Director shall charge the fees specified under subparagraph (B) for the search of each application for a patent, except for provisional applications. The Director shall adjust the fees charged under this paragraph to ensure that the fees recover an amount not to exceed the estimated average cost to the Office of searching applications for patent by Office personnel.

"(B) SPECIFIC FEES.—The fees referred to in subparagraph (A) are—

"(i) $540 for each application for an original patent, except for design, plant, provisional, or international applications;

"(ii) $100 for each application for an original design patent;

"(iii) $330 for each application for an original plant patent;

"(iv) $540 for the national stage of each international application; and

"(v) $540 for each application for the reissue of a patent.

"(C) APPLICABILITY OF OTHER PROVISIONS.—The provisions of paragraphs (3) and (4) of section 111(a) relating to the payment of the fee for filing the application shall apply to the payment of the fee specified in this paragraph with respect to an application filed under section 111(a). The provisions of section 371(d) relating to the payment of the national fee shall apply to the payment of the fee specified in this paragraph with respect to an international application.

Regulations.

"(D) REFUNDS.—The Director may by regulation provide for a refund of any part of the fee specified in this paragraph for any applicant who files a written declaration of express abandonment as prescribed by the Director before an examination has been made of the application under section 131.

"(2) OTHER FEES.—

"(A) IN GENERAL.—The Director shall establish fees for all other processing, services, or materials relating to patents not specified in this section to recover the estimated average cost to the Office of such processing, services, or materials, except that the Director shall charge the following fees for the following services:

"(i) For recording a document affecting title, $40 per property.

"(ii) For each photocopy, $.25 per page.

"(iii) For each black and white copy of a patent, $3.

"(B) COPIES FOR LIBRARIES.—The yearly fee for providing a library specified in section 12 with uncertified printed copies of the specifications and drawings for all patents in that year shall be $50.".

(d) FEES FOR SMALL ENTITIES.—Subsection (h) of section 41 of title 35, United States Code, is amended to read as follows:

"(h) FEES FOR SMALL ENTITIES.—

"(1) REDUCTIONS IN FEES.—Subject to paragraph (3), fees charged under subsections (a), (b), and (d)(1) shall be reduced by 50 percent with respect to their application to any small business concern as defined under section 3 of the Small Business Act, and to any independent inventor or nonprofit organization as defined in regulations issued by the Director.

"(2) SURCHARGES AND OTHER FEES.—With respect to its application to any entity described in paragraph (1), any surcharge or fee charged under subsection (c) or (d) shall not be higher than the surcharge or fee required of any other entity under the same or substantially similar circumstances.

"(3) REDUCTION FOR ELECTRONIC FILING.—The fee charged under subsection (a)(1)(A) shall be reduced by 75 percent with respect to its application to any entity to which paragraph (1) applies, if the application is filed by electronic means as prescribed by the Director.".

(e) TECHNICAL AMENDMENTS.—Section 41 of title 35, United States Code, is amended—

(1) in subsection (e), in the first sentence, by striking "The Director" and inserting "WAIVER OF FEES; COPIES REGARDING NOTICE.—The Director";

(2) in subsection (f), by striking "The fees" and inserting "ADJUSTMENT OF FEES.—The fees";

(3) by repealing subsection (g); and

(4) in subsection (i)—

(A) by striking "(i)(1) The Director" and inserting the following:

"(i) ELECTRONIC PATENT AND TRADEMARK DATA.—

"(1) MAINTENANCE OF COLLECTIONS.—The Director";

(B) by striking "(2) The Director" and inserting the following:

"(2) AVAILABILITY OF AUTOMATED SEARCH SYSTEMS.—The Director";

(C) by striking "(3) The Director" and inserting the following:

"(3) ACCESS FEES.—The Director"; and

(D) by striking "(4) The Director" and inserting the following:

"(4) ANNUAL REPORT TO CONGRESS.—The Director".

(f) ADJUSTMENT OF TRADEMARK FEES.—Section 802(a) of division B of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended—

35 USC 41 note.

(1) in the first sentence, by striking "During fiscal years 2005, 2006, and 2007,", and inserting "Until such time as the Director sets or adjusts the fees otherwise,"; and

(2) in the second sentence, by striking "During fiscal years 2005, 2006, and 2007, the" and inserting "The".

(g) EFFECTIVE DATE, APPLICABILITY, AND TRANSITION PROVISIONS.—Section 803(a) of division B of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended by striking "and shall apply only with respect to the remaining portion of fiscal year 2005 and fiscal year 2006".

35 USC 41 note.

(h) PRIORITIZED EXAMINATION FEE.—

35 USC 41 note.

(1) IN GENERAL.—

(A) FEE.—

(i) PRIORITIZED EXAMINATION FEE.—A fee of $4,800 shall be established for filing a request, pursuant to section 2(b)(2)(G) of title 35, United States Code, for prioritized examination of a nonprovisional application for an original utility or plant patent.

(ii) ADDITIONAL FEES.—In addition to the prioritized examination fee under clause (i), the fees due on an application for which prioritized examination is being sought are the filing, search, and examination fees (including any applicable excess claims and application size fees), processing fee, and publication fee for that application.

(B) REGULATIONS; LIMITATIONS.—

(i) REGULATIONS.—The Director may by regulation prescribe conditions for acceptance of a request under subparagraph (A) and a limit on the number of filings for prioritized examination that may be accepted.

(ii) LIMITATION ON CLAIMS.— Until regulations are prescribed under clause (i), no application for which prioritized examination is requested may contain or be amended to contain more than 4 independent claims or more than 30 total claims.

(iii) LIMITATION ON TOTAL NUMBER OF REQUESTS.—The Director may not accept in any fiscal year more than 10,000 requests for prioritization until regulations are prescribed under this subparagraph setting another limit.

(2) REDUCTION IN FEES FOR SMALL ENTITIES.—The Director shall reduce fees for providing prioritized examination of nonprovisional applications for original utility and plant patents by 50 percent for small entities that qualify for reduced fees under section 41(h)(1) of title 35, United States Code.

(3) DEPOSIT OF FEES.—All fees paid under this subsection shall be credited to the United States Patent and Trademark Office Appropriation Account, shall remain available until expended, and may be used only for the purposes specified in section 42(c)(3)(A) of title 35, United States Code.

(4) EFFECTIVE DATE AND TERMINATION.—

(A) EFFECTIVE DATE.—This subsection shall take effect on the date that is 10 days after the date of the enactment of this Act.

(B) TERMINATION.—The fee imposed under paragraph (1)(A)(i), and the reduced fee under paragraph (2), shall terminate on the effective date of the setting or adjustment of the fee under paragraph (1)(A)(i) pursuant to the exercise of the authority under section 10 for the first time with respect to that fee.

(i) APPROPRIATION ACCOUNT TRANSITION FEES.—

   (1) SURCHARGE.—

      (A) IN GENERAL.—There shall be a surcharge of 15 percent, rounded by standard arithmetic rules, on all fees charged or authorized by subsections (a), (b), and (d)(1) of section 41, and section 132(b), of title 35, United States Code. Any surcharge imposed under this subsection is, and shall be construed to be, separate from and in addition to any other surcharge imposed under this Act or any other provision of law.

      (B) DEPOSIT OF AMOUNTS.—Amounts collected pursuant to the surcharge imposed under subparagraph (A) shall be credited to the United States Patent and Trademark Appropriation Account, shall remain available until expended, and may be used only for the purposes specified in section 42(c)(3)(A) of title 35, United States Code.

   (2) EFFECTIVE DATE AND TERMINATION OF SURCHARGE.— The surcharge provided for in paragraph (1)—

      (A) shall take effect on the date that is 10 days after the date of the enactment of this Act; and

      (B) shall terminate, with respect to a fee to which paragraph (1)(A) applies, on the effective date of the setting or adjustment of that fee pursuant to the exercise of the authority under section 10 for the first time with respect to that fee.

(j) EFFECTIVE DATE.—Except as otherwise provided in this section, this section and the amendments made by this section shall take effect on the date of the enactment of this Act.

### SEC. 12. SUPPLEMENTAL EXAMINATION.

(a) IN GENERAL.—Chapter 25 of title 35, United States Code, is amended by adding at the end the following:

### "§ 257. Supplemental examinations to consider, reconsider, or correct information

"(a) REQUEST FOR SUPPLEMENTAL EXAMINATION.—A patent owner may request supplemental examination of a patent in the Office to consider, reconsider, or correct information believed to be relevant to the patent, in accordance with such requirements as the Director may establish. Within 3 months after the date a request for supplemental examination meeting the requirements of this section is received, the Director shall conduct the supplemental examination and shall conclude such examination by issuing a certificate indicating whether the information presented in the request raises a substantial new question of patentability.

"(b) REEXAMINATION ORDERED.—If the certificate issued under subsection (a) indicates that a substantial new question of patentability is raised by 1 or more items of information in the request,

35 USC 41 note.

Applicability.

35 USC 41 note.

Deadline.
Certificate.

the Director shall order reexamination of the patent. The reexamination shall be conducted according to procedures established by chapter 30, except that the patent owner shall not have the right to file a statement pursuant to section 304. During the reexamination, the Director shall address each substantial new question of patentability identified during the supplemental examination, notwithstanding the limitations in chapter 30 relating to patents and printed publication or any other provision of such chapter.

"(c) EFFECT.—

"(1) IN GENERAL.—A patent shall not be held unenforceable on the basis of conduct relating to information that had not been considered, was inadequately considered, or was incorrect in a prior examination of the patent if the information was considered, reconsidered, or corrected during a supplemental examination of the patent. The making of a request under subsection (a), or the absence thereof, shall not be relevant to enforceability of the patent under section 282.

"(2) EXCEPTIONS.—

"(A) PRIOR ALLEGATIONS.—Paragraph (1) shall not apply to an allegation pled with particularity in a civil action, or set forth with particularity in a notice received by the patent owner under section 505(j)(2)(B)(iv)(II) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(2)(B)(iv)(II)), before the date of a supplemental examination request under subsection (a) to consider, reconsider, or correct information forming the basis for the allegation.

"(B) PATENT ENFORCEMENT ACTIONS.—In an action brought under section 337(a) of the Tariff Act of 1930 (19 U.S.C. 1337(a)), or section 281 of this title, paragraph (1) shall not apply to any defense raised in the action that is based upon information that was considered, reconsidered, or corrected pursuant to a supplemental examination request under subsection (a), unless the supplemental examination, and any reexamination ordered pursuant to the request, are concluded before the date on which the action is brought.

"(d) FEES AND REGULATIONS.—

"(1) FEES.—The Director shall, by regulation, establish fees for the submission of a request for supplemental examination of a patent, and to consider each item of information submitted in the request. If reexamination is ordered under subsection (b), fees established and applicable to ex parte reexamination proceedings under chapter 30 shall be paid, in addition to fees applicable to supplemental examination.

"(2) REGULATIONS.—The Director shall issue regulations governing the form, content, and other requirements of requests for supplemental examination, and establishing procedures for reviewing information submitted in such requests.

"(e) FRAUD.—If the Director becomes aware, during the course of a supplemental examination or reexamination proceeding ordered under this section, that a material fraud on the Office may have been committed in connection with the patent that is the subject of the supplemental examination, then in addition to any other actions the Director is authorized to take, including the cancellation of any claims found to be invalid under section 307 as a result of a reexamination ordered under this section, the Director shall

also refer the matter to the Attorney General for such further action as the Attorney General may deem appropriate. Any such referral shall be treated as confidential, shall not be included in the file of the patent, and shall not be disclosed to the public unless the United States charges a person with a criminal offense in connection with such referral.

"(f) RULE OF CONSTRUCTION.—Nothing in this section shall be construed—

"(1) to preclude the imposition of sanctions based upon criminal or antitrust laws (including section 1001(a) of title 18, the first section of the Clayton Act, and section 5 of the Federal Trade Commission Act to the extent that section relates to unfair methods of competition);

"(2) to limit the authority of the Director to investigate issues of possible misconduct and impose sanctions for misconduct in connection with matters or proceedings before the Office; or

"(3) to limit the authority of the Director to issue regulations under chapter 3 relating to sanctions for misconduct by representatives practicing before the Office.".

(b) CONFORMING AMENDMENT.—The table of sections for chapter 25 of title 35, United States Code, is amended by adding at the end the following new item:

"257. Supplemental examinations to consider, reconsider, or correct information.".

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued before, on, or after that effective date.

*Applicability.
35 USC 257 note.*

**SEC. 13. FUNDING AGREEMENTS.**

(a) IN GENERAL.—Section 202(c)(7)(E)(i) of title 35, United States Code, is amended—

(1) by striking "75 percent" and inserting "15 percent";

(2) by striking "25 percent" and inserting "85 percent"; and

(3) by striking "as described above in this clause (D);" and inserting "described above in this clause;".

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to any patent issued before, on, or after that date.

*Applicability.
35 USC 202 note.*

**SEC. 14. TAX STRATEGIES DEEMED WITHIN THE PRIOR ART.**

*35 USC 102 note.*

(a) IN GENERAL.—For purposes of evaluating an invention under section 102 or 103 of title 35, United States Code, any strategy for reducing, avoiding, or deferring tax liability, whether known or unknown at the time of the invention or application for patent, shall be deemed insufficient to differentiate a claimed invention from the prior art.

(b) DEFINITION.—For purposes of this section, the term "tax liability" refers to any liability for a tax under any Federal, State, or local law, or the law of any foreign jurisdiction, including any statute, rule, regulation, or ordinance that levies, imposes, or assesses such tax liability.

(c) EXCLUSIONS.—This section does not apply to that part of an invention that—

(1) is a method, apparatus, technology, computer program product, or system, that is used solely for preparing a tax

or information return or other tax filing, including one that records, transmits, transfers, or organizes data related to such filing; or

(2) is a method, apparatus, technology, computer program product, or system used solely for financial management, to the extent that it is severable from any tax strategy or does not limit the use of any tax strategy by any taxpayer or tax advisor.

(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to imply that other business methods are patentable or that other business method patents are valid.

(e) EFFECTIVE DATE; APPLICABILITY.—This section shall take effect on the date of the enactment of this Act and shall apply to any patent application that is pending on, or filed on or after, that date, and to any patent that is issued on or after that date.

### SEC. 15. BEST MODE REQUIREMENT.

(a) IN GENERAL.—Section 282 of title 35, United States Code, is amended in the second undesignated paragraph by striking paragraph (3) and inserting the following:

"(3) Invalidity of the patent or any claim in suit for failure to comply with—

"(A) any requirement of section 112, except that the failure to disclose the best mode shall not be a basis on which any claim of a patent may be canceled or held invalid or otherwise unenforceable; or

"(B) any requirement of section 251.".

(b) CONFORMING AMENDMENT.—Sections 119(e)(1) and 120 of title 35, United States Code, are each amended by striking "the first paragraph of section 112 of this title" and inserting "section 112(a) (other than the requirement to disclose the best mode)".

Applicability.
35 USC 119 note.

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the date of the enactment of this Act and shall apply to proceedings commenced on or after that date.

### SEC. 16. MARKING.

(a) VIRTUAL MARKING.—

(1) IN GENERAL.—Section 287(a) of title 35, United States Code, is amended by striking "or when," and inserting "or by fixing thereon the word 'patent' or the abbreviation 'pat.' together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when,".

Applicability.
35 USC 287 note.

(2) EFFECTIVE DATE.—The amendment made by this subsection shall apply to any case that is pending on, or commenced on or after, the date of the enactment of this Act.

(3) REPORT.—Not later than the date that is 3 years after the date of the enactment of this Act, the Director shall submit a report to Congress that provides—

(A) an analysis of the effectiveness of "virtual marking", as provided in the amendment made by paragraph (1) of this subsection, as an alternative to the physical marking of articles;

(B) an analysis of whether such virtual marking has limited or improved the ability of the general public to access information about patents;

(C) an analysis of the legal issues, if any, that arise from such virtual marking; and

(D) an analysis of the deficiencies, if any, of such virtual marking.

(b) FALSE MARKING.—

(1) CIVIL PENALTY.—Section 292(a) of title 35, United States, Code, is amended by adding at the end the following: "Only the United States may sue for the penalty authorized by this subsection.".

(2) CIVIL ACTION FOR DAMAGES.—Subsection (b) of section 292 of title 35, United States Code, is amended to read as follows:

"(b) A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury.".

(3) EXPIRED PATENTS.—Section 292 of title 35, United States Code, is amended by adding at the end the following:

"(c) The marking of a product, in a manner described in subsection (a), with matter relating to a patent that covered that product but has expired is not a violation of this section.".

(4) EFFECTIVE DATE.—The amendments made by this subsection shall apply to all cases, without exception, that are pending on, or commenced on or after, the date of the enactment of this Act.

*Applicability.*
*35 USC 292 note.*

### SEC. 17. ADVICE OF COUNSEL.

(a) IN GENERAL.—Chapter 29 of title 35, United States Code, is amended by adding at the end the following:

### "§ 298. Advice of counsel

"The failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent.".

(b) CONFORMING AMENDMENT.—The table of sections for chapter 29 of title 35, United States Code, is amended by adding at the end the following:

"298. Advice of counsel.".

### SEC. 18. TRANSITIONAL PROGRAM FOR COVERED BUSINESS METHOD PATENTS.

*35 USC 321 note.*

(a) TRANSITIONAL PROGRAM.—

(1) ESTABLISHMENT.—Not later than the date that is 1 year after the date of the enactment of this Act, the Director shall issue regulations establishing and implementing a transitional post-grant review proceeding for review of the validity of covered business method patents. The transitional proceeding implemented pursuant to this subsection shall be regarded as, and shall employ the standards and procedures of, a post-grant review under chapter 32 of title 35, United States Code, subject to the following:

*Deadline.*
*Regulations.*

(A) Section 321(c) of title 35, United States Code, and subsections (b), (e)(2), and (f) of section 325 of such title shall not apply to a transitional proceeding.

(B) A person may not file a petition for a transitional proceeding with respect to a covered business method patent unless the person or the person's real party in interest or privy has been sued for infringement of the patent or has been charged with infringement under that patent.

(C) A petitioner in a transitional proceeding who challenges the validity of 1 or more claims in a covered business method patent on a ground raised under section 102 or 103 of title 35, United States Code, as in effect on the day before the effective date set forth in section 3(n)(1), may support such ground only on the basis of—

(i) prior art that is described by section 102(a) of such title of such title (as in effect on the day before such effective date); or

(ii) prior art that—

(I) discloses the invention more than 1 year before the date of the application for patent in the United States; and

(II) would be described by section 102(a) of such title (as in effect on the day before the effective date set forth in section 3(n)(1)) if the disclosure had been made by another before the invention thereof by the applicant for patent.

(D) The petitioner in a transitional proceeding that results in a final written decision under section 328(a) of title 35, United States Code, with respect to a claim in a covered business method patent, or the petitioner's real party in interest, may not assert, either in a civil action arising in whole or in part under section 1338 of title 28, United States Code, or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337), that the claim is invalid on any ground that the petitioner raised during that transitional proceeding.

(E) The Director may institute a transitional proceeding only for a patent that is a covered business method patent.

(2) EFFECTIVE DATE.—The regulations issued under paragraph (1) shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any covered business method patent issued before, on, or after that effective date, except that the regulations shall not apply to a patent described in section 6(f)(2)(A) of this Act during the period in which a petition for post-grant review of that patent would satisfy the requirements of section 321(c) of title 35, United States Code.

(3) SUNSET.—

(A) IN GENERAL.—This subsection, and the regulations issued under this subsection, are repealed effective upon the expiration of the 8-year period beginning on the date that the regulations issued under to paragraph (1) take effect.

(B) APPLICABILITY.—Notwithstanding subparagraph (A), this subsection and the regulations issued under this subsection shall continue to apply, after the date of the

repeal under subparagraph (A), to any petition for a transitional proceeding that is filed before the date of such repeal.

(b) REQUEST FOR STAY.—

(1) IN GENERAL.—If a party seeks a stay of a civil action alleging infringement of a patent under section 281 of title 35, United States Code, relating to a transitional proceeding for that patent, the court shall decide whether to enter a stay based on—

(A) whether a stay, or the denial thereof, will simplify the issues in question and streamline the trial;

(B) whether discovery is complete and whether a trial date has been set;

(C) whether a stay, or the denial thereof, would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and

(D) whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court.

(2) REVIEW.—A party may take an immediate interlocutory appeal from a district court's decision under paragraph (1). The United States Court of Appeals for the Federal Circuit shall review the district court's decision to ensure consistent application of established precedent, and such review may be de novo.

(c) ATM EXEMPTION FOR VENUE PURPOSES.—In an action for infringement under section 281 of title 35, United States Code, of a covered business method patent, an automated teller machine shall not be deemed to be a regular and established place of business for purposes of section 1400(b) of title 28, United States Code.

(d) DEFINITION.—

(1) IN GENERAL.—For purposes of this section, the term "covered business method patent" means a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions.

(2) REGULATIONS.—To assist in implementing the transitional proceeding authorized by this subsection, the Director shall issue regulations for determining whether a patent is for a technological invention.

(e) RULE OF CONSTRUCTION.—Nothing in this section shall be construed as amending or interpreting categories of patent-eligible subject matter set forth under section 101 of title 35, United States Code.

**SEC. 19. JURISDICTION AND PROCEDURAL MATTERS.**

(a) STATE COURT JURISDICTION.—Section 1338(a) of title 28, United States Code, is amended by striking the second sentence and inserting the following: "No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights. For purposes of this subsection, the term 'State' includes any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.".

(b) COURT OF APPEALS FOR THE FEDERAL CIRCUIT.—Section 1295(a)(1) of title 28, United States Code, is amended to read as follows:

"(1) of an appeal from a final decision of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court of the Northern Mariana Islands, in any civil action arising under, or in any civil action in which a party has asserted a compulsory counterclaim arising under, any Act of Congress relating to patents or plant variety protection;".

(c) REMOVAL.—

(1) IN GENERAL.—Chapter 89 of title 28, United States Code, is amended by adding at the end the following new section:

## "§ 1454. Patent, plant variety protection, and copyright cases

"(a) IN GENERAL.—A civil action in which any party asserts a claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights may be removed to the district court of the United States for the district and division embracing the place where the action is pending.

"(b) SPECIAL RULES.—The removal of an action under this section shall be made in accordance with section 1446, except that if the removal is based solely on this section—

"(1) the action may be removed by any party; and

"(2) the time limitations contained in section 1446(b) may be extended at any time for cause shown.

"(c) CLARIFICATION OF JURISDICTION IN CERTAIN CASES.—The court to which a civil action is removed under this section is not precluded from hearing and determining any claim in the civil action because the State court from which the civil action is removed did not have jurisdiction over that claim.

"(d) REMAND.—If a civil action is removed solely under this section, the district court—

"(1) shall remand all claims that are neither a basis for removal under subsection (a) nor within the original or supplemental jurisdiction of the district court under any Act of Congress; and

"(2) may, under the circumstances specified in section 1367(c), remand any claims within the supplemental jurisdiction of the district court under section 1367.".

(2) CONFORMING AMENDMENT.—The table of sections for chapter 89 of title 28, United States Code, is amended by adding at the end the following new item:

"1454. Patent, plant variety protection, and copyright cases.".

(d) PROCEDURAL MATTERS IN PATENT CASES.—

(1) JOINDER OF PARTIES AND STAY OF ACTIONS.—Chapter 29 of title 35, United States Code, as amended by this Act, is further amended by adding at the end the following new section:

## "§ 299. Joinder of parties

"(a) JOINDER OF ACCUSED INFRINGERS.—With respect to any civil action arising under any Act of Congress relating to patents, other than an action or trial in which an act of infringement under section 271(e)(2) has been pled, parties that are accused infringers may be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, or counterclaim defendants only if—

"(1) any right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product or process; and

"(2) questions of fact common to all defendants or counterclaim defendants will arise in the action.

"(b) ALLEGATIONS INSUFFICIENT FOR JOINDER.—For purposes of this subsection, accused infringers may not be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, based solely on allegations that they each have infringed the patent or patents in suit.

"(c) WAIVER.—A party that is an accused infringer may waive the limitations set forth in this section with respect to that party.".

(2) CONFORMING AMENDMENT.—The table of sections for chapter 29 of title 35, United States Code, as amended by this Act, is further amended by adding at the end the following new item:

"299. Joinder of parties.".

(e) EFFECTIVE DATE.—The amendments made by this section shall apply to any civil action commenced on or after the date of the enactment of this Act.

Applicability.
28 USC 1295 note.

## SEC. 20. TECHNICAL AMENDMENTS.

(a) JOINT INVENTIONS.—Section 116 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph, by striking "When" and inserting "(a) JOINT INVENTIONS.—When";

(2) in the second undesignated paragraph, by striking "If a joint inventor" and inserting "(b) OMITTED INVENTOR.—If a joint inventor"; and

(3) in the third undesignated paragraph—

(A) by striking "Whenever" and inserting "(c) CORRECTION OF ERRORS IN APPLICATION.—Whenever"; and

(B) by striking "and such error arose without any deceptive intention on his part,".

(b) FILING OF APPLICATION IN FOREIGN COUNTRY.—Section 184 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "Except when" and inserting "(a) FILING IN FOREIGN COUNTRY.—Except when"; and

(B) by striking "and without deceptive intent";

(2) in the second undesignated paragraph, by striking "The term" and inserting "(b) APPLICATION.—The term"; and

(3) in the third undesignated paragraph, by striking "The scope" and inserting "(c) SUBSEQUENT MODIFICATIONS, AMENDMENTS, AND SUPPLEMENTS.—The scope".

(c) FILING WITHOUT A LICENSE.—Section 185 of title 35, United States Code, is amended by striking "and without deceptive intent".

(d) REISSUE OF DEFECTIVE PATENTS.—Section 251 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "Whenever" and inserting "(a) IN GENERAL.—Whenever"; and

(B) by striking "without any deceptive intention";

(2) in the second undesignated paragraph, by striking "The Director" and inserting "(b) MULTIPLE REISSUED PATENTS.—The Director";

(3) in the third undesignated paragraph, by striking "The provisions" and inserting "(c) APPLICABILITY OF THIS TITLE.—The provisions"; and

(4) in the last undesignated paragraph, by striking "No reissued patent" and inserting "(d) REISSUE PATENT ENLARGING SCOPE OF CLAIMS.—No reissued patent".

(e) EFFECT OF REISSUE.—Section 253 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph, by striking "Whenever, without any deceptive intention," and inserting "(a) IN GENERAL.—Whenever"; and

(2) in the second undesignated paragraph, by striking "In like manner" and inserting "(b) ADDITIONAL DISCLAIMER OR DEDICATION.—In the manner set forth in subsection (a),".

(f) CORRECTION OF NAMED INVENTOR.—Section 256 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "Whenever" and inserting "(a) CORRECTION.—Whenever"; and

(B) by striking "and such error arose without any deceptive intention on his part"; and

(2) in the second undesignated paragraph, by striking "The error" and inserting "(b) PATENT VALID IF ERROR CORRECTED.—The error".

(g) PRESUMPTION OF VALIDITY.—Section 282 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "A patent" and inserting "(a) IN GENERAL.—A patent"; and

(B) by striking the third sentence;

(2) in the second undesignated paragraph—

(A) by striking "The following" and inserting "(b) DEFENSES.—The following";

(B) in paragraph (1), by striking "uneforceability," and inserting "unenforceability."; and

(C) in paragraph (2), by striking "patentability," and inserting "patentability." ; and

(3) in the third undesignated paragraph—

(A) by striking "In actions involving the validity or infringement of a patent" and inserting "(c) NOTICE OF ACTIONS; ACTIONS DURING EXTENSION OF PATENT TERM.—In an action involving the validity or infringement of a patent"; and

(B) by striking "Claims Court" and inserting "Court of Federal Claims".

(h) ACTION FOR INFRINGEMENT.—Section 288 of title 35, United States Code, is amended by striking ", without deceptive intention,".

(i) REVISER'S NOTES.—

(1) Section 3(e)(2) of title 35, United States Code, is amended by striking "this Act," and inserting "that Act,".

(2) Section 202 of title 35, United States Code, is amended—

(A) in subsection (b)(3), by striking "the section 203(b)" and inserting "section 203(b)"; and

(B) in subsection (c)(7)(D), by striking "except where it proves" and all that follows through "small business firms; and" and inserting: "except where it is determined to be infeasible following a reasonable inquiry, a preference in the licensing of subject inventions shall be given to small business firms; and".

(3) Section 209(d)(1) of title 35, United States Code, is amended by striking "nontransferrable" and inserting "nontransferable".

(4) Section 287(c)(2)(G) of title 35, United States Code, is amended by striking "any state" and inserting "any State".

(5) Section 371(b) of title 35, United States Code, is amended by striking "of the treaty" and inserting "of the treaty.".

(j) UNNECESSARY REFERENCES.—

(1) IN GENERAL.—Title 35, United States Code, is amended by striking "of this title" each place that term appears.

(2) EXCEPTION.—The amendment made by paragraph (1) shall not apply to the use of such term in the following sections of title 35, United States Code:

    (A) Section 1(c).

    (B) Section 101.

    (C) Subsections (a) and (b) of section 105.

    (D) The first instance of the use of such term in section 111(b)(8).

    (E) Section 161.

    (F) Section 164.

    (G) Section 171.

    (H) Section 251(c), as so designated by this section.

    (I) Section 261.

    (J) Subsections (g) and (h) of section 271.

    (K) Section 287(b)(1).

    (L) Section 289.

    (M) The first instance of the use of such term in section 375(a).

(k) ADDITIONAL TECHNICAL AMENDMENTS.—Sections 155 and 155A of title 35, United States Code, and the items relating to those sections in the table of sections for chapter 14 of such title, are repealed.

(l) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to proceedings commenced on or after that effective date.

*35 USC 2, 12, 32, 41, 103, 104, 111, 119–123, 132, 135, 143, 145, 146, 154, 157, 162, 172, 182–186, 207, 210, 257, 267.*

*Applicability. 35 USC 2 note.*

### SEC. 21. TRAVEL EXPENSES AND PAYMENT OF ADMINISTRATIVE JUDGES.

(a) AUTHORITY TO COVER CERTAIN TRAVEL RELATED EXPENSES.—Section 2(b)(11) of title 35, United States Code, is amended by inserting ", and the Office is authorized to expend funds to cover the subsistence expenses and travel-related expenses, including per diem, lodging costs, and transportation costs, of persons attending such programs who are not Federal employees" after "world".

(b) PAYMENT OF ADMINISTRATIVE JUDGES.—Section 3(b) of title 35, United States Code, is amended by adding at the end the following:

"(6) ADMINISTRATIVE PATENT JUDGES AND ADMINISTRATIVE TRADEMARK JUDGES.—The Director may fix the rate of basic pay for the administrative patent judges appointed pursuant to section 6 and the administrative trademark judges appointed pursuant to section 17 of the Trademark Act of 1946 (15 U.S.C. 1067) at not greater than the rate of basic pay payable for level III of the Executive Schedule under section 5314 of title 5. The payment of a rate of basic pay under this paragraph shall not be subject to the pay limitation under section 5306(e) or 5373 of title 5.".

**SEC. 22. PATENT AND TRADEMARK OFFICE FUNDING.**

(a) IN GENERAL.—Section 42(c) of title 35, United States Code, is amended—

(1) by striking "(c)" and inserting "(c)(1)";

(2) in the first sentence, by striking "shall be available" and inserting "shall, subject to paragraph (3), be available";

(3) by striking the second sentence; and

(4) by adding at the end the following:

"(2) There is established in the Treasury a Patent and Trademark Fee Reserve Fund. If fee collections by the Patent and Trademark Office for a fiscal year exceed the amount appropriated to the Office for that fiscal year, fees collected in excess of the appropriated amount shall be deposited in the Patent and Trademark Fee Reserve Fund. To the extent and in the amounts provided in appropriations Acts, amounts in the Fund shall be made available until expended only for obligation and expenditure by the Office in accordance with paragraph (3).

"(3)(A) Any fees that are collected under sections 41, 42, and 376, and any surcharges on such fees, may only be used for expenses of the Office relating to the processing of patent applications and for other activities, services, and materials relating to patents and to cover a share of the administrative costs of the Office relating to patents.

"(B) Any fees that are collected under section 31 of the Trademark Act of 1946, and any surcharges on such fees, may only be used for expenses of the Office relating to the processing of trademark registrations and for other activities, services, and materials relating to trademarks and to cover a share of the administrative costs of the Office relating to trademarks.".

35 USC 142 note.

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on October 1, 2011.

35 USC 1 note.

**SEC. 23. SATELLITE OFFICES.**

Deadline.

(a) ESTABLISHMENT.—Subject to available resources, the Director shall, by not later than the date that is 3 years after the date of the enactment of this Act, establish 3 or more satellite offices in the United States to carry out the responsibilities of the Office.

(b) PURPOSES.—The purposes of the satellite offices established under subsection (a) are to—

(1) increase outreach activities to better connect patent filers and innovators with the Office;

(2) enhance patent examiner retention;

(3) improve recruitment of patent examiners;

(4) decrease the number of patent applications waiting for examination; and

(5) improve the quality of patent examination.

(c) REQUIRED CONSIDERATIONS.—

(1) IN GENERAL.—In selecting the location of each satellite office to be established under subsection (a), the Director—

(A) shall ensure geographic diversity among the offices, including by ensuring that such offices are established in different States and regions throughout the Nation;

(B) may rely upon any previous evaluations by the Office of potential locales for satellite offices, including any evaluations prepared as part of the Office's Nationwide Workforce Program that resulted in the 2010 selection of Detroit, Michigan, as the first satellite office of the Office;

(C) shall evaluate and consider the extent to which the purposes of satellite offices listed under subsection (b) will be achieved;

(D) shall consider the availability of scientific and technically knowledgeable personnel in the region from which to draw new patent examiners at minimal recruitment cost; and

(E) shall consider the economic impact to the region.

(2) OPEN SELECTION PROCESS.—Nothing in paragraph (1) shall constrain the Office to only consider its evaluations in selecting the Detroit, Michigan, satellite office.

(d) REPORT TO CONGRESS.—Not later than the end of the third fiscal year that begins after the date of the enactment of this Act, the Director shall submit a report to Congress on—

(1) the rationale of the Director in selecting the location of any satellite office required under subsection (a), including an explanation of how the selected location will achieve the purposes of satellite offices listed under subsection (b) and how the required considerations listed under subsection (c) were met;

(2) the progress of the Director in establishing all such satellite offices; and

(3) whether the operation of existing satellite offices is achieving the purposes under subsection (b).

### SEC. 24. DESIGNATION OF DETROIT SATELLITE OFFICE.

35 USC 1 note.

(a) DESIGNATION.—The satellite office of the United States Patent and Trademark Office to be located in Detroit, Michigan, shall be known and designated as the "Elijah J. McCoy United States Patent and Trademark Office".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the satellite office of the United States Patent and Trademark Office to be located in Detroit, Michigan, referred to in subsection (a) shall be deemed to be a reference to the "Elijah J. McCoy United States Patent and Trademark Office".

### SEC. 25. PRIORITY EXAMINATION FOR IMPORTANT TECHNOLOGIES.

Section 2(b)(2) of title 35, United States Code, is amended—

(1) in subparagraph (E), by striking "and" after the semicolon;

(2) in subparagraph (F), by inserting "and" after the semicolon; and

(3) by adding at the end the following:

"(G) may, subject to any conditions prescribed by the Director and at the request of the patent applicant, provide for prioritization of examination of applications for products, processes, or technologies that are important to the national economy or national competitiveness without recovering the aggregate extra cost of providing such prioritization, notwithstanding section 41 or any other provision of law;".

## SEC. 26. STUDY ON IMPLEMENTATION.

(a) PTO STUDY.—The Director shall conduct a study on the manner in which this Act and the amendments made by this Act are being implemented by the Office, and on such other aspects of the patent policies and practices of the Federal Government with respect to patent rights, innovation in the United States, competitiveness of United States markets, access by small businesses to capital for investment, and such other issues, as the Director considers appropriate.

(b) REPORT TO CONGRESS.—The Director shall, not later than the date that is 4 years after the date of the enactment of this Act, submit to the Committees on the Judiciary of the House of Representatives and the Senate a report on the results of the study conducted under subsection (a), including recommendations for any changes to laws and regulations that the Director considers appropriate.

## SEC. 27. STUDY ON GENETIC TESTING.

(a) IN GENERAL.—The Director shall conduct a study on effective ways to provide independent, confirming genetic diagnostic test activity where gene patents and exclusive licensing for primary genetic diagnostic tests exist.

(b) ITEMS INCLUDED IN STUDY.—The study shall include an examination of at least the following:

(1) The impact that the current lack of independent second opinion testing has had on the ability to provide the highest level of medical care to patients and recipients of genetic diagnostic testing, and on inhibiting innovation to existing testing and diagnoses.

(2) The effect that providing independent second opinion genetic diagnostic testing would have on the existing patent and license holders of an exclusive genetic test.

(3) The impact that current exclusive licensing and patents on genetic testing activity has on the practice of medicine, including but not limited to: the interpretation of testing results and performance of testing procedures.

(4) The role that cost and insurance coverage have on access to and provision of genetic diagnostic tests.

(c) CONFIRMING GENETIC DIAGNOSTIC TEST ACTIVITY DEFINED.—For purposes of this section, the term "confirming genetic diagnostic test activity" means the performance of a genetic diagnostic test, by a genetic diagnostic test provider, on an individual solely for the purpose of providing the individual with an independent confirmation of results obtained from another test provider's prior performance of the test on the individual.

(d) REPORT.—Not later than 9 months after the date of enactment of this Act, the Director shall report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary

of the House of Representatives on the findings of the study and provide recommendations for establishing the availability of such independent confirming genetic diagnostic test activity.

### SEC. 28. PATENT OMBUDSMAN PROGRAM FOR SMALL BUSINESS CONCERNS.

35 USC 2 note.

Using available resources, the Director shall establish and maintain in the Office a Patent Ombudsman Program. The duties of the Program's staff shall include providing support and services relating to patent filings to small business concerns and independent inventors.

### SEC. 29. ESTABLISHMENT OF METHODS FOR STUDYING THE DIVERSITY OF APPLICANTS.

Deadline.

The Director shall, not later than the end of the 6-month period beginning on the date of the enactment of this Act, establish methods for studying the diversity of patent applicants, including those applicants who are minorities, women, or veterans. The Director shall not use the results of such study to provide any preferential treatment to patent applicants.

### SEC. 30. SENSE OF CONGRESS.

It is the sense of Congress that the patent system should promote industries to continue to develop new technologies that spur growth and create jobs across the country which includes protecting the rights of small businesses and inventors from predatory behavior that could result in the cutting off of innovation.

### SEC. 31. USPTO STUDY ON INTERNATIONAL PATENT PROTECTIONS FOR SMALL BUSINESSES.

(a) STUDY REQUIRED.—The Director, in consultation with the Secretary of Commerce and the Administrator of the Small Business Administration, shall, using the existing resources of the Office, carry out a study—

(1) to determine how the Office, in coordination with other Federal departments and agencies, can best help small businesses with international patent protection; and

(2) whether, in order to help small businesses pay for the costs of filing, maintaining, and enforcing international patent applications, there should be established either—

(A) a revolving fund loan program to make loans to small businesses to defray the costs of such applications, maintenance, and enforcement and related technical assistance; or

(B) a grant program to defray the costs of such applications, maintenance, and enforcement and related technical assistance.

(b) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Director shall issue a report to the Congress containing—

(1) all findings and determinations made in carrying out the study required under subsection (a);

(2) a statement of whether the determination was made that—

(A) a revolving fund loan program described under subsection (a)(2)(A) should be established;

(B) a grant program described under subsection (a)(2)(B) should be established; or

125 STAT. 340          PUBLIC LAW 112–29—SEPT. 16, 2011

(C) neither such program should be established; and
(3) any legislative recommendations the Director may have developed in carrying out such study.

35 USC 2 note.

**SEC. 32. PRO BONO PROGRAM.**

(a) IN GENERAL.—The Director shall work with and support intellectual property law associations across the country in the establishment of pro bono programs designed to assist financially under-resourced independent inventors and small businesses.

(b) EFFECTIVE DATE.—This section shall take effect on the date of the enactment of this Act.

35 USC 101 note.

**SEC. 33. LIMITATION ON ISSUANCE OF PATENTS.**

(a) LIMITATION.—Notwithstanding any other provision of law, no patent may issue on a claim directed to or encompassing a human organism.

(b) EFFECTIVE DATE.—

Applicability.

(1) IN GENERAL.—Subsection (a) shall apply to any application for patent that is pending on, or filed on or after, the date of the enactment of this Act.

(2) PRIOR APPLICATIONS.—Subsection (a) shall not affect the validity of any patent issued on an application to which paragraph (1) does not apply.

**SEC. 34. STUDY OF PATENT LITIGATION.**

(a) GAO STUDY.—The Comptroller General of the United States shall conduct a study of the consequences of litigation by non-practicing entities, or by patent assertion entities, related to patent claims made under title 35, United States Code, and regulations authorized by that title.

(b) CONTENTS OF STUDY.—The study conducted under this section shall include the following:

(1) The annual volume of litigation described in subsection (a) over the 20-year period ending on the date of the enactment of this Act.

(2) The volume of cases comprising such litigation that are found to be without merit after judicial review.

(3) The impacts of such litigation on the time required to resolve patent claims.

(4) The estimated costs, including the estimated cost of defense, associated with such litigation for patent holders, patent licensors, patent licensees, and inventors, and for users of alternate or competing innovations.

(5) The economic impact of such litigation on the economy of the United States, including the impact on inventors, job creation, employers, employees, and consumers.

(6) The benefit to commerce, if any, supplied by non-practicing entities or patent assertion entities that prosecute such litigation.

(c) REPORT TO CONGRESS.—The Comptroller General shall, not later than the date that is 1 year after the date of the enactment of this Act, submit to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate a report on the results of the study required under this section, including recommendations for any changes to laws and regulations that will minimize any negative impact of patent litigation that was the subject of such study.

PUBLIC LAW 112–29—SEPT. 16, 2011          125 STAT. 341

**SEC. 35. EFFECTIVE DATE.**

Except as otherwise provided in this Act, the provisions of this Act shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued on or after that effective date.

Applicability.
35 USC 1 note.

**SEC. 36. BUDGETARY EFFECTS.**

The budgetary effects of this Act, for the purpose of complying with the Statutory Pay-As-You-Go Act of 2010, shall be determined by reference to the latest statement titled "Budgetary Effects of PAYGO Legislation" for this Act, submitted for printing in the Congressional Record by the Chairman of the House Budget Committee, provided that such statement has been submitted prior to the vote on passage.

**SEC. 37. CALCULATION OF 60-DAY PERIOD FOR APPLICATION OF PATENT TERM EXTENSION.**

(a) IN GENERAL.—Section 156(d)(1) of title 35, United States Code, is amended by adding at the end the following flush sentence: "For purposes of determining the date on which a product receives permission under the second sentence of this paragraph, if such permission is transmitted after 4:30 P.M., Eastern Time, on a business day, or is transmitted on a day that is not a business day, the product shall be deemed to receive such permission on the next business day. For purposes of the preceding sentence, the term 'business day' means any Monday, Tuesday, Wednesday, Thursday, or Friday, excluding any legal holiday under section 6103 of title 5.".

(b) APPLICABILITY.—The amendment made by subsection (a) shall apply to any application for extension of a patent term under section 156 of title 35, United States Code, that is pending on, that is filed after, or as to which a decision regarding the application is subject to judicial review on, the date of the enactment of this Act.

35 USC 156 note.

Approved September 16, 2011.

---

LEGISLATIVE HISTORY—H.R. 1249:

HOUSE REPORTS: No. 112–98, Pt. 1 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 157 (2011):
    June 22, 23, considered and passed House.
    Sept. 7, 8, considered and passed Senate.
DAILY COMPILATION OF PRESIDENTIAL DOCUMENTS (2011):
    Sept. 16, Presidential remarks.

○

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2016, I filed the foregoing Corrected Brief for Appellants Richard Storer, Gilles Gosselin, Jean-Pierre Sommadossi, and Paola LaColla with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered users.

Dated:  February 5, 2016                              */s/ Jennifer L. Swize*
                                                      Jennifer L. Swize

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this corrected brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,938 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  February 5, 2016                    */s/ Jennifer L. Swize*
                                            Jennifer L. Swize